**Nos. 2013-1011, -1029, -1376**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PROMEGA CORPORATION,

*Plaintiff-Cross Appellant*,

and

MAX-PLANCK-GESELLSCHAFT ZUR FORDERUNG DER WISSENSCHAFTEN E.V.,

*Plaintiff,*

v.

LIFE TECHNOLOGIES CORPORATION,
INVITROGEN IP HOLDINGS, INC.,
and APPLIED BIOSYSTEMS, LLC,

*Defendants-Appellants*.

Appeals from the United States District Court for the Western District of Wisconsin in case no. 10-CV-00281, Senior Judge Barbara B. Crabb.

## NON-CONFIDENTIAL OPENING BRIEF OF PLAINTIFF-CROSS APPELLANT PROMEGA CORPORATION

MARK C. FLEMING
PROSHANTO MUKHERJI
ERIC F. FLETCHER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

SETH P. WAXMAN
THOMAS G. SAUNDERS
DINA B. MISHRA
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

August 26, 2013

# CERTIFICATE OF INTEREST

Counsel for Promega Corporation certifies the following:

1.   The full name of every party or amicus represented by us is:

   Promega Corporation

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

   Promega Corporation

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by us are:

   None

4.   The names of all law firms and the partners or associates who appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this Court are:

   WILMER CUTLER PICKERING HALE AND DORR LLP:  Seth P. Waxman; Mark C. Fleming; Thomas G. Saunders; Dina B. Mishra; Proshanto Mukherji; Eric F. Fletcher

   LAW OFFICES OF SUSAN R. PODOLSKY: Susan R. Podolsky

   MEDLEN & CARROLL LLP: Peter G. Carroll

   TROUPIS LAW OFFICE, LLC: James R. Troupis; Sarah E. Troupis; Brandon M. Lewis; Stewart W. Karge

   MICHAEL BEST & FRIEDRICH, LLP: Ian A. J. Pitz; Miriam S. Fleming; Nathan L. Moenck; S. Edward Sarskas

Dated:  August 26, 2013         */s/ Seth P. Waxman*
                                Seth P. Waxman

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................................. i

TABLE OF AUTHORITIES ....................................................................................v

STATEMENT OF RELATED CASES ....................................................................1

STATEMENT OF JURISDICTION........................................................................1

STATEMENT OF ISSUES .....................................................................................2

INTRODUCTION ..................................................................................................3

STATEMENT OF THE CASE ...............................................................................6

STATEMENT OF FACTS ......................................................................................7

    A.    The Parties And Technology..........................................................7

    B.    The 2006 Cross-License ................................................................9

    C.    Pre-Trial Proceedings .................................................................10

    D.    Jury Trial, Verdict, And Judgment.............................................13

    E.    Post-Verdict Proceedings ...........................................................19

SUMMARY OF ARGUMENT .............................................................................22

STANDARD OF REVIEW ...................................................................................26

ARGUMENT ........................................................................................................27

I.    REGARDLESS OF HOW THIS COURT INTERPRETS SECTION 271(F)(1), THE DISTRICT COURT ERRED IN VACATING THE JUDGMENT OF INFRINGEMENT ........................................................................................27

    A.    The District Court's Original Judgment Of Infringement Should Not Have Been Disturbed ................................................27

    B.    Promega Is At Least Entitled To A New Trial On Infringement........31

C.    Promega Is Entitled To A New Trial On Damages, Regardless Of How This Court Interprets Section 271(f)(1)..................................33

    1.    Promega's new trial request was timely .....................................33

    2.    Even if the jury's verdict is not reinstated, Promega is entitled to a remittitur or new trial on damages.......................36

II.   THE DISTRICT COURT COMMITTED LEGAL ERROR IN INTERPRETING 35 U.S.C. § 271(F)(1).........................................................................................41

    A.    An Entity That Sends Components Abroad For Combination Does Not Escape Liability Simply Because It Performs The Combination Itself Or Through A Related Party .................................41

    B.    Life Supplied "A Substantial Portion Of The Components" For Assembly Abroad ...................................................................................48

        1.    A single, important component can be "a substantial portion of the components of a patented invention"................48

        2.    At a minimum, a remittitur or new damages trial is required because Promega quantified sales of three kits for which Life conceded U.S. supply of multiple components ....................................................................................53

III.  THE DISTRICT COURT CORRECTLY FOUND PROMEGA'S CLAIMS ENABLED ...................................................................................................54

    A.    Promega's Recited Claim Elements Are Undisputedly Enabled, And Unrecited Additional Matter Need Not Be Enabled ...................54

    B.    Life's Remaining Arguments Fail.........................................................59

IV.  LIFE HAS NOT SHOWN THAT PROMEGA'S ASSERTED CLAIMS ARE OBVIOUS .....................................................................................................61

    A.    Life's Legal Argument Is Contrary To Statute And Precedent ..........61

    B.    Life Identifies No Material Infirmity In The District Court's Nonobviousness Decision ...................................................................63

iii

V.  THE DISTRICT COURT CORRECTLY RULED THAT THE LICENSE DOES
    NOT AUTHORIZE RESEARCH, EDUCATION, AND TRAINING
    UNCONNECTED TO LAW ENFORCEMENT AGENCIES ........................................64

    A.  The License's Plain Language Unambiguously Forecloses
        Life's Reading ......................................................................................64

    B.  Life Already Received All The Relief To Which It Was Entitled......67

        1.  The district court already ruled that required forensic
            training by law enforcement personnel is licensed..................67

        2.  Life provided no evidence that its kits are required for
            forensic education ....................................................................68

        3.  Life's attempt to add ambiguously-defined "forensic
            research" into the license should be rejected...........................69

    C.  The District Court Properly Interpreted The License As A
        Matter Of Law ......................................................................................70

CONCLUSION .........................................................................................................71

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on pages 14, 15, 16, 17, 37, 53, and 54 contains or would reveal confidential sales information that was designated confidential by Life.  The material omitted on pages 9 and 10 contains the terms of a confidential license agreement.

# TABLE OF AUTHORITIES

*Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301
(Fed. Cir. 2012) ......................................................................... 42, 43

*Alloc, Inc. v. ITC*, 342 F.3d 1361 (Fed. Cir. 2003) ................................. 55

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir.
2003) ............................................................................................ 57

*Application of Hogan*, 559 F.2d 595 (C.C.P.A. 1977) ............................ 60

*Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348
(Fed. Cir. 2001) ............................................................................ 39

*Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk A/S*,
132 S. Ct. 1670 (2012) ................................................................. 46

*Celanese Corp. of America v. Vandalia Warehouse Corp.*, 424 F.2d
1176 (7th Cir. 1970) .................................................................... 40

*Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573 (Fed. Cir.
1983) ............................................................................................ 66

*Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*, 707 F.3d 1330
(Fed. Cir. 2013) ............................................................................ 56

*CFMT, Inc. v. Yieldup International Corp.*, 349 F.3d 1333 (Fed. Cir.
2003) ............................................................................................ 56

*City of Hope National Medical Center v. Genentech, Inc.*, 181 P.3d
142 (Cal. 2008) ............................................................................ 70

*Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330 (Fed. Cir. 2011) ..... 31

*Cuno Engineering Corp. v. Automatic Devices Corp.*, 314 U.S. 84
(1941) .......................................................................................... 62

*Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972) ............. 44

*DeGeorge v. Bernier*, 768 F.2d 1318 (Fed. Cir. 1985) ............................ 56

*e360 Insight v. Spamhaus Project*, 500 F.3d 594 (7th Cir. 2007) ........... 26

v

*Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305 (Fed. Cir. 2012) .................................................................................56, 60

*Engel Industries, Inc. v. Lockformer Co.*, 946 F.2d 1528 (Fed. Cir. 1991) ...........................................................................................59

*Eolas Technologies, Inc. v. Microsoft Corp.*, 399 F.3d 1325 (Fed. Cir. 2005) ...........................................................................................44

*Erwin v. County of Manitowoc*, 872 F.2d 1292 (7th Cir. 1989) ..............................35

*Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010) ...........................................................................................26

*Firestone Tire & Rubber Co. v. Pearson*, 769 F.2d 1471 (10th Cir. 1985) ...........................................................................................37

*First National Bank of Aberdeen v. County of Chehalis*, 166 U.S. 440 (1897) ...........................................................................................49

*Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495 (Fed. Cir. 1997).....................55, 58

*Golden Bridge Technology, Inc. v. Nokia, Inc.*, 527 F.3d 1318 (Fed. Cir. 2008) ....................................................................................68

*Goodrich Corp. v. Town of Middlebury*, 311 F.3d 154 (2d Cir. 2002) ..................66

*Goulding v. United States*, 957 F.2d 1420 (7th Cir. 1992).....................................49

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) .......................................................62

*Harper v. Albert*, 400 F.3d 1052 (7th Cir. 2005).....................................................26

*Hetzel v. Prince William County*, 523 U.S. 208 (1998)..........................................38

*Hollmer v. Harari*, 681 F.3d 1351 (Fed. Cir. 2012) ...............................................44

*Hormone Research Foundation, Inc. v. Genentech, Inc.*, 904 F.2d 1558 (Fed. Cir. 1990)....................................................................60

*Huff v. Sheahan*, 493 F.3d 893 (7th Cir. 2007)........................................................26

*In re Cyclobenzaprine*, 676 F.3d 1063 (Fed. Cir. 2012)..........................................64

vi

*In re Fay*, 347 F.2d 597 (C.C.P.A. 1965) ............................................................. 62

*In re Innovative Construction Systems, Inc.*, 793 F.2d 875 (7th Cir. 1986) ....................................................................................................... 37

*In re Wands*, 858 F.2d 731 (Fed. Cir. 1988) ....................................................... 57

*Jackson State Bank v. King*, 992 F.2d 256 (10th Cir. 1993) ................................. 40

*Jacobs Vehicle Systems, Inc. v. Pacific Diesel Brake Co.*, 424 F. Supp. 2d 388 (D. Conn. 2006) ........................................................................... 44

*Johns Hopkins University v. CellPro, Inc.*, 152 F.3d 1342 (Fed. Cir. 1998) ....................................................................................................... 57

*Kennon v. Gilmer*, 131 U.S. 22 (1889) ................................................................ 38

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342 (Fed. Cir. 2012) ................................................................................................. 30

*Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056 (Fed. Cir. 1983) ................... 38

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012) ............................................................................................... 36

*Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995) ................... 44

*Litton Sys. v. Honeywell, Inc.*, 87 F.3d 1559 (Fed. Cir. 1996) ............................. 36

*Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ....................................................................................................... 28

*MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*, 687 F.3d 1377 (Fed. Cir. 2012) ..................................................................... 57, 58

*Mathis v. Spears*, 857 F.2d 749 (Fed. Cir. 1988) ................................................. 66

*MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081 (7th Cir. 1983) ........................................................................ 37

*Medical Operations Management, Inc. v. National Health Labs., Inc.*, 222 Cal. Rptr. 455 (Ct. App. 1986) ........................................................ 27, 70

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007) ............................... 46, 47, 52

*Minks v. Polaris Industries, Inc.*, 546 F.3d 1364 (Fed. Cir. 2008) .......................... 38

*Moore U.S.A. Inc. v. Standard Register Co.*, 144 F. Supp. 2d 188
    (W.D.N.Y. 2001) .................................................................... 40, 52

*Neely v. Martin K. Eby Construction Co.*, 386 U.S. 317 (1967) ...................... 34, 35

*Network Publications, Inc. v. Ellis Graphics Corp.*, 959 F.2d 212
    (11th Cir. 1992) ...................................................................... 37

*Northpoint Technology, Ltd. v. MDS America, Inc.*, 413 F.3d 1301
    (Fed. Cir. 2005) ...................................................................... 31

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005) ................ 28

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565
    (Fed. Cir. 1986) ...................................................................... 44

*Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680 (2012) ................ 52

*Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281 (1st Cir.
    1993) .................................................................................... 32

*Phillips v. Duro-Last Roofing, Inc.*, 973 F.2d 869 (10th Cir. 1992) ...................... 39

*Pincus v. Pabst Brewing Co.*, 893 F.2d 1544 (7th Cir. 1990) ................................ 36

*Promega Corp. v. Life Technologies Corp.*, 674 F.3d 1352 (Fed. Cir.
    2012) ..................................................................................... 1

*Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.*, 438 F.3d 1123
    (Fed. Cir. 2006) ...................................................................... 62

*Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446 (Fed. Cir.
    1984) .................................................................................... 30

*Setco Enterprises v. Robbins*, 19 F.3d 1278 (8th Cir. 1994) ................................ 48

*Setser v. United States*, 132 S. Ct. 1463 (2012) ................................................ 50

*Shore v. Dandurand*, 875 F.2d 656 (7th Cir. 1989) ............................................ 26

*Smith v. Washington Sheraton Corp.*, 135 F.3d 779 (D.C. Cir. 1998) .............. 33, 40

*SRAM Corp. v. AD-II Engineering, Inc.*, 465 F.3d 1351 (Fed. Cir. 2006) .................................................................................................61

*SRI International v. Matsushita Electric Corp. of America*, 775 F.2d 1107 (Fed. Cir. 1985).............................................................................59

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931)...................................................................................................39

*Streck, Inc. v. Research & Diagnostic Systems, Inc.*, 665 F.3d 1269 (Fed. Cir. 2012)...............................................................................56

*T.D. Williamson, Inc. v. Laymon*, 723 F. Supp. 587 (N.D. Okla. 1989), *aff'd*, 923 F.2d 871 (Fed. Cir. 1990).......................................................42, 45

*Trading Technologies International v. eSpeed, Inc.*, 595 F.3d 1340 (Fed. Cir. 2010)...............................................................................26, 60

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296 (Fed. Cir. 2010)....................................................56

*Transunion Intelligence LLC v. Search America, Inc.*, No. 11-cv-1075, 2013 WL 656616 (D. Minn. Feb. 22, 2013).......................................43

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) .............36, 40

*United States v. Gonzalez*, 93 F.3d 311 (7th Cir. 1996) ..........................................31

*United States v. Yerena-Magana*, 478 F.3d 683 (5th Cir. 2007) ............................66

*Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012) ...................................................................................................34

*Wyeth v. Abbott Laboratories*, 720 F.3d 1380 (Fed. Cir. 2013) ..............................58

*Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563 (Fed. Cir. 1996) ....................................59

## STATUTES AND RULES

1 U.S.C. § 1 ......................................................................................................50, 52

28 U.S.C.
§ 1295(a) ....................................................................................1
§ 1331 ........................................................................................1
§ 1338(a) ....................................................................................1

35 U.S.C.
§ 103 ........................................................................................25
§ 103 Revision Notes and Legislative Reports, 1952 Notes ........62
§ 112(a) ..............................................................................25, 55
§ 271(a) ..............................................................13, 19, 28, 31, 47
§ 271(b) ..............................................................................42, 47
§ 271(c) ....................................................................................51
§ 271(d) ....................................................................................41
§ 271(f) ....................................................................................28
§ 271(f)(1) .......................................................................*passim*
§ 271(f)(2) ..........................................................................51, 52
§ 271(i) ....................................................................................41
§ 284 ................................................................................23, 38
§ 285 ........................................................................................66

Cal. Civ. Code § 1638 ..............................................................65

Fed. R. Civ. P.
Rule 50(d) ........................................................4, 21, 23, 33, 34
Rule 50 Advisory Committee's Note (1963) ........................34, 35
Rule 59 ..............................................................................31, 33

## LEGISLATIVE MATERIALS

S. Rep. No. 98-663 (1984) ........................................................45

130 Cong. Rec. H10525 (daily ed. Oct. 1, 1984) ......................45

Section-By-Section Analysis:  Patent Law Amendments of 1984,
1984 U.S.C.C.A.N. 5827 ......................................................45, 51

## OTHER AUTHORITIES

ABA Standards for Approval of Law Schools 2012-2013,
Standard 502 ........................................................................66

*American Heritage College Dictionary* (3d ed. 1997) ......................42, 48

*Black's Law Dictionary* (9th ed. 2009)....................................................................65

Fed. Civ. Jury Instr. 7th Cir. § 11.2.10 (2010).......................................................28

9 *Moore's Federal Practice* (3d ed. 2013) .............................................................40

*Oxford English Dictionary* (2d ed. 1998) .........................................................42, 48

*Webster's Third New International Dictionary* (2002) ...........................................48

9B Wright, Charles Alan, et al., *Federal Practice and Procedure*
(3d ed. 2012) ............................................................................................34, 40

## STATEMENT OF RELATED CASES

This Court previously affirmed a district court order compelling arbitration between the parties regarding one of the patents-in-suit (U.S. Patent No. RE37,984). *Promega Corp. v. Life Techs. Corp.*, No. 2011-1263, 674 F.3d 1352 (Fed. Cir. 2012) (Dyk, J., joined by Rader, C.J.; Newman, J., dissenting). Promega and Applied Biosystems have also filed appeals in *Promega Corp. v. Applied Biosystems LLC*, No. 1:13-cv-02333 (N.D. Ill.). Those appeals have been docketed in this Court as Nos. 2013-1454 and 2013-1484. Counsel for Promega is unaware of any other case pending in this or any other court that will directly affect or be directly affected by this Court's decision in this case.

## STATEMENT OF JURISDICTION

The district court had original jurisdiction under 28 U.S.C. §§ 1331, 1338(a). The court entered judgment on the jury verdict in Promega's favor on February 23, 2012 (A9242-9243), but after Defendants-Appellants (collectively "Life") moved for JMOL, the court entered an amended judgment against Promega on September 18, 2012 (A70-71). Promega timely appealed on October 16, 2012 (No. 2013-1029). The district court denied Promega's timely Rule 59 and 60 motions on April 22, 2013, and Promega timely amended its notice of appeal on April 26, 2013 (No. 2013-1376). This Court has jurisdiction under 28 U.S.C. § 1295(a).

1

# STATEMENT OF ISSUES

**Promega's Cross-Appeal**

1.     a.     Did the district court err when, in ruling on Life's motion for JMOL on *damages*, it vacated its judgment of *infringement* in Promega's favor and dismissed Promega's post-trial injunction, exceptional case, and enhanced damages motions as moot, notwithstanding the court's order granting summary judgment of direct infringement and the jury's implicit finding of infringement?

       b.     Did the district court err by vacating the jury's verdict of willful infringement and $52 million damages award and by denying Promega, at a minimum, a new trial on infringement and damages?

2.     a.     Did the district court err by holding that a company that supplies all or a substantial portion of the components of a patented invention for assembly overseas by *itself or its subsidiaries, divisions, or employees* can never be liable under 35 U.S.C. § 271(f)(1)?

       b.     Did the district court err by holding that one important component can never constitute "a substantial portion of the components" of a patented invention under 35 U.S.C. § 271(f)(1)?

**Life's Appeal**

3.     Did the district court correctly hold that the asserted claims of the Promega patents, which contain open claim language ("comprising"), are enabled

because the specification enables all *recited* elements in the claims and because Promega was not required to enable *unrecited* elements that an infringer might add beyond the patented invention?

4.     Did the district court correctly grant summary judgment of nonobviousness?

5.     Did the district court correctly conclude that the 2006 cross-license's coverage of "use in, or in preparation for, legal proceedings" does not extend beyond law enforcement uses to include undergraduate education in forensics and "every research project going on in the world that had anything to do with genetics" (A69)?

## INTRODUCTION

The district court granted Promega summary judgment of direct infringement, presided over a trial at which the jury found willful infringement and awarded $52 million in damages, and entered judgment on that verdict. But the court then changed its mind on key issues, retroactively altered the rules of the game, and inexplicably vacated the judgment of *infringement*, despite an overwhelming record to the contrary. This Court should restore the judgment of infringement and damages or, at the very least, direct a new trial on those issues.

The district court originally granted summary judgment of direct infringement based on an undisputed record of Life's infringing U.S. sales. A688-

689; A694-702; A1288-1298; A1307-1309; A1443-1459; A1541-1544.  At trial,

Life conceded infringement (A5127:14-19) and admitted that the only questions

before the jury were willfulness and damages (A5112:2-6).  The district court also

noted that "the infringement question has been answered" (A6310:20-25) and

instructed the jury that the court had "found previously that all the STR kits that

defendants sold infringed plaintiff's patents" (A2287).  The jury implicitly found

infringement as well through its willfulness and damages verdicts, which rested on

overwhelming evidence of infringing sales.  A7003-7028; A7031; A7049-7179;

A7362-7473; A7632-7744; A7906-8002; *see also infra* pp. 14-18.  And even as it

sought JMOL on damages, Life continued to concede infringing U.S. sales: "[I]t is

undisputed that some portion of the stipulated sales figure represents sales of STR

kits in the United States.  A number of witnesses testified about sales to particular

U.S. customers and within certain U.S. regions."  A2313.

Notwithstanding this background, the court not only ruled on JMOL that

Promega was entitled to *zero damages*, but also vacated the judgment of

*infringement* and dismissed Promega's motions for an injunction and exceptional

case finding as moot.  The court then compounded its error by treating Promega's

alternative request for a new trial as untimely, even though Federal Rule of Civil

Procedure 50(d) and other authority expressly permit a verdict winner like

Promega to bring its new trial arguments *after* JMOL is entered against it.

The district court also reversed itself on the availability of damages under 35 U.S.C. § 271(f)(1), adopting two *per se* legal rules that conflict with the statute. First, despite admitting that it made "little sense," the court held that a party supplying components from the United States for combination abroad can evade liability by performing the overseas combination itself or through a related company. A2350. Second, the court held that U.S. supply of a single component, no matter how important to the claimed invention, can never support liability.

This Court should reverse both Section 271(f)(1) errors, restore the original judgment, and remand for consideration of Promega's injunction, exceptional case, and enhanced damages motions. Alternatively, the Court should restore the infringement judgment and grant a new trial on damages or, at a minimum, grant a new trial on both points.

Promega's right to relief does not depend upon the outcome of Life's invalidity appeal. Life does not contest the validity of one of the patents-in-suit (RE37,984), which all accused products infringe. A32; A9237-9238; A9242-9243. In any event, Life's invalidity arguments are meritless. And the district court correctly rejected Life's attempt to extend the parties' 2006 license beyond its plain terms. The Court should not allow Life's strained arguments on these secondary issues to distract from the fundamental errors in the district court's decisions on infringement and damages.

### STATEMENT OF THE CASE

Promega filed this suit alleging that Life's AMPFlSTR amplification kits infringe U.S. Patent Nos. 5,843,660 ("the '660 patent"), 6,221,598 ("the '598 patent"), 6,479,235 ("the '235 patent"), and 7,008,771 ("the '771 patent") (collectively, the "Promega patents"), as well as U.S. Patent No. RE37,984 (the "Tautz patent"). A409-410; A83-84.

On November 29, 2011, the district court granted Promega summary judgment of direct infringement, holding that Life infringed claim 42 of the Tautz patent with all of its kits and certain claims of the Promega patents with some of the same kits. A32. The court rejected Life's principal license defense to direct infringement and its enablement and obviousness challenges to the Promega patents. A22-25; A27-30. Life did not challenge the validity of the Tautz patent.

The case proceeded to trial on willfulness and damages. A jury found willful infringement and awarded Promega $52 million in lost profits. A203. The court entered judgment on the jury verdict on February 23, 2012. A9242-9243. Life moved for JMOL on the ground that Promega "failed to prove the applicable damages for patent infringement." A2296. On September 13, 2012, the court not only granted Life's motion, but also vacated its prior judgment of infringement, and denied Promega's motions for a permanent injunction, exceptional case finding, and enhanced damages as moot. A2333-2354. Promega sought

6

reconsideration or, in the alternative, a new trial. The district court denied Promega's motions on April 22, 2013. A2358-2370.

## STATEMENT OF FACTS

### A. The Parties And Technology

Promega is a global leader in developing and producing technologies for use by scientists in academic, medical, law enforcement, and industrial settings. The Promega patents-in-suit arose from Promega's groundbreaking work on the multiplex amplification of short tandem repeat ("STR") loci in DNA samples. STR loci are locations on chromosomes that are "polymorphic" within a population, meaning that they vary with each individual and thus can be useful for identification. A1378-1379. However, because no single locus varies enough within a population to identify a particular individual by itself, multiple polymorphic loci within a DNA sample must be compared to achieve a reliable, statistically significant identification. A1378-1379. For example, the Combined DNA Index System ("CODIS") database, which is managed by the FBI, stores information about 13 standard loci. A5222.

To compare DNA samples, the segments of interest must be "amplified," meaning that copies are made through a process such as polymerase chain reaction ("PCR"). A979; A1380-1381. Time and resources are saved by amplifying multiple STR loci simultaneously—known as "co-amplification"—in a

"multiplex" reaction.  A1245-1246.  Such multiplex reactions are also useful where only a small DNA sample is available.  *Id.*

Promega's scientists performed the "difficult, arduous process" of inventing a series of increasingly complex reactions that allowed for the multiplex amplification of STR loci.  A1238; *see also* Life's Opening Br. ("Br.") 19.  Even Life concedes that the experiments were "laborious" and "unpredictable" (Br. 19) in light of the "multitude of factors" (A1239) and "myriad of parameters" (A1240) that had to be evaluated.  After Promega successfully identified new multiplex reactions involving combinations of STR loci that had never been successfully co-amplified, Promega received patents on its inventions.

Promega's patents include method claims directed to the novel multiplex reactions taught in the patents (*e.g.*, A338(cl. 1)), as well as apparatus claims directed to kits for conducting those multiplex reactions (*e.g.*, A340(cl. 18)).  For example, the first Promega patent-in-suit taught a novel quadraplex reaction involving four of the 13 CODIS loci (A722), as well as multiple octoplex reactions (*e.g.*, A257(cl. 5)).  Another (the '235 patent) taught skilled artisans to co-amplify all 13 CODIS loci in a single multiplex reaction.  A725-726.  This was "regarded as a significant technical advance," as it was previously thought not "technically feasible … to multiplex so many STR loci."  A726.  The combinations were new and the conditions for getting them to work unknown in the art.  A729.

The Tautz patent, which is exclusively licensed to Promega, relates to a process for examining polymorphisms in DNA samples. A402(3:40-42). It was the first patent application to describe STR loci and is considered a foundational patent in STR technology. A1929; A2004.

The technology disclosed in the patents-in-suit has numerous important uses. In forensic work, STR kits are used to identify or exonerate criminal suspects and to identify the victims of crimes or disasters. A842-843. STR kits are also used to determine paternity. A842-843. Importantly for this case, STR kits also have many clinical and research uses: for example, they are used to monitor transplant rejection after bone marrow transplants (A845-846); to analyze cancer cells (A855-856); to determine fetal sex at very early stages to assist in disease diagnosis (A862); and to ensure that cells used in research settings are derived from the correct source (A856-861).

## B. The 2006 Cross-License

In 2006, Promega and defendant Applied Biosystems entered into a cross-license agreement. A618; A815. Applied Biosystems was then part of Applera Corporation and is now a wholly owned subsidiary of Life Technologies. Br. 12.

The license allows Applied Biosystems to practice the patents-in-suit ███████

██████████████████ A815; A819. The license was purposely limited to authorize only forensic and paternity uses. A1868-1869; A905. Specifically, the

CONFIDENTIAL MATERIAL DELETED

license defines 

A816.

A816.

### C. Pre-Trial Proceedings

Life sold numerous STR kits for unlicensed clinical and research uses. After Promega sued Life for infringement, Life counterclaimed that (a) Applied Biosystems was licensed to practice the Promega and Tautz patents, and (b) the Promega patents were invalid. A9038-9040.

In September 2011, the parties cross-moved for summary judgment on infringement and validity. Promega sought summary judgment of infringement based on evidence that Life "made, used, sold, or offered for sale" infringing STR kits. A688-689. Among other support, Promega provided a detailed comparison of the accused products to the asserted claims (A879-888) and extensive undisputed evidence showing that Life sold each accused product to U.S. institutions for unlicensed purposes (A694-702; A1288-1300; A1307-1309). Promega also sought summary judgment of induced infringement based on evidence that Life knew that its U.S. customers were purchasing the accused kits

CONFIDENTIAL MATERIAL DELETED

for unlicensed purposes[1] and, in fact, actively targeted and supported these unlicensed U.S. sales.[2]  In its opposition, Life never disputed that it sold the accused products in the United States.  Life's only defenses against direct infringement were based on its interpretation of the patent claims and the license.  A9192-9197; A1443-1463; *see also* A1541-1544.  Life also challenged the validity of the Promega patents—but not the Tautz patent—by arguing that the asserted claims were obvious and did not enable multiplex amplification of *unrecited* loci.

The district court granted Promega's "motion for summary judgment with respect to direct infringement" on all of Promega's apparatus claims except claims 25 and 27-31 of the '660 patent, on which the court granted summary judgment of noninfringement.  A3.  The court also upheld Promega's interpretation of the license, concluding "from the plain language of the license" that Life's kits were licensed only for forensic and paternity uses, not for clinical or research applications, including but not limited to transplant monitoring, cell line authentication, and determination of fetal sex.  A23.  The court largely rejected Life's construction of the asserted claims, concluding that most claims were infringed as long as the accused kits included the loci recited in the claims,

---

[1]     *See, e.g.*, A9108; A9053(26:1-10); A9054(31:20-33:4); A9056(39:1-17); A9058(47:11-16); A9066(78:22-79:7); *see also* A9059(50:4-51:12); A9059(51:18-25); A9061(61:4-20); A9062(63:25-64:8); A9065(75:19-77:4); A9077(124:15-22).

[2]     *See* A9100-9104; A9120-9126; A9131-9134; A9153-9156; A9158-9159; A9176.

regardless of whether the infringer added further unrecited loci.  A21.  The court

ruled that only claims 25 and 27-31 of the '660 patent were "closed," meaning that

they were not infringed by kits that added unrecited loci.  A19-21.

The court also granted Promega summary judgment on validity.  The court

explained that the patentees were not "required to enable unrecited elements" (A4)

and that "[e]mploying open-ended claim language does not change the invention; it

is simply a way to insure that others cannot avoid infringement by adding to the

invention" (A27).  In light of this holding, the court dismissed as moot Life's

contingent theory that, if Promega's patent enabled unrecited loci, the prior art

must have been sufficient to render Promega's claims obvious.  A29.  The court

also held that Life had failed to support its contentions regarding the prior art with

expert testimony or proposed findings of fact, despite the court's warning that it

would not consider facts alleged only in briefing.  A30.  The court also determined

that Life "failed to adduce any evidence that at the time the patent applications

were filed, it would have been obvious to a person of ordinary skill in the art that

the combinations of loci disclosed in the asserted patents could coamplify

successfully."  A4.

On February 1, 2012, the parties entered into a stipulation extending the

court's summary judgment ruling on infringement to certain additional STR kits.

A9237-9239; A44-45; A1667-1668.  Accordingly, by the time trial began, the

patents-in-suit were established as valid and infringed by all STR kits at issue.

### D. Jury Trial, Verdict, And Judgment

In February 2012, the court held a two-week jury trial focused on damages

and willfulness.  The question *whether* Life had infringed was not tried;

infringement was discussed only to the extent necessary to calculate the *amount* of

damages and to determine whether Life's infringement had been *willful*.

Life conceded in its opening statement that there "was technically an

infringement" and "[t]he law says [Promega is] entitled to be compensated for that

infringement."  A5127:14-19.  Life told the jury: "the two questions that you're

going to decide here are whether or not my clients acted willfully and what exactly

Promega is entitled to … as a consequence of the Judge now deciding that certain

sales were not within the scope of the license."  A5112:2-6.

On the first day of trial, the parties stipulated that Life had made

$707,618,247 in "total worldwide sales of STR kits" during the damages period.

A9240.  The jury was ultimately asked to determine what proportion of those sales

should be included in the damages calculation.  The first step was to determine

which sales were for (a) kits made, used, offered for sale, sold within, or imported

into the United States (infringement under 35 U.S.C. § 271(a)), or (b) kits for

which Life had supplied from the United States a substantial portion of the

components for combination by its facility in the United Kingdom (infringement under 35 U.S.C. § 271(f)(1)). A202. The second step was to determine which of those sales were permitted by the 2006 license. A202.

The record of Life's infringing sales to U.S. customers was extensive. Promega introduced several spreadsheets from Life's own records quantifying ███████ of sales to U.S. customers. For example, Life's record of its STR kit sales in 2005-2007 contained a "B.O. Data" worksheet showing ███████████ ███████ between the fourth quarter of 2006 and the fourth quarter of 2007. A7051-7170; A6249-6258.[3] The "Pivot" worksheet showed total U.S. sales for each kit. A7033-7050; A6259-6263; A6261:16-20 ("Q. Okay. So if I added these up for those years, I would actually be able to tell the location of the sale as well as the amount of the sale during that year; is that right? A. That's what I think was done with the pivot table.").

_____

[3] Life initially objected that specific sales data was "not relevant to any issue before the jury" because there had been "a stipulation as to the total amount of sales of STR kits." A5572:12-16. This statement, along with earlier ones, created the impression that the only damages issue left to resolve was the percentage of licensed sales. *See* A5065:15-5073:21; A6127:6-6130:3; 6184:12-6191:17. Later, Life reversed course, arguing that U.S. sales had to be quantified. The court expressed surprise that there was an "open question about what percentage was attributable to the United States" because "when there was an effort to get into that, the agreement was that we didn't need to." A6187:13-18. The court added: "I think there's miscommunication between counsel, and that included me." A6190:4-6. Promega subsequently presented detailed evidence of Life's U.S. sales.

CONFIDENTIAL MATERIAL DELETED

Life's record of its STR kit sales in 2009-2011 likewise showed  of U.S. sales of the accused kits.  A7362-7473; A7632-7744; A7906-8002; *see also* 6265:17-6267:4 (testimony describing spreadsheet).  Those sales included the following:

- Life sold A7947-7948(lines 7832, 7838, 7846).

- Life sold A7960(line 8316).

- Life sold . A7732(line 10244).

- Life sold . A7733(line 10289).

- Life sold . A7709(line 9330).

- Life sold . A7705(line 9179).

- Life sold . A7376(lines 6364, 6367).

- Life sold . A7397(lines 7137-7138).

Promega also elicited testimony from Life employee Guido Sandulli on this subject.  *See* A6250:11-12; A6251:24; A6252:4-5; A6255:21-22; A6256:1-6; A6258:4-5, 22; A6266:3-6; A6266:18-6267:6; A6268:17-25.  Sandulli confirmed

CONFIDENTIAL MATERIAL DELETED

that the spreadsheets were accurate (A6258:4-6; A6262:25-6263:5; A6266:19-6267:5) and could be used to calculate total sales by location (A6261:16-6262:1; A6267:8-10).

Other exhibits and testimony also demonstrated Life's numerous infringing U.S. sales. For example:

- Promega introduced a sales report for Life's U.S. sales representative Robert Rossi showing sales to ▇ select customers in ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. A7001-7028. Rossi testified that the report shows the following:

    o In 2010 alone, Life sold $61,787 in STR kits to Esoterix Genetic Laboratories, which used the kits for maternal cell contamination testing. A6620-6621.

    o In 2010 alone, Life sold $41,795 in STR kits to MIT Lincoln Laboratory, which used the kits for research. A6624-6625.

    o Life sold STR kits to Hackensack University Medical Center, which used the kits for bone marrow engraftment monitoring. A6621-6622.

    o Life sold STR kits to, among others, Boston Children's Hospital, the University of Medicine & Dentistry of New Jersey, the University of Connecticut, Dartmouth Medical School, and Columbia University, which used the kits for research. A6622-6624.

    o Life sold STR kits to Massachusetts General Hospital and Brigham and Women's Hospital, which likely used the kits for clinical purposes. A6625-6626.

- Another Life record showed sales to approximately ▇ U.S. customers in 2006-2008. A5561-5563; A7171-7176.

- A record of Life's sales to more than ▇ U.S. customers in 2000-2009 (A5559-5561; A7177) showed, among many other infringing acts,

16

that 

- A Life list of "Non-Forensic Accounts" (A7178-7179) was "tagged by what state they were in," thus confirming U.S. sales. A5566:16.

- Phillip Czar, Life's sales representative for Texas, Oklahoma, New Mexico, Arkansas, Kansas, and Arizona, testified that Life sold $30 million of STR kits in his region. A5978:24-25; A5989:6-18. He acknowledged that his customers buy kits for unlicensed uses. A5986:20-23 ("Q. Do you have any nonforensic accounts? A. I do. Q. Nonforensic, nonpaternity? A. Sure."). He then listed a number of specific clients not doing paternity testing or forensic casework, including the "University of Texas MD Anderson," the "University of Texas at Austin," "UT Southwestern University in Dallas," and the "University of Arizona." A5987:8-13.

- John Wilton, Life's sales representative for Alabama, Mississippi, and Tennessee, testified that Life sold $5.5 million of STR kits in his region. A6013:6; A6014:23-6015:6. He acknowledged that he has customers who are not processing crime samples or doing paternity work (A6015:13-17), and he estimated that 5-10% of his accounts are nonforensic (A6017:19-21). He specifically testified that Vanderbilt University purchases approximately $30,000 in STR kits a year for chimerism studies. A6015:20-6016:13.

- Guido Sandulli testified regarding several "nonforensic/nonpaternity customers" in the United States. A6121:19. He testified that the National Cancer Institute does sample tracking (A6121:21-23) and bought $1.6 million worth of Life's STR kits (A6122:18). He also identified the City of Hope National Medical Center, Stanford University, the University of Michigan, Vanderbilt University, Emory University, the University of Minnesota, and the University of Massachusetts as nonforensic/nonpaternity clients. A6121:22-6122:12; A6123:2-9.

CONFIDENTIAL MATERIAL DELETED

- Timothy Sheehy testified that, when he was at SAIC-Frederick supporting the National Cancer Institute and the National Institutes of Health, his lab alone purchased approximately $350,000 of Identifiler STR kits in a twelve-month period. A5636:13-21.

In addition to this evidence of U.S. sales, Promega presented evidence supporting damages under Section 271(f)(1) due to Life's U.S. supply of components for assembly overseas. It was undisputed that, for every accused product, Life supplied Taq polymerase—which Life's witness admitted was a "major" component (A6290:19-6291:1)—from the United States to its assembly facility in the United Kingdom. It was also undisputed that Life supplied primers from the United States for at least three accused STR kits: Identifiler, Identifiler Direct, and Identifiler Plus. *See* A6282:15-6283:3; A6284:24-6285:8; A2340; *see also* A6505:2-8.

The jury returned a verdict of willful infringement. A6512:1-6514:22. The jury also determined that all of Life's worldwide sales were attributable to infringing acts in the United States, that 10 percent of those sales were for unlicensed uses, and that Promega was entitled to $52 million in lost profits. A202-203.

On February 23, 2012, the district court entered judgment based on the court's summary judgment rulings on infringement and validity, the parties' stipulations, and the jury's verdict. A9242-9243. The judgment stated that each of the accused kits infringed claim 42 of the Tautz patent and that several kits

18

infringed other specified claims of the Promega patents.  A9242-9243.  The

judgment awarded Promega $52 million in damages.  A9242-9243.

### E.    Post-Verdict Proceedings

The parties filed various post-trial motions, but no motion challenged the

infringement judgment.  To the contrary, Life's principal JMOL motion, which

asserted perceived insufficiencies in the *damages* evidence, conceded that there

had been infringement in the United States.  A2313 ("[I]t is undisputed that some

portion of the stipulated sales figure represents *sales of STR kits in the United*

*States*.  A number of witnesses testified about *sales to particular U.S. customers*

and within certain U.S. regions." (emphases added)); *see also* A9296.

On September 13, 2012, the district court granted Life's motion for JMOL

on damages.  But instead of confining its ruling to damages, the court also ruled

that "plaintiff failed to prove infringement under 35 U.S.C. § 271(a) or (f)(1)."

A2334.  The Court then vacated the judgment of infringement and denied as moot

Promega's motions for a permanent injunction, enhanced damages, and an

exceptional case finding.  A2353-2354.

The court's JMOL order began by holding that there was insufficient

evidence to find that *all* of Life's worldwide sales had the requisite connection to

the United States under Sections 271(a) or 271(f)(1).  With respect to Section

271(a), the court held that testimony regarding manufacturing and warehousing in

the United States could not support damages for worldwide sales. A2352-2353.

On Section 271(f)(1), the court based its ruling on two legal conclusions. First, the

court held that, as a matter of law, supplying a single component (as opposed to

two or more components) from the United States can *never* give rise to liability.

A2342-2345. Second, the court held that infringement under Section 271(f)(1)

requires the involvement of a *third party*, meaning that a company that supplies

components for overseas assembly can avoid infringement liability if the assembly

is performed by its own foreign subsidiaries, divisions, or employees. A2347-

2351. The court admitted that "it makes little sense to prohibit a party from

supplying another with components while permitting the party to supply itself," but

it concluded that this "loophole is not one that a court is empowered to close."

A2350.

 The court next ruled that, absent evidence to sustain the jury's damages

award for *all* worldwide sales of Life's kits, Life was entitled to judgment in its

favor. A2353. The court stated without explanation and without considering the

extensive evidence of record (*see supra* pp. 14-18) that Promega had not

"adduce[d] evidence regarding defendants' sales of any subset of products" that

infringed. A2353. The court also held that Promega had waived its right to a new

trial by failing to request one in its JMOL opposition. A2353.

20

On September 18, 2012, the court issued an amended judgment reflecting its JMOL ruling on damages and infringement. A70-71. Promega timely moved for amendment of or relief from the new judgment, or, in the alternative, a remittitur or new trial. Among other things, Promega argued that the court's decision was inconsistent with its order granting summary judgment of direct infringement, the extensive evidence of infringement and damages adduced at trial, and Life's concession that it made infringing sales in the United States. Promega also noted that, because it had prevailed at trial, Federal Rule of Civil Procedure 50(d) and other authority permitted it to raise new trial arguments after JMOL was entered against it.[4]

On April 22, 2013, without hearing argument, the court denied Promega's motions. *See generally* A2358-2370. The court adhered to its interpretation of Section 271(f)(1) and its conclusion that insufficient evidence supported a verdict based on worldwide sales. A2363-2364. The court also adhered to its view that Promega had waived its right to a remittitur or new trial on damages. A2365-2366. The court did not address Federal Rule of Civil Procedure 50(d) or the extensive record evidence of damages and infringement. Finally, the court reiterated its denial of a permanent injunction and attorneys' fees. A2366-2368. The court held

---

[4]     Promega also requested a new trial based on newly discovered evidence that Life first disclosed after trial. A9358-9362.

that its order granting summary judgment of infringement could not support an injunction, because Promega supposedly had not asked the court to find at least one act of infringement for each accused product. A2367. The court also held that Promega should have "request[ed] more specific findings in the verdict form" on infringement and was not entitled to a new trial. A2367.

## SUMMARY OF ARGUMENT

1. **Infringement and Damages.** The district court's grant of JMOL regarding *damages* provided no basis for vacating the judgment of *infringement*. A finding of infringement can rest on as little as one instance of infringement, and ample evidence supported both the grant of summary judgment of direct infringement and the infringement finding implicit in the jury's verdict.

At a minimum, if the Court does not restore the original judgment of infringement and damages, Promega is entitled to a new trial. The district court's sole basis for denying such relief was Promega's failure to request specific infringement findings at trial. But Promega had no reason to request infringement findings where the district court had already granted summary judgment of direct infringement, Life conceded infringement and said the sole issues for trial were damages and willfulness, and the district court instructed the jury, "I have found previously that all the STR kits that defendants sold infringed plaintiff's patents" (A2287).

Promega is also entitled to a new trial on damages. The district court's holding that Promega needed to raise its new trial arguments in its JMOL opposition contradicts Federal Rule of Civil Procedure 50(d) and governing precedent, which allow a verdict winner like Promega to raise new trial arguments *after* JMOL is entered against it.

A new trial is required here for multiple reasons. First, even where a court concludes that there is some flaw in a damages award, the proper remedy is to grant a remittitur or new trial as long as there is *some* evidence of damages. Here, there was not only some evidence, but a detailed record including Life's own sales spreadsheets. Second, where there is some evidence of damages, the Seventh Amendment does not permit a court to alter the jury's damages award without offering a choice between a remittitur and a new trial. Third, the Patent Act directs that "the court shall award the claimant damages adequate to compensate for the infringement," 35 U.S.C. § 284, and it would be anomalous to deny any damages where there is clear proof of infringement, especially given that damages need not be calculated with precision. Fourth, the district court's decision was due partly to a change in its own view of the applicable law, and where such a change occurs after trial, fairness requires that the verdict winner be given a chance to make its case under the new interpretation. Fifth, any purported defects in Promega's damages evidence can be easily remedied.

23

2. **Section 271(f)(1).** The district court's ruling that Life could not be liable under Section 271(f)(1) rested on two legal errors. The Court should reverse on both points and reinstate the original judgment based on the jury's verdict.

First, the court ruled that liability under Section 271(f)(1) "require[s] the involvement of a third party." A2363; *see* A2347-2351. But the statute envisions liability for inducing the "*combination* of such components" abroad; it places no limit on *who* must combine them. Neither the statute's text nor its purpose requires immunizing parties who perform the combination themselves, a rule that even the district court recognized made "little sense." A2350.

Second, the court ruled that "the statute requires that at least two components be supplied from the United States." A2363; *see* A2345. The statute, however, requires only that "a substantial *portion* of the components of a patented invention" be supplied from the United States, and there is no reason why that "portion" may not consist of a single, important component. Moreover, even under the district court's reading, Life conceded that it supplied multiple components from the United States for three kits, and Promega quantified those infringing sales. At a minimum, therefore, Promega is entitled to a remittitur or new trial on damages under Section 271(f)(1).

3. **Enablement.** Life does not dispute that Promega enabled co-amplification of the loci recited in the asserted claims. Instead, Life argues that

24

Promega was required to enable *unrecited* loci.  The district court correctly rejected this argument.  The Patent Act specifies that a patent must enable the "invention."  35 U.S.C. § 112(a).  While the claims use open language ("comprising") that does not prohibit amplifying other loci, such "open-ended language does not change the *invention*; it is simply a way to insure that others cannot avoid infringement by *adding to* the invention."  A27 (emphases added).

4.    **Obviousness.**  Life's argument that trial-and-error experiments cannot yield a patentable invention contradicts the Patent Act, which provides that "[p]atentability shall not be negated by the manner in which the invention was made."  35 U.S.C. § 103.  Life failed to conduct a proper obviousness analysis, much less adduce clear and convincing evidence that Promega's novel multiplexes would have been obvious in a field that Life itself argues is unpredictable.

5.    **License.**  Life's license argument depends on an incoherent, boundless construction of the term "use in, or in preparation for, legal proceedings."  The Court should reject Life's attempt to stretch that term beyond its plain meaning to include undergraduate education in forensics and a broad swath of undefined research that the district court described as "every research project going on in the world that had anything to do with genetics" (A69).

## STANDARD OF REVIEW

This Court reviews JMOL and new trial decisions under regional circuit law.

*Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1202 (Fed. Cir. 2010). A

JMOL grant is reviewed "without deference, while viewing all the evidence in the

light most favorable to the nonmoving party." *Trading Techs. Int'l v. eSpeed, Inc.*,

595 F.3d 1340, 1357 (Fed. Cir. 2010) (citing *Harper v. Albert*, 400 F.3d 1052,

1061 (7th Cir. 2005)). Denial of a new trial motion is reviewed for abuse of

discretion. *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007). "[A] court

categorically abuses its discretion when a decision rests on legal error," *id.*, or on a

clearly erroneous factual finding, *Shore v. Dandurand*, 875 F.2d 656, 660 (7th Cir.

1989).

With respect to the argument that Promega waived its new-trial request by

not raising it in its JMOL opposition, the Seventh Circuit "review[s] the factual

determinations upon which a district court predicates a finding of waiver for clear

error and the legal question of whether the conduct amounts to waiver de novo."

*e360 Insight v. Spamhaus Project*, 500 F.3d 594, 599 (7th Cir. 2007).

Promega does not dispute Life's statement of the standard of review

governing Life's appeal except to clarify that, under California law, even where

extrinsic evidence is considered to clarify an ambiguous contractual term (which is

not necessary here), the court may consider the inferences to be drawn from that

evidence where "the evidentiary facts themselves are not in conflict." *Medical Operations Mgmt., Inc. v. National Health Labs., Inc.*, 222 Cal. Rptr. 455, 458 (Ct. App. 1986).

## ARGUMENT

## I.   REGARDLESS OF HOW THIS COURT INTERPRETS SECTION 271(F)(1), THE DISTRICT COURT ERRED IN VACATING THE JUDGMENT OF INFRINGEMENT

The district court's JMOL decision rested on two fundamentally erroneous interpretations of Section 271(f)(1), reversal of which should lead to reinstatement of the original judgment of infringement and damages.  *See infra* Part II.  But regardless of how this Court interprets Section 271(f)(1), the district court erred in setting aside the original judgment of infringement and denying Promega even the minimum relief of a new trial.

### A.   The District Court's Original Judgment Of Infringement Should Not Have Been Disturbed

Following trial, the district court entered judgment of infringement.  A9242-9243.  Nothing in Life's motion for JMOL on *damages* provided any basis for disturbing that *infringement* judgment.  Indeed, Life's own JMOL brief conceded infringement: "[I]t is undisputed that some portion of the stipulated sales figure represents *sales of STR kits in the United States*.  A number of witnesses testified about *sales to particular U.S. customers* and within certain U.S. regions."  A2313 (emphases added).  Life's reply similarly stated that "it was undisputed that *some*

*kits were imported into the U.S. or sold in the U.S.*" A9296 (emphasis added).

Accordingly, the district court erred in vacating the judgment of infringement and

denying Promega's motions for an injunction, exceptional case finding, and

enhanced damages as moot.

"[A] finding of infringement can rest on as little as one instance" of

infringement. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir.

2009). Here, the undisputed evidence at summary judgment and the trial record

conclusively demonstrated numerous such instances.

The existence of Life's infringement was first established when the district

court granted Promega summary judgment of "direct infringement." A3; A21;

A32.[5] The district court sought to dismiss this history after the fact, asserting that

Promega "never asked in its summary judgment motion that the court find that any

particular act by defendants violated § 271(a) or § 271(f) with respect to a

particular accused product." A2367. That was error. Promega's summary

judgment motion stated: "Promega hereby moves for summary judgment that the

Defendants[] made, used, sold, or offered for sale, certain products [that] directly

infringe Promega Patents." A688. This request was followed by a chart listing

---

[5]   "Direct infringement" means infringement under Section 271(a), *see NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1313 (Fed. Cir. 2005), and includes as an element that the defendant made, used, sold, offered to sell, or imported the patented invention in the United States, *see* Fed. Civ. Jury Instr. 7th Cir. § 11.2.10 (2010).

28

each of the products and the claims infringed (A688-689) and supported by specific allegations regarding Life's sales to numerous U.S. customers for unlicensed uses (including at least one use of each accused kit). A693-702; A1443-1459; A1542-1544. Life responded not by denying these U.S. sales and uses, but only with its licensing and claim construction defenses. Thus, when the district court rejected those defenses and granted summary judgment of direct infringement, its order provided full support for the judgment of infringement entered after trial. A9242-9243.

Subsequent developments confirmed that the summary judgment ruling had settled the infringement issue. Life conceded in opening that there "was technically an infringement" (A5127:17-18) and that "[t]he law says [Promega is] entitled to be compensated for that infringement." A5127:16-22. The parties also agreed that only willfulness and damages were at issue at trial. A5112:2-6; A5167:23-25; A5103:9-16; A5103:18-20; A5107:17-19. In fact, the court refused to give a separate infringement instruction because "*the infringement question has been answered*" (A6310:20-25 (emphasis added)) and told the jury "*I have found previously that all the STR kits that defendants sold infringed* plaintiff's patents" (A2287 (emphasis added)).

Moreover, even if the existence of infringement had not been settled, the jury implicitly found infringement through its determinations of willfulness and

damages.  A finding of willful infringement necessarily encompasses a finding of infringement.  The jury also implicitly found infringement as it quantified damages.  Question 2 on the verdict form asked the jury to decide the total dollar amount of Life's "United States sales" of the accused kits (A202), a term defined to encompass "all kits made, used, offered for sale, [or] sold within the United States or imported into the United States" and "kits made outside the United States where a substantial portion of the components are supplied from the United States."  A2288.  The jury found that *all* sales of the accused kits made anywhere in the world qualified as "United States sales."  A201-202.  This finding necessarily incorporates subsidiary findings that Life's U.S. manufacturing, sales, or importation activities violated Section 271(a) for each kit and that its U.S. supply of components for foreign manufacturing activities violated Section 271(f)(1).  *See Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1453 (Fed. Cir. 1984) (jury verdict "necessarily resolves any disputed underlying factual issues," and a court is not "free to make a specific finding … which overrule[s such] an implicit and inherent finding of the jury within a broader question" (emphasis omitted)); *see also Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012).  The jury's implicit finding of infringement was

supported by overwhelming evidence from Life's own records, including sales spreadsheets and customer lists. *See supra* pp. 14-18.[6]

The district court was wrong to rewrite the history of this case at the JMOL stage. The original judgment of infringement as to all kits (A9242-9243) was amply supported by the summary judgment record and ruling, and was only confirmed and strengthened by the trial record and jury verdict. That judgment should not have been disturbed, and Promega was entitled to have its motions for an injunction, exceptional case finding, and enhanced damages considered on their merits.[7]

**B.      Promega Is At Least Entitled To A New Trial On Infringement**

Alternatively, even if this Court does not reinstate the infringement judgment, Promega is entitled to a new trial on infringement under Federal Rule of Civil Procedure 59, which "provides a means of relief in cases in which a party has

---

[6]      The jury's implied infringement finding under Section 271(a) survives regardless of whether the corresponding finding under Section 271(f)(1) does. *See United States v. Gonzalez*, 93 F.3d 311, 320 (7th Cir. 1996) ("[A] general verdict is valid and will not be set aside as long as the evidence supporting one of the possible bases … submitted to the jury is legally sufficient."); *Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1339 (Fed. Cir. 2011); *Northpoint Tech., Ltd. v. MDS Am., Inc.*, 413 F.3d 1301, 1311 (Fed. Cir. 2005).

[7]      The district court stated that there were "no findings … that would allow the court to determine what the proper scope of any injunction should be." A2366. But the summary judgment record and the findings implicit in the jury's verdict support enjoining, at a minimum, the making, selling, using, or importing of the accused kits in the United States.

been unfairly made the victim of surprise ... that is inconsistent with substantial justice." *Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 287-288 (1st Cir. 1993).

The district court's sole reason for denying Promega a new trial—that Promega supposedly should have "request[ed] more specific findings [on infringement] in the verdict form" (A2367)—was, in a word, whipsawing. Promega had no reason to seek formal infringement findings from the jury.  It asked for *and was granted* summary judgment of "direct infringement" (A22-26; A31-32) and thus justifiably believed that the question *whether* Life infringed had been conclusively settled before trial, even if it remained for the jury to determine the *amount of damages* attributable to infringing acts and whether the infringement was *willful*.  This belief was reinforced by the district court's refusal to put the infringement question to the jury (A6310:20-25), Life's admissions of infringement (*e.g.*, A5127:14-19), and Life's own statements that the trial was limited to damages and willfulness (*e.g.*, A5112:2-6).

For the district court to reconsider its summary judgment and judgment of infringement without notice to Promega was by itself questionable; to vacate the judgment of infringement without allowing Promega a chance to carry its newly-imposed trial burden before a new jury is fundamentally unfair.  Promega presented overwhelming evidence of infringement; indeed, given the record and

32

Life's repeated admissions, it is difficult to see how a reasonable jury could *not* find infringement.  It is substantially unjust to deny Promega that opportunity when infringement so clearly exists.  *See Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 785 (D.C. Cir. 1998) (granting new trial instead of JMOL partly because "the defect in the nonmoving party's proof might be remedied on a second trial").

### C. Promega Is Entitled To A New Trial On Damages, Regardless Of How This Court Interprets Section 271(f)(1)

Even if this Court does not reverse the district court's erroneous interpretations of Section 271(f)(1) and reinstate the jury's verdict (*see infra* Part II), Promega is also entitled, at a minimum, to a new trial on damages.

#### 1. Promega's new trial request was timely

The district court erroneously held that Promega waived its new trial request by not raising it in opposition to Life's JMOL motion.  A2365-2366; A2353.  Rule 50(d) expressly gives a verdict winner like Promega the right to bring a *subsequent* new trial motion if JMOL is entered against it:

> Time for a Losing Party's New-Trial Motion.  Any motion for a new trial under Rule 59 *by a party against whom judgment as a matter of law is rendered* must be filed no later than 28 days after the entry of the judgment.

Fed. R. Civ. P. 50(d) (emphasis added).  The Advisory Committee elaborated:

> [T]he verdict-winner may apply to the trial court for a new trial pursuant to Rule 59 after the judgment n.o.v. has been entered against him.  In arguing to the trial court in opposition to the motion for judgment n.o.v., the verdict-winner *may*, and often

> will, contend that he is entitled, at the least, to a new trial ….
> Subdivision [50(d)][8] is a reminder that *the verdict-winner is*
> *entitled, even after entry of judgment n.o.v. against him, to move*
> *for a new trial in the usual course*.

Rule 50 Advisory Committee's Note (1963) (emphases added).

The reason for permitting a verdict winner to reserve its new trial request until after JMOL is evident: most verdicts (especially damages verdicts) survive JMOL because they are "supported by substantial evidence." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 26 (Fed. Cir. 2012). When that happens, the verdict winner's alternative arguments for a new trial become moot, and the time spent briefing or adjudicating them is wasted.

The Supreme Court has accordingly recognized that, "[w]here a defendant moves for n.o.v. in the trial court, the plaintiff may present, in connection with that motion *or with a separate motion after n.o.v. is granted*, his grounds for a new trial." *Neely v. Martin K. Eby Constr. Co.*, 386 U.S. 317, 325 (1967) (emphasis added); *see also* 9B Wright et al., *Federal Practice and Procedure* § 2538 (3d ed. 2012) ("Rule 50(d) … provides that if the court in fact grants the renewed motion for judgment as a matter of law, *the party against whom judgment was entered may move for a new trial within 28 days* after the entry of judgment." (emphasis added)).

---

[8] This 1963 note refers to Rule 50(c)(2), as Rule 50(d) was then numbered.

Indeed, a verdict winner may simply appeal a JMOL order and seek a remand for a new trial as one form of relief. *See Neely*, 386 U.S. at 328 ("if the plaintiff's verdict is set aside by the trial court on defendant's motion for judgment n.o.v., plaintiff may bring these very grounds [for a new trial] directly to the court of appeals without moving for a new trial in the district court"); *see also* Rule 50 Advisory Committee's Note (1963). The Seventh Circuit, whose precedent governs here, has even granted a new trial where a verdict-winner plaintiff, after losing at JMOL, first sought a new trial at *oral argument on appeal*. *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1300 (7th Cir. 1989) (affirming that "the law of this circuit permits a new trial under these circumstances" even though "plaintiffs did not conditionally move for a new trial in the event the j.n.o.v. was granted"). The district court's failure to consider Promega's motion here was legal error.

Moreover, even if a verdict winner were generally required to include an alternative new trial request in its JMOL opposition, there was no requirement to do so here. For Life to receive JMOL of no damages, it had to establish that no rational jury could have awarded even a single dollar in damages. *See infra* pp. 36-38. But Life's own JMOL brief admitted U.S. sales and cited testimony quantifying some of them. A2313 (citing testimony of Life's U.S. sales representatives Czar, Wilton, and Rossi); *see also supra* p. 17. In light of those

35

admissions, there was no need for Promega to tell the court what Life had already

told it, namely that the record *did* contain evidence quantifying U.S. sales.

Promega thus focused its opposition on the issue in dispute—whether the full

scope of the jury's verdict could be upheld—not the obvious point that, even under

Life's own argument, the most that Life could receive was a new trial.  Indeed, as

the following section shows, where a party moving for JMOL on damages admits

that there were *some* damages, it is error for a court to enter JMOL of no damages

rather than grant a new trial.

> **2.    Even if the jury's verdict is not reinstated, Promega is
> entitled to a remittitur or new trial on damages**

The district court's decision to award zero damages on a record of pervasive

infringement, without giving Promega the option of a remittitur or new trial, was

error for multiple reasons.

*First*, a plaintiff who proves *some* damages but not as much as the jury

awarded is entitled to a new trial or a remittitur.  *See, e.g.*, *Uniloc USA, Inc. v.

Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed. Cir. 2011) (new trial on damages

where full scope of jury's damages verdict could not stand because based on

flawed method of calculating royalties); *LaserDynamics, Inc. v. Quanta Computer,

Inc.*, 694 F.3d 51, 70 (Fed. Cir. 2012) (new trial on damages where prevailing

plaintiff's damages theory at trial was flawed); *Litton Sys. v. Honeywell, Inc.*, 87

F.3d 1559, 1577 (Fed. Cir. 1996) (same); *see also Pincus v. Pabst Brewing Co.*,

893 F.2d 1544, 1556 (7th Cir. 1990); *In re Innovative Constr. Sys., Inc.*, 793 F.2d 875, 889 (7th Cir. 1986); *MCI Commc'ns Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1166-1168 (7th Cir. 1983).

Here, Promega presented not just some evidence but overwhelming evidence of damages, including spreadsheets quantifying ████████ of sales in the United States. *See supra* pp. 14-18.[9] This case thus resembles *Network Publications, Inc. v. Ellis Graphics Corp*., 959 F.2d 212 (11th Cir. 1992), where the district court granted JMOL, believing the evidence did not support the jury's full damages award, but the Eleventh Circuit ordered a new trial because "clearly plaintiff suffered some damages," and "[i]f plaintiff failed in proof it was only as to amount." *Id.* at 213, 215. The Tenth Circuit took the same view in *Firestone Tire & Rubber Co. v. Pearson*, 769 F.2d 1471 (10th Cir. 1985), where the prevailing plaintiff proved breach of contract but failed to quantify damages properly. Because "[t]he confusion concerning the proper measure of damages … did not affect the determination of liability," the Tenth Circuit held that "the interests of justice require a new trial as to the proper amount of damages, rather than a judgment notwithstanding the verdict." *Id.* at 1480.

---

[9]     The district court's remark that Promega took an "'all or nothing' approach at trial" (A2359) is clearly erroneous in light of this extensive evidence of U.S. sales.

CONFIDENTIAL MATERIAL DELETED

*Second*, the district court's reduction of damages to zero violates the Seventh Amendment, under which "a court has no authority … 'according to its own estimate of the amount of damages which the plaintiff ought to have recovered, to enter an absolute judgment for any other sum than that assessed by the jury.'" *Hetzel v. Prince William Cnty.*, 523 U.S. 208, 211 (1998) (quoting *Kennon v. Gilmer*, 131 U.S. 22, 29 (1889)).  Where there is evidence of some damages but not enough to support the entire verdict, a court *must* offer the prevailing party a new trial at which a new jury can determine damages afresh.  *Id.* ("[R]equiring the District Court to enter judgment for a lesser amount than that determined by the jury without allowing petitioner the option of a new trial … cannot be squared with the Seventh Amendment."); *see also Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1372 (Fed. Cir. 2008) ("[T]he district court's reduction of compensatory damages necessarily amounted to an assessment of the sufficiency of the evidence, and as such, the option of a new trial was required[.]").

*Third*, the Patent Act directs that "the court shall award the claimant damages adequate to compensate for the infringement."  35 U.S.C. § 284.  Courts are properly skeptical of arguments for denying damages where it is evident that an underlying wrong (infringement) has occurred.  *See Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983) ("[W]hen the amount of the damages cannot be ascertained with precision, any doubts regarding the amount must be

38

resolved against the infringer."); *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person[.]"); *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision"). Promega provided more than enough evidence to show that its damages are substantially greater than zero, regardless of Section 271(f)(1), and indeed Life conceded that Promega was entitled to some compensation. *See* A5127:14-19.

*Fourth*, the district court's ruling that the verdict was unsupported by substantial evidence was partly due to *a change in its own view* of the applicable law. At trial, Life argued that no damages were available under its interpretation of Section 271(f)(1) and sought to keep that theory from the jury, but the court declined to do so. A6344:25-6345:2. It was not until JMOL that the district court reversed itself and adopted Life's interpretation. A2342-2345; A2347-2351.

When a court adopts a new interpretation of law after trial that undercuts the jury's verdict, fairness requires that the verdict winner be given a chance to make its case under the new interpretation. *E.g.*, *Phillips v. Duro-Last Roofing, Inc.*, 973

39

F.2d 869, 871 (10th Cir. 1992) (where new interpretation adopted after trial

affected jury's verdict, new trial was necessary because "it would be manifestly

unjust to assume in any way what the jury would have done" under the new rule);

*Jackson State Bank v. King*, 992 F.2d 256, 258 (10th Cir. 1993) (same); *see also*

*Celanese Corp. of Am. v. Vandalia Warehouse Corp.*, 424 F.2d 1176, 1181 (7th

Cir. 1970) (remanding for a new trial where burden-of-proof instruction was

insufficient); *Uniloc*, 632 F.3d at 1315 (granting new trial to determine damages

under proper legal rule).[10]

*Fifth*, a new trial is warranted because any supposed defects in Promega's

damages evidence can be easily remedied.  *E.g.*, *Smith*, 135 F.3d at 785 (granting

new trial in part because "the defect in the nonmoving party's proof might be

remedied on a second trial"); *see also* Wright et al., *supra*, § 2538 ("[T]he district

court has discretion to order a new trial rather than grant judgment as a matter of

law if it believes that the defect in the nonmoving party's proof might be remedied

on a second trial."); 9 *Moore's Federal Practice* § 50.50[2] (3d ed. 2013) ("a new

trial may be proper when the deficiencies in the nonmovant's proof may be

---

[10]     These cases dispose of the district court's assertion that, simply because *Life*
asserted its view of the law before the jury's verdict, Promega was obligated to
anticipate the *court's* change in direction.  A2342.  In each case cited in text, the
party challenging the verdict also raised its arguments before the verdict, as
required to preserve them, yet a new trial was still granted.

remedied on retrial"). In fact, the exhibits introduced at trial already quantified Life's sales. *See supra* pp. 14-18.

For all these reasons, if the damages verdict is not reinstated, the Court should direct a new trial on damages.

## II. THE DISTRICT COURT COMMITTED LEGAL ERROR IN INTERPRETING 35 U.S.C. § 271(F)(1)

### A. An Entity That Sends Components Abroad For Combination Does Not Escape Liability Simply Because It Performs The Combination Itself Or Through A Related Party

The district court erroneously held that Section 271(f)(1) requires inducement of an *unrelated party* and therefore can never impose liability on a company that procures, through U.S. component supply, assembly of a patented invention overseas by *itself or its subsidiaries, divisions, or employees*.

Section 271(f)(1) renders liable a person who supplies from the United States all or a substantial portion of the components of a patented invention "in such manner as to *actively induce the combination* of such components outside of the United States" in a manner that would infringe if done here. 35 U.S.C. § 271(f)(1) (emphasis added). The text does not specify *who* must perform the combination. This is in notable contrast to other provisions in the same section describing a given action as being performed by particular persons. *See id.* § 271(i) ("'offer to sell' *by a person other than the patentee*" (emphasis added)); *id.* § 271(d) ("licens[ing] or authoriz[ing] *another to perform*" (emphasis added)).

41

Nothing in the meaning of "induce the combination" forecloses performance of the combination by the same party who supplies the U.S. components. Many dictionaries—including the one the district court cited (A2348)—define "induce" as "cause." *E.g.*, VII *Oxford English Dictionary* 888 (2d ed. 1998) ("[t]o bring about, bring on, produce, cause, give rise to"); *American Heritage College Dictionary* 693 (3d ed. 1997) ("[t]o bring about or stimulate; cause"); *cf. Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308 (Fed. Cir. 2012) (en banc) (per curiam) (for "induce" under Section 271(b), "[i]t is enough that the inducer 'cause[s]'" the infringing conduct (second alteration in original)). The causal meaning is appropriate here where the textual object of inducement is a process ("combination") rather than an individual. And a company can "cause the combination of" components by directly performing that combination abroad or procuring a related entity to do so.

Accordingly, courts have rejected efforts to introduce an atextual requirement that the combination "actively induce[d]" under Section 271(f)(1) must be performed by a "third party." *See, e.g.*, *Moore U.S.A. Inc. v. Standard Register Co.*, 144 F. Supp. 2d 188, 193-195 (W.D.N.Y. 2001); *T.D. Williamson, Inc. v. Laymon*, 723 F. Supp. 587, 591-592 (N.D. Okla. 1989), *aff'd*, 923 F.2d 871 (Fed. Cir. 1990).

This Court applied similar reasoning in *Akamai*, which explained that what must be induced under Section 271(b) is "infringement"—that is, "the acts necessary to infringe a patent." 692 F.3d at 1309. The provision thus imposes "a duty not to cause the acts that constitute infringement." *Id.* at 1313. *Akamai* held that inducement liability applies even where the defendant itself "has performed some of the steps" constituting the infringement it induced. *Id.* at 1305. Each requisite act need only be "performed by *someone* (either the defendant itself or someone acting at the behest of the defendant)." *Transunion Intelligence LLC v. Search Am., Inc.*, No. 11-cv-1075, 2013 WL 656616, at *3 (D. Minn. Feb. 22, 2013).

As in *Akamai*, Life's duty was "not to cause the acts" that constitute "the combination of" the invention's components, whether the acts are performed by Life or another entity. And the "impact on the patentee" is likewise "precisely the same" whether that combination is completed by Life or others overseas. *Akamai*, 692 F.3d at 1309. Accordingly, "[i]t would be a bizarre result to hold someone liable for inducing another to perform all [the relevant acts] but to hold harmless one who goes further by actually performing some of [them] himself." *Id.* Indeed, "[t]he party who actually participates in performing … is, if anything, more culpable than one who does not perform." *Id.*

Other decisions similarly establish that the inducer and inducee may be related parties (for example, officer/corporation or corporation/subsidiary), even if one is the other's alter ego. *See, e.g.*, *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1578-1579 (Fed. Cir. 1986) (corporate officer inducement liability is "well settled"); *Jacobs Vehicle Sys., Inc. v. Pacific Diesel Brake Co.*, 424 F. Supp. 2d 388, 393, 395 (D. Conn. 2006) (inducement of subsidiary).[11]

The district court's ruling also sharply undermines the purpose of Section 271(f)(1), which was enacted to address *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972). *See, e.g.*, *Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1340 (Fed. Cir. 2005). *Deepsouth* ruled that a defendant could avoid liability under Section 271(a) by shipping the components of a patented invention for assembly abroad. 406 U.S. at 527-529. Congress responded with

---

[11] The district court mistakenly suggested that this aspect of Promega's argument was "new." A2364. Promega's JMOL opposition argued that Section 271(f)(1) is not limited to combination by "only a third party," in the sense of a party unrelated to the parties in suit, but instead encompasses combination by related parties, such as "an offshore division of a company." A9251. Promega's post-judgment briefing further discussed the point. A9316-9317; A9349-9350. But the court continued to hold that Promega had to argue that the combiner was "distinct *from defendants*." A2365 (emphasis added).

In any event, even if the argument had been "new," the district court has now passed on its merits. *See* A2360 ("[A]ny new arguments in [Promega's post-JMOL reply briefs] would make no difference to the outcome of plaintiff's motions."). An argument is not waived "'so long as it has been passed upon'" by the court below. *Hollmer v. Harari*, 681 F.3d 1351, 1356 n.3 (Fed. Cir. 2012) (quoting *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995)).

Section 271(f)(1) "to broaden the basis for liability," *T.D. Williamson*, 723 F.

Supp. at 592, so that when component supply is done "for assembly abroad to

circumvent a patent, the situation will be treated the same as when the invention is

'made' or 'sold' in the United States." S. Rep. No. 98-663, at 2-3 (1984); *see also,*

*e.g.*, Section-By-Section Analysis: Patent Law Amendments of 1984, 1984

U.S.C.C.A.N. 5827, 5828. Congress intended to prevent companies like Life from

avoiding liability by procuring assembly abroad, without regard to who performs

the assembly.[12] It is "unreasonable" to conclude "that Congress, in attempting to

close the loophole for infringement created by the *Deepsouth* decision, would

create another loophole allowing infringers to eschew dealing with foreign parties

in order to avoid liability for 'active inducement.'" *T.D. Williamson*, 723 F. Supp.

at 592.

    The district court "expressed doubt 'that Congress intended to leave a

loophole for anybody who did its own combinations'" abroad and admitted that

such a rule would "make[] little sense." A2350. Nonetheless, it ruled that Section

271(f)(1) should be confined to the specific facts of *Deepsouth*, which happened to

---

[12]    *See, e.g.*, 1984 U.S.C.C.A.N. at 5828 (component supply "so that the
assembly of the components may be completed abroad"); *id.* (invention
components "that are to be combined" abroad); S. Rep. No. 98-663, at 1
(component supply "for final assembly abroad"); *id.* at 2 ("for assembly" abroad);
*id.* at 3 ("where the final assembly and sale is abroad"; "for assembly abroad");
130 Cong. Rec. H10525 (daily ed. Oct. 1, 1984) (Rep. Kastenmeier) ("so that the
assembly of the components may be completed abroad").

involve "inducement of a third party." A2350-2351 (citing *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 457-458 (2007)). That was error. *Microsoft*'s offhand mention that *Deepsouth* involved combination by foreign buyers played no role in its reasoning. And nothing in Section 271(f)'s text or history indicates an intent to limit the section to the specific facts of *Deepsouth*. Indeed, Section 271(f)(1) sweeps beyond those facts, not least because *Deepsouth* involved U.S. supply of *all* of an invention's components, yet Section 271(f)(1) concerns "all *or a substantial portion*." *See Microsoft*, 550 U.S. at 457-458 & n.18. Accordingly, the district court erred in importing an atextual limitation into Section 271(f)(1) based on its view of "the facts of *Deepsouth*." A2350; A2351; *cf. Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1686-1687 (2012) (statute applied beyond the specific facts of a prior decision because the decision "alerted Congress to a broader problem").

Nor does *Microsoft*'s discussion of loopholes or the presumption against extraterritoriality apply here, contrary to the district court's reasoning. A2350-2351; A2344-2345. In *Microsoft*, the patentholder sought liability for activity different from that addressed by Section 271(f)(1)—namely, the *copying* abroad of software code that the Court held was not "supplied" from the United States. *Microsoft*, 550 U.S. at 456-458. Here, by contrast, Life's actions—U.S. supply of physical components in such manner as to cause assembly abroad—is the very

conduct that Congress addressed through Section 271(f)(1).  Similarly, the presumption against extraterritoriality is irrelevant here, as Life's conduct (component supply "in or from the United States") is domestic, and Promega's interpretation would not "convert[] a single act of supply from the United States into a springboard for liability" for an unlimited number of downstream copies made abroad.  *Id.* at 456.

Finally, the district court inferred too much from certain decisions under Section 271(b).  A2348-2349 (citing cases).  Those cases concern only the required *mens rea* for inducement liability, not the issue presented here.  And while this Court referred in dicta to inducement of "another" or "a third party," those word choices reflect not any limitation in the concept of "inducement," but the particular fact that Section 271(b) covers inducement of "infringement," such that a party that induces itself under Section 271(b) is usually also liable as a direct infringer under Section 271(a).  Thus, inducement under Section 271(b) typically arises only when the inducer and the infringer are different parties.  As *Akamai* demonstrates, however, nothing in the meaning of "inducement" requires a third party's involvement, and that is all the more evident for Section 271(f)(1), where a party that induces its own combination of components overseas is not otherwise liable for direct infringement under Section 271(a).

Accordingly, nothing in the statute or the case law recommends, much less requires, the unreasonable interpretation of Section 271(f)(1) adopted below. A party that supplies one or more U.S. components to cause overseas combination into a claimed invention is no less "induc[ing] the combination" when the combination is performed by the supplier or its affiliate. Any other interpretation is contrary to the statutory text and would sharply undermine its effectiveness.

**B.      Life Supplied "A Substantial Portion Of The Components" For Assembly Abroad**

   **1.      A single, important component can be "a substantial portion of the components of a patented invention"**

The district court also erred by adopting a *per se* rule that a single U.S.-supplied component can never constitute "a substantial portion of the components of a patented invention." A2342; A2345. Section 271(f)(1) does not exclude the possibility of a single component being "a *substantial portion* of the components." A "portion" is "a part of a whole," *e.g.*, *American Heritage Dictionary*, *supra*, at 1066, and a single component is certainly "part" of a set of components. And "substantial" means important or essential. *E.g.*, *Webster's Third New International Dictionary* 2280 (2002); XVII *OED*, *supra*, at 67. There is no reason why a single component cannot be an important or essential part of a whole set, as it clearly is in other contexts. *See Setco Enters. v. Robbins*, 19 F.3d 1278, 1280-1281 (8th Cir. 1994) (single event was "a substantial part of the events or

48

omissions giving rise to the claim" because of its "importance" to the suit); *Goulding v. United States*, 957 F.2d 1420, 1426 (7th Cir. 1992) (a single entry is "a substantial portion of a [tax] return" if it forms "the dominant portion" of the return in its length or complexity); *First Nat'l Bank of Aberdeen v. County of Chehalis*, 166 U.S. 440, 457 (1897) ("single and separate operations" formed "substantial parts" of the banking business).

Substantial evidence supports the conclusion that Taq polymerase, which Life admitted supplying from the United States for all kits (A6282:15-6283:3; A2303-2304), is sufficiently important to the claims to support liability under Section 271(f)(1). As a "polymerizing enzyme suitable for performing a primer-directed polymerase chain reaction," Taq plays a critical role in claim 42 of the Tautz patent (A408), which each accused kit infringed (A9242-9243). Taq is also one of only two components required by claim 21 of the '235 patent (A340), which was infringed by Life's Identifiler, Identifiler Plus, and Identifiler Direct kits (A9242-9243). And Life's own witness Sandulli admitted that Taq is a "main" and "major" component. A6290:20-6291:1.

The court's rigid requirement of "at least two components" for a "substantial portion" (A2363; A2345) was erroneous. Substantiality is a fact question that turns primarily not on component quantity, but on importance to the patented invention. The U.S. supply need only be of a "substantial portion" of the

49

invention's components, not "substantially all" or "a large number" of them. *See, e.g.*, *Moore*, 144 F. Supp. 2d at 195. What constitutes a substantial portion in a given case depends on facts regarding the invention and patent claims—issues that are the jury's province.[13]

The statute's reference to a "combination of *such components*" does not support the district court's requirement of at least two U.S.-supplied components. 35 U.S.C. § 271(f)(1) (emphasis added). That combination refers not to multiple components *from the United States*, but to the larger set of components that will be combined "outside of the United States *in a manner that would infringe* the patent if such combination occurred within the United States." *Id.* (emphasis added). Such a combination could only meet the infringement criterion if it involved *all* the invention's components, including any component not supplied from the United States. Were the district court correct that "such components" refers to U.S.-supplied components (A2343-2344), they would need to amount to *all* the invention's components to meet the infringement criterion, but this reading renders the words "all *or a substantial portion*" meaningless. *See Setser v. United States*,

---

[13]     The district court noted that Section 271(f)(1) "consistently uses the plural term 'components'" (A2342), but that is beside the point. As explained, it is the singular "portion" that must be supplied from the United States, not the plural "components," and there is no reason why the "portion" cannot be a single component. Moreover, the Dictionary Act weakens any inference from the use of the plural, as "words importing the plural [can] include the singular." 1 U.S.C. § 1.

50

132 S. Ct. 1463, 1470 (2012) (courts "must 'give effect … to every clause and word'" of a statute).

The district court's reading also leads to the absurd result that a component supplier could avoid liability simply by combining U.S.-supplied components into one bigger "component" before shipment abroad. That would strangely immunize companies that assemble *more* of an infringing product within the United States, contrary to the statutory purpose and common sense. The district court's rule would also unreasonably protect a company that supplies from the United States one component of a two-component invention, no matter how important the supplied component is.

The district court's reasons for its *per se* rule do not withstand scrutiny. First, the court inferred too much from the contrast between Section 271(f)(2)'s use of the singular "component" and Section 271(f)(1)'s use of the plural "components." Unlike Section 271(f)(1), the language in Section 271(f)(2) "comes from existing [Section] 271(c) of the patent law, which governs contributory infringement." 1984 U.S.C.C.A.N. at 5828. Section 271(f)(2), like Section 271(c), governs specially-designed components that are "especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c), (f)(2). Because Section 271(f)(2) tracks Section 271(c), the imitative use of the singular

51

"component" is no surprise.  This history weakens any inference from a contrast

with Section 271(f)(1), which does not derive from an existing section that

referenced a specially-designed "component" of an invention.  The district court's

inference is also undermined by the Dictionary Act, which sets forth Congress's

presumption that "words importing the singular include and apply to several

persons, parties, or things."  1 U.S.C. § 1.

The court similarly overread the footnote in *Microsoft* stating that

Sections 271(f)(1) and 271(f)(2) "'differ, among other things, on the quantity of

components that must be "supplie[d] … from the United States" for liability to

attach.'"  A2344 (quoting *Microsoft*, 550 U.S. at 454 n.16).  The statement was

dicta ("that distinction does not affect our analysis," 550 U.S. at 454 n.16) and at

the very least ambiguous.  True, Section 271(f)(2) may set a lower threshold for

liability than Section 271(f)(1) in particular circumstances—Section 271(f)(2)'s

"single component," *Microsoft*, 550 U.S. at 458 n.18, can ground liability even

where it is not "a substantial portion" of the components under Section 271(f)(1),

such as where the invention has a great many components, each of which is not by

itself important.  But the relevant question is whether "a single component" could

*ever* also be "a substantial portion"—a question *Microsoft* had no need to address

and did not answer.  *See Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct.

680, 688 (2012) (refusing to rely upon an "ambiguous comment … made without analysis in dicta" in a prior Supreme Court decision).

Because the district court based its JMOL grant on the addition of limitations that do not exist in Section 271(f)(1), the jury verdict should be reinstated.

### 2. At a minimum, a remittitur or new damages trial is required because Promega quantified sales of three kits for which Life conceded U.S. supply of multiple components

Alternatively, Promega is at least entitled to a remittitur or a new trial on damages because, as even the trial court acknowledged, "some of the accused products [undisputedly] included a substantial portion of components supplied from the United States." A2359; *see also* A2340. Specifically, Life conceded multiple U.S.-supplied components for the Identifiler, Identifiler Direct, and Identifiler Plus kits. A2303; A6505:5-8; *see also* A6282:15-6283:3; A6284:24-6285:8.

The district court dismissed this fact because it believed that Promega "did not attempt to quantify the sales of those accused products." A2340. That was clear error. In addition to the spreadsheets discussed above (*supra* pp. 14-15), Promega submitted Life's royalty reports, which show that gross sales of the Identifiler, Identifiler Direct, and Identifiler Plus kits for 19 out of the 20 quarters between July 1, 2006 and June 30, 2011 amounted to at least ███████████, or

CONFIDENTIAL MATERIAL DELETED

more than ███ of stipulated worldwide sales.  A7180-7186; A7188-7192; A7196-

7204.[14]  Even that figure is an underestimate, because Life's original royalty

reports omitted more than █████████ in worldwide kit sales.  *Compare*

A6223:14-6224:7 *with* A5478:8-12.  The court was therefore wrong to conclude

that Promega had not presented "evidence regarding [D]efendants' sales of a[]

subset of products that would meet [Section 271(f)(1)'s] requirements."  A2353.

At a minimum, therefore, the trial court should have ordered a remittitur or a new

trial.  *See supra* pp. 36-38.

## III.   THE DISTRICT COURT CORRECTLY FOUND PROMEGA'S CLAIMS ENABLED

Life has not appealed the validity of the Tautz patent, which every accused

kit infringes.  Life's invalidity arguments therefore do not affect the infringement

and damages issues discussed above.  In any event, Life's arguments are meritless.

### A.   Promega's Recited Claim Elements Are Undisputedly Enabled, And Unrecited Additional Matter Need Not Be Enabled

Life does not deny that Promega enabled co-amplification of all loci recited

in the asserted claims.  *E.g.*, A1185 n.11 ("[T]he issue [is not] whether the

Promega patents teach and enable the multiplex amplification of the specific sets

of loci listed in the claims[.]").  Rather, Life argues that Promega was required to

enable all potential *unrecited* loci as well.  The district court properly rejected this

unsupported theory.

---

[14]     For the sales figures in each trial exhibit, *see also* A9323-9324 nn.8-10.

CONFIDENTIAL MATERIAL DELETED

Promega's "open" patent claims permit but do not require—and therefore need not enable—additional matter. For example, claim 1 of the '235 patent claims a method "*comprising*," among other steps, "selecting *a set of loci of the DNA sample, comprising* D3S1358, D5S818, D7S820, D8S1179, D13S317, D16S539, D18S51, D21S11, HUMCSF1PO, HUMFIBRA, HUMTH01, HUMTPOX, and HUMvWFA31," and "*co-amplifying the loci in the set* in a multiplex amplification reaction." A338 (emphases added). The claim thus requires "a set of loci … comprising" thirteen specific loci. The other relevant claims (as construed) also list sets of specific loci that permit, but do not require, additional matter. A8-21; *see also* A2 (listing claims at issue). Life has not challenged these constructions on appeal.

As the district court found, Promega was required to enable only co-amplification of the recited loci, because a patent need only enable a skilled artisan to "make and use" the "invention." 35 U.S.C. § 112(a). The scope of the "invention" is defined by the claims. *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1368 (Fed. Cir. 2003). Open-ended claim language like "comprising" simply "means that the named elements are essential, but other elements may be added." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). Thus, as the district court put it, "[e]mploying open-ended language does not change the *invention*; it is simply a

55

way to insure that others cannot avoid infringement by *adding to* the invention."

A27 (emphases added).

Thus, this Court upheld as enabled a claim that recited a "TCCPI circuit"

that would interface with a "word processor," ruling that "the enablement

requirement of § 112 was satisfied by disclosure of detailed, *claimed* TCCPI

circuitry without requiring detailed disclosure of all related, *unclaimed* circuitry

with which the TCCPI might be interfaced." *DeGeorge v. Bernier,* 768 F.2d 1318,

1324 (Fed. Cir. 1985); *see also Transocean Offshore Deepwater Drilling, Inc. v.*

*Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1307 (Fed. Cir. 2010) ("It is not

required to enable the most optimized configuration, unless this is an explicit part

of the claims."); *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1338, 1340

(Fed. Cir. 2003) (holding that "[i]f a patent claimed a system that achieved

cleanliness up to a specified numerical ... range, then enablement would require ...

enabl[ing] one of ordinary skill to achieve that range," but because "[t]he claims ...

state[d] no standard of cleaning," enablement of "any level of cleaning" sufficed).

This Court has upheld numerous open-ended "comprising" claims as enabled.[15]

---

[15] *E.g.*, *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336-1340 (Fed. Cir. 2013) ("method of administering … comprising …"); *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1308-1310 (Fed. Cir. 2012) ("valve prosthesis … comprising …"); *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1275, 1287-1292 (Fed. Cir. 2012) ("hematology control composition comprising: …"); *CFMT*, 349 F.3d at 1337-1340 ("Apparatus for wet processing of semiconductor wafers comprising …"); *Amgen Inc. v. Hoechst*

Life cites no instance where an open claim was invalidated merely because an infringer could implement the invention by adding unrecited features. *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377 (Fed. Cir. 2012), involved an overbroad *claimed range*, not open language such as "comprising" that allowed for additional *unclaimed* features. Specifically, the *MagSil* patent claimed an electrical junction that in certain circumstances exhibited a "change in resistance by at least 10% at room temperature"—a term construed to cover "resistance changes beyond 120% and up to infinity." *Id.* at 1381 (internal quotation marks omitted). Importantly, that range was an essential feature of the claim, not merely a non-prohibited additional feature. *Id.* This Court upheld and relied on that difference:

> [T]his case's claim limitation extending to an open-ended range of values, *which must be present for infringement*, is different from a preamble recitation 'comprising,' *which does not exclude additional features* to devices otherwise within the narrower claim definition.

*Id.* at 1384 (emphases added).

*MagSil* thus supports the ruling here: The "invention," whose full scope must be enabled, includes only the elements "which *must* be present for

---

*Marion Roussel, Inc.*, 314 F.3d 1313, 1334-1337 (Fed. Cir. 2003) ("pharmaceutical composition comprising …"); *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1359-1361 (Fed. Cir. 1998) ("suspension of human cells comprising …"); *In re Wands*, 858 F.2d 731, 735-740 (Fed. Cir. 1988) ("immunoassay method … which comprises the steps of: …").

infringement." 687 F.3d at 1384 (emphasis added). Promega's claims do not

require co-amplification of STR loci beyond those recited and undisputedly

enabled. Life's other loci are merely "additional features ... permitted by the word

'comprising,'" *id.*; the invention can be practiced regardless of their presence or

absence. *Chiron*, 112 F.3d at 501. By contrast, the *MagSil* patent required that the

claimed device permit an open-ended range of resistance changes, even though the

patent only enabled resistance changes up to 11.8%. 687 F.3d at 1382.[16]

    *Wyeth v. Abbott Laboratories*, 720 F.3d 1380 (Fed. Cir. 2013), is inapposite.

There, the Court ruled that a claim term ("rapamycin") *itself* defined a large class

of undisclosed compounds, such that the claim term's full range was not enabled.

*Id.* at 1385. The Court thus did not need to consider (and did not consider)

whether the administration of additional, unclaimed compounds was enabled. *Id.*

at 1385-1386.

    This Court's and the district court's rulings on the subject reflect sound

policy because, as the district court observed, "[i]f defendants were correct, nearly

every open-ended claim would be invalidated." A27. Open language inherently

permits "additional features" that an infringer could potentially add to an

---

[16]    Life also argues in passing that "unlisted loci [*sic*; presumably "amplified alleles"] are part of the … claimed multiplex *mixture*" recited in claim 1. Br. 41-42. That argument is waived because not made below. A1185-1202. In any event, Life's "mixture" argument adds nothing to its "set of loci" argument.

implementation of the claimed invention. A patentee could not, and should not be required to, disclose all possible "additional features" for an open claim; "the disclosure would be boundless, and the pitfalls endless." *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1531 (Fed. Cir. 1991). Fortunately, and contrary to Life's arguments, "[t]he law does not require the impossible." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).[17]

## B. Life's Remaining Arguments Fail

Life raises three other enablement arguments, all meritless.

*First*, Life asserts that the "unrecited elements" analysis does not apply because the claimed "set of loci" *itself* "include[s] both the particular loci recited in the claim and all unlisted STR loci that might be used." Br. 41-42. That is simply incorrect. Life confuses the "set" of loci of the claimed *invention*—which as discussed above, consists of the recited loci only—with the set of loci of potential *infringing instrumentalities*, which may but need not include other loci. For example, in a claim to "a widget comprising an element A and an element B," the widget of the *invention* is defined by the elements A and B, but *infringing* "widgets" may contain additional elements C, D, E, etc. Just so here: the fact that Life has added additional loci to the "sets" it co-amplifies does not mean that it has

---

[17]    Best-mode cases discussing the scope of the "invention" likewise confirm that "[u]nclaimed subject matter is not subject to the disclosure requirements of § 112." *Engel*, 946 F.2d at 1531-1532; *see also Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1567 (Fed. Cir. 1996).

ceased to practice Promega's invention, but neither does it expand the invention

beyond the recited "sets."

*Second*, Life argues that the "unrecited elements" analysis does not apply

because the open language defining the "set" of loci appears in a claim limitation

rather than in the preamble. Br. 41. Life cites no authority for that distinction, and

this Court has found open claim language within limitations to be enabled. *See*

*Edwards*, 699 F.3d at 1308-1310 ("[a] valve prosthesis … comprising a … valve

which is mounted on an elastical stent, … *wherein the stent comprises*: …"

(emphasis added)). Indeed, many patent claims contain multiple open elements

because inventors often build upon existing components and steps. *E.g.*, *Trading*

*Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1347, 1349-1350 (Fed. Cir. 2010)

("A method ... comprising ... displaying an order entry region ... comprising ...").

Life's proposed distinction would invalidate nearly all such patents.

*Third*, Life asserts at length that co-amplification of its additional unrecited

loci was unpredictable, inventive, and not obvious. Br. 31-41. Even if true, that is

unremarkable. It is expected that nonobvious additional elements will be added to

patented technologies, and the results may even be patentable. *Application of*

*Hogan*, 559 F.2d 595, 606 (C.C.P.A. 1977) ("Patents are and should be granted to

later inventors upon unobvious improvements."). But "such developments do not

alone cast doubt on enablement of the original invention." *Hormone Research*

60

*Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1568 (Fed. Cir. 1990). Promega proved for the first time that the specific loci in the claims could be co-amplified, and showed how to do it. Life built on Promega's invention by adding loci to Promega's sets. Even if Life's incremental contribution is patentable, that does not deprive Promega of its patents on its prior discovery.[18]

## IV. LIFE HAS NOT SHOWN THAT PROMEGA'S ASSERTED CLAIMS ARE OBVIOUS

Life contends that 58 claims in four Promega patents issued over eight years are all obvious because they resulted from an unpredictable trial-and-error process. Br. 43-45. But that is inconsistent with the patent statute and decades of well-settled precedent. Life has not shown any issue of fact requiring remand, much less clear and convincing evidence that Promega's claims are obvious. *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006).

### A. Life's Legal Argument Is Contrary To Statute And Precedent

Life contends that inventions requiring lengthy, difficult, and unpredictable experimentation are unworthy of a patent. That argument effectively revives the long-discredited "flash of creative genius" doctrine and should be rejected.

---

[18] Life insinuates, without citation, that its incremental additions "may well" have been developed "without any benefit from the success of" Promega's discoveries. Br. 38. But as the patents themselves make clear, "[o]nce a multiplex containing three loci is developed, it may be used as a core to create multiplexes containing more than three loci. New combinations are created including the first three loci." A232(13:15-18); *see also* A232(13:27-29); A314(9:66-10:1).

The "flash of creative genius" standard, set forth in *Cuno Eng'g Corp. v. Automatic Devices Corp.*, 314 U.S. 84, 91 (1941), was abrogated in 1952 by Congress's enactment of Section 103, which provides that "[p]atentability shall not be negated by the manner in which the invention was made." Section 103 reflects Congress's view that "it is immaterial whether [an invention] *resulted from long toil and experimentation* or from a flash of genius." 35 U.S.C. § 103 Revision Notes and Legislative Reports, 1952 Notes (emphasis added). The Supreme Court noted Congress's unambiguous intent in *Graham v. John Deere Co.*, 383 U.S. 1, 15 (1966), and this Court's precedent has consistently recognized that "the manner in which an invention is discovered, whether by insight or experiment, does not by itself affect patentability." *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1132 (Fed. Cir. 2006); *see also In re Fay*, 347 F.2d 597, 602 (C.C.P.A. 1965) ("[W]e do not agree that 'routine experimentation' negatives patentability.").

Promega's patents "resulted from" exactly the type of "long toil and experimentation" that Congress contemplated would potentially lead to a patentable invention. Life concedes, as it must, that development of a new multiplex was "unpredictable," "laborious," and a "difficult, arduous process." Br. 19 (quoting A1238-1240); *see also* A1159-1160 (Life admitting that "the prior art disclosed a rudimentary process of trial and error experimentation that was unpredictable, laborious, and time consuming"); A1517 (uncontested fact that

"multiplex PCR remained an unpredictable and experimental method"). These descriptions refute Life's attempt to describe the process as "rote testing" (Br. 48) and certainly do not compel an obviousness finding.

## B. Life Identifies No Material Infirmity In The District Court's Nonobviousness Decision

Life's scattershot attack on the district court's nonobviousness decision misses the mark. Contrary to Life's contention (Br. 49), the district court did not reject Life's obviousness argument simply because the patents were "deemed enabled." Rather, the court responded to Life's contention that *if* the Promega patents were deemed sufficient to teach unrecited loci, then the prior art also would have taught previously-undisclosed loci such as those in Promega's claims. A1202; A2399; A950-951. The court properly concluded that the first premise of Life's argument—which the court called the "enablement theory"—was legally incorrect because (as discussed in Part III above) patentees who use open-ended language need not enable unrecited elements. A2399 ("Because I have rejected defendants' enablement theory, this [obviousness] argument is moot.").

Life's second obviousness argument was that the new loci combinations Promega disclosed were not significantly different from the prior art. The court rejected this argument as factually unsupported, noting that it was "an afterthought because defendants' expert does not discuss it and defendants have submitted no proposed findings of fact about it." A2400. This was sufficient reason to reject the

argument, given that Life bore the burden of proving it by clear and convincing evidence.

Even on appeal, Life cites "no evidence showing that it would be obvious to a person of ordinary skill in the art that combinations of loci in the claims can be successfully co-amplified." A2400. Nor does Life show that the "possible options skilled artisans would have encountered were 'finite,' 'small,' or 'easily traversed,' and that skilled artisans would have had a reason to select the route that produced the claimed invention." *In re Cyclobenzaprine,* 676 F.3d 1063, 1072 (Fed. Cir. 2012). The only references that Life mentions, Caskey and Kimpton '93, were of record during prosecution (A205-206; A261), and do not teach all the elements of Promega's claims, let alone render those claims obvious (A712-732). Moreover, Life itself argues that the "selection of loci and primers was not predictable." Br. 45. Life's obviousness argument is woefully deficient and was properly rejected.

## V. THE DISTRICT COURT CORRECTLY RULED THAT THE LICENSE DOES NOT AUTHORIZE RESEARCH, EDUCATION, AND TRAINING UNCONNECTED TO LAW ENFORCEMENT AGENCIES

### A. The License's Plain Language Unambiguously Forecloses Life's Reading

The license does not use the terms "forensic education," "forensic research," or "forensic training," and Life's brief to this Court does not define those concepts. Instead, Life asks this Court to read the words "use in, or in preparation for, legal

proceedings" to authorize a nebulous, wide-ranging group of unspecified applications.  Br. 52; A816.  That contradicts the license's plain language.

*First*, Life baldly asserts that it is "difficult to see" how its desired uses of research, education, and training could not qualify as use in "legal proceedings." Br. 52-53.  Quite the contrary: it is difficult to see how those *could* be considered uses in "legal proceedings," which are typically defined as "proceeding[s] authorized by law and instituted in a court or tribunal to acquire a right or to enforce a remedy."  *Black's Law Dictionary* (9th ed. 2009) (defining "legal proceeding").  Nothing about research, education, or training is "instituted in a court or tribunal" or intended to "acquire a right or to enforce a remedy."  Life's interpretation thus runs contrary to the license's clear terms, which must be enforced as written.  *See* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").

*Second*, Life argues that forensic education, research, and training are done "in preparation for[] legal proceedings."  Br. 53-54.  This argument stretches "preparation" far beyond any reasonable interpretation, with no meaningful limit. Life ventures that one must undergo forensic education in order to become a forensic analyst who can testify in legal proceedings (Br. 58-59)—an argument that collapses all prerequisites for a future action into "preparation" for that action.

65

But just as a lawyer typically must obtain a law degree and be admitted to the bar

before representing clients in legal proceedings—and indeed, must attend college

beforehand[19]—one does not reasonably say that time spent in college, law school,

or bar review classes is "in preparation for legal proceedings," any more than one

would speak of attending medical school "in preparation for surgery."

Life's unbounded construction of "preparation" would produce absurd

effects in other contexts. Attorney's fees under 35 U.S.C. § 285 "include those

sums that the prevailing party incurs *in the preparation for* and performance of

legal services related to the suit." *Central Soya Co. v. Geo. A. Hormel & Co.*, 723

F.2d 1573, 1578 (Fed. Cir. 1983) (emphasis added); *Mathis v. Spears*, 857 F.2d

749, 757 (Fed. Cir. 1988).[20] But no one would reasonably consider such a rule to

allow prevailing parties to recover their attorneys' law school tuition or bar fees.

An action taken "in preparation for" a future action implies a temporal and

purposive proximity wholly inconsistent with Life's argument. *See United States

v. Yerena-Magana*, 478 F.3d 683, 689 (5th Cir. 2007) ("[T]he nexus between the

[defendant's] illegal entry on May 24, 2004 and the drug offense on June 24, 2004

is too attenuated to constitute 'preparation for that offense.' The illegal entry [one

---

[19]     *See* ABA Standards for Approval of Law Schools 2012-2013, Standard 502.

[20]     *See also, e.g.*, *Goodrich Corp. v. Town of Middlebury*, 311 F.3d 154, 174
(2d Cir. 2002) (under CERCLA, parties may recover "expenses incurred solely *in
preparation for* litigation" under certain circumstances (emphasis added)).

month earlier] made the drug crime possible only in the most philosophic and metaphysical sense." (footnote omitted)).

The district court's reading of "in preparation for[] legal proceedings," which required a direct connection to law enforcement, was reasonable and correct. The plain language requires a close connection to an actual or impending legal proceeding, which research, education, and training far removed from any court or tribunal cannot satisfy.

### B. Life Already Received All The Relief To Which It Was Entitled

Life's argument that enforcing the license's plain language would deprive Life of the full benefit of the bargain is absurd. Br. 54-60. The jury found that the license permitted Life to make *hundreds of millions of dollars* in licensed sales. A202. Life's claim that unlicensed sales are necessary to facilitate these licensed sales is wholly unsupported.

#### 1. The district court already ruled that required forensic training by law enforcement personnel is licensed

Life's complaint that "forensic analysts cannot be trained and tested in the use of Life's STR kits" (Br. 58) ignores the district court's order and jury instruction permitting the ongoing training of law enforcement personnel and forensic laboratory employees (A1792; A2288). The district court ruled that the license covered "forensic applications that are … 'connected' to 'law enforcement agencies.'" Br. 52. The court also instructed the jury that "ongoing training of

67

forensic laboratory employees" is licensed. A2288. Those interpretations provide ample leeway for forensic laboratory personnel to meet the training requirements spelled out in the FBI's Quality Assurance Standards.

Though Life does not define "forensic training" in its brief to this Court, Life defined it below as "training *in forensic labs* to establish and maintain qualifications and competency in forensic testing." A1578 (emphasis added). Under that definition, Life has already received all the relief that it requested. To the extent it now seeks to extend the definition of forensic training, Life cannot assert error on appeal based on the district court's adoption of the very definition Life offered. *See Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322 (Fed. Cir. 2008) ("Our precedent generally counsels against entertaining arguments not presented to the district court.").

### 2. Life provided no evidence that its kits are required for forensic education

Before the district court, Life defined forensic education as "academic instruction leading to a degree in forensic science or a specialty thereof." A1578. But Life has offered no basis for concluding that, if it cannot sell its kits for such education, it will not be able to sell its kits for use in or preparation for actual "legal proceedings."

Neither below nor in its brief to this Court has Life suggested that classroom education requires use of *Life's kits*. As Life's expert conceded, the Forensic

68

Science Education Programs Accreditation Commission ("FEPAC") standards only require "laboratory-based instruction."  A1596 (citing A1635).[21]  While academic instruction can "include[] actual use of STR kits" (A1596), that does not mean that *Life's kits* must be used in forensic education for them to be used in legal proceedings.  Indeed, Life never explains how it could introduce a new kit if everyone had to go back to college before they could use it.

### 3. Life's attempt to add ambiguously-defined "forensic research" into the license should be rejected

Life offers no definition of "forensic research" on appeal, and below stated only that forensic research "*is not a precise term*, but would include developmental validation (including population studies) and internal validation."  A1578 (emphasis added).  The district court concluded that Life wanted the license "to apply to every research project going on in the world that ha[s] anything to do with genetics," which "[d]oesn't work."  A69.

In spite of the breadth and ambiguity of its arguments, Life got much of what it asked for.  Where Life showed a direct, immediate connection to actual legal proceedings, such uses were treated as licensed.  For example, on internal validation "within a laboratory" (Br. 56), the district court ruled and instructed that applications within a forensic laboratory *are* licensed.  A69; A2288-2289.  The

---

[21]    The requirement for "laboratory-based instruction" appears in the FEPAC standards for a "General Curriculum" and makes no reference to DNA testing, let alone to use of STR kits.  A1635.

district court's ruling also covers population databases built by "the FBI and all the state crime labs and the police crime labs around the world." A2288; A6461.

This Court should reject Life's attempt to benefit from its ambiguity by expanding "forensic research" to include undefined activities with little or no connection to legal proceedings. The district court's interpretation amply encompasses the parties' intended bargain. To the extent that Life wanted the license to extend to basic research outside of law enforcement agencies, it should have negotiated for that right.

### C. The District Court Properly Interpreted The License As A Matter Of Law

Life alternatively asserts that conflicts in extrinsic evidence created fact questions about the license's interpretation. Br. 60. Life tellingly identifies no actual evidentiary conflict, because none existed. Under California law, contract interpretation only becomes a jury question when "ascertaining the intent of the parties at the time the contract was executed depends on the *credibility* of extrinsic evidence." *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 181 P.3d 142, 156 (Cal. 2008) (emphasis added). Life points to no credibility dispute here; the only disputed issue is the license's meaning in light of the evidence provided. That was a legal question properly decided by the court. *See Medical Operations*, 222 Cal. Rptr. at 458-461 (considering extrinsic evidence and interpreting contract as a question of law).

70

## CONCLUSION

The Court should reinstate the judgment of infringement and the jury's damages award and remand for consideration of Promega's motions for an injunction, exceptional case finding, and enhanced damages. Alternatively, the Court should restore the infringement judgment and grant a new trial on damages or, at a minimum, grant a new trial on both points. The Court should affirm the rulings regarding enablement, obviousness, and the license's scope.

Respectfully submitted,

*/s/ Seth P. Waxman*

SETH P. WAXMAN
THOMAS G. SAUNDERS
DINA B. MISHRA
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

MARK C. FLEMING
PROSHANTO MUKHERJI
ERIC F. FLETCHER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Dated: August 26, 2013

71

# ADDENDUM

# TABLE OF CONTENTS

Opinion and Order on Summary Judgment,
    Dkt. No. 345 (Nov. 29, 2011) .................................................A1-A33 (TAB 1)

Opinion and Order on Motions in Limine and
    Stipulation To Expand Summary Judgment Ruling,
    Dkt. No. 486 (Feb. 1, 2012)..................................................A34-A51 (TAB 2)

Amended Judgment,
    Dkt. No. 685 (Sept. 18, 2012).............................................A70-A71 (TAB 3)

Order Amending Summary Judgment Order,
    Dkt. No. 512 (Feb. 6, 2012)........................................A1667-A1668 (TAB 4)

Opinion and Order on Post-Trial Motions,
    Dkt. No. 684 (Sept. 13, 2012)....................................A2333-A2354 (TAB 5)

Opinion and Order,
    Dkt. No. 770 (Apr. 22, 2013) ....................................A2358-A2370 (TAB 6)

Judgment,
    Dkt. No. 573 (Feb. 23, 2012)......................................A9242-A9243 (TAB 7)

CASE PARTICIPANTS ONLY

# TAB 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PROMEGA CORPORATION,

             OPINION AND ORDER

     Plaintiff,

  and            10-cv-281-bbc

MAX-PLANCK-GESELLSCHAFT zur
FORDERUNG der WISSENSCHAFTEN E.V.,

     Involuntary Plaintiff,

  v.

LIFE TECHNOLOGIES CORPORATION,
INVITROGEN IP HOLDINGS, INC. and
APPLIED BIOSYSTEMS, LLC,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

   Plaintiff Promega Corporation is suing defendants Life Technologies Corporation,

Applied Biosystems, LLC and Invitrogen IP Holdings, Inc. for infringement of U.S. Patents

Nos. 5,843,660, 6,221,598, 6,479,235, 7,008,771 and Re 37,984. (Both sides treat the

three defendants as one entity for the purpose of the motions for summary judgment, so I

will do the same.) Plaintiff owns the first four patents and is the exclusive licensee of

1

A1

involuntary plaintiff Max Planck with respect to the fifth. The patents relate to "multiplex amplification of short tandem repeat loci," which are regions on a DNA strand that contain repeating nucleotide sequences. Because the number of repeats of particular sequences can vary greatly from person to person, these differences can be used to compare different DNA samples for possible matches. To facilitate the process, the loci are copied, or "amplified." "Multiplex" amplification means that multiple loci are copied simultaneously to make the process more efficient.

The asserted patents include both apparatus and method claims. Plaintiff contends that kits made and sold by defendants directly infringe the apparatus claims and that defendants induce infringement of the method claims. The asserted apparatus claims are claims 18-19 and 21-23 of the '235 patent, claims 10, 23-24, 27 and 33 of the '598 patent; claims 25 and 27-31 of the '660 patent, claim 5 of the '771 patent and claim 42 of the '984 patent. The asserted method claims are claims 1-4, 6-13 and 15-17 of the '235 patent, claims 1-2, 4-5, 7-9, 12, 15, 19, 21-22, 28 and 31-32 of the '598 patent; claims 2-5, 16-17, 19-21 and 23-24 of the '660 patent and claims 15-16, 18, 23, 25, 27-28 and 41 of the '984 patent.

Plaintiff has filed a motion for summary judgment with respect to infringement of all five patents as well as on defendants' invalidity defenses and counterclaims for anticipation, lack of enablement and obviousness. Defendants have filed a motion for partial summary

2

judgment for noninfringement, lack of enablement and obviousness with respect to all of the patents except the '984 patent.

I am granting defendants' motion with respect to noninfringement of claims 25 and 27-31 of the '660 patent because I conclude that those claims are limited to products that use no loci other than those listed in the claims and the parties agree that none of the accused products are limited to just those loci. Because the remaining asserted claims are open-ended (they do not exclude unrecited loci) and the parties identify no other potential differences between the accused products, I am granting plaintiff's motion for summary judgment with respect to direct infringement of all other claims that disclose a kit. I disagree with defendants that their sale of the kits is covered by a license agreement with plaintiff and that plaintiff lacks standing to sue under the '984 patent.

With respect to the method claims, plaintiff is not seeking summary judgment for direct infringement, only for inducement under 35 U.S.C. § 271(b). I am denying plaintiff's motion for summary judgment with respect to inducement and willfulness because plaintiff failed to develop arguments on these issues. Because defendants' motion for summary judgment did not include these issues, they will have to proceed to trial.

With respect to invalidity, I conclude that plaintiff is entitled to summary judgment on defendants' affirmative defenses and counterclaims of anticipation, obviousness and lack of enablement. The enablement defense is contingent on an incorrect view that the

3

patentees were required to enable unrecited elements and defendants have failed to adduce any evidence that at the time the patent applications were filed, it would have been obvious to a person of ordinary skill in the art that the combinations of loci disclosed in the asserted patents could coamplify successfully.

Defendants do not contend in their summary judgment briefs that any of the claims in the asserted patents are anticipated, but they say that the court should not rule on this issue because they never raised it. I disagree. Although it is true that defendants did not include an opinion on anticipation in their expert report, in their answer they included an affirmative defense and a counterclaim that "the '660, '598, '235, and '771 patents are invalid for failure to comply with one or more of the requirements of the United States patent laws, including at least 35 U.S.C. sections 102, 103 and/or 112." Ans., dkt. #150, at 35. Anticipation is one of the defenses under 35 U.S.C. § 102. Defendants did not explicitly identify anticipation as a defense or a counterclaim, but they did not identify any other particular invalidity defenses either. Thus, if defendants properly raised any invalidity defenses in their answer and counterclaim, anticipation was among them. Accordingly, I conclude that there is an actual controversy regarding that issue and that plaintiff is entitled to summary judgment because defendants failed to show that a genuine issue of material fact exists.

Two other motions are before the court: (1) plaintiff's motion to "strike" defendants'

4

brief in support of their motion for partial summary judgment, or, in the alternative, to disregard any facts not included in defendants' proposed findings of fact, dkt. #262; and (2) plaintiff's motion for leave to file a reply brief in support of the motion to strike. Dkt. #293. With respect to the motion to strike, I will grant plaintiff's alternative request because the court's procedures are clear that "[a]ll facts necessary to sustain a party's position on a motion for summary judgment must be explicitly proposed as findings of fact." Helpful Tips for Filing a Summary Judgment Motion, Tip #1, dkt. #69, at 11. See also Procedure to Be Followed on Motions for Summary Judgment, I.B.4, dkt, #69, at 14 ("The court will not consider facts contained only in a brief."). I have not considered facts submitted by either side unless they were included in its proposed findings of fact. Plaintiff's motion to file a reply brief will be denied as unnecessary.

## BACKGROUND

Certain locations or "loci" on chromosomes vary from individual to individual. These are called polymorphic loci and are useful as identifiers. However, no one locus will positively identify an individual to a statistically significant degree because no one locus is unique to each individual within any given population.

Short tandem repeats (STRs) are loci found within genomic DNA that have a number of short repetitive nucleotide sequences. The DNA sequences at a particular STR locus

5

A5

within a given population will exhibit a variable number of these repeat sequences. It is this variation in the number of repeats at a particular locus that is responsible for the polymorphisms that permit scientists to genetically distinguish one individual from another.

Polymerase chain reaction is one method of amplifying loci. There are several steps in the process. First, the two strands of genomic DNA are heated and then separated to form "single stranded" DNA. Second, a pair of "primers" is introduced and allowed to pair with the single stranded DNA. This pairing occurs in accordance with the nucleotide pairing rules, that is, at a point on the single stranded DNA where the primer sequence is complementary to the genomic nucleotide sequence.

Amplifying the alleles present at a single locus is commonly referred to as a "monoplex" reaction. Amplifying multiple STR loci simultaneously is a "multiplex" reaction. To minimize labor, materials and analysis time, it is desirable to analyze multiple loci and samples simultaneously. One approach for reaching this goal involves amplification of multiple loci simultaneously in a single reaction.

The amplified alleles from one DNA sample can be compared to the amplified alleles of a second DNA sample by, for example, running the two samples side-by-side on the gel. One can then determine whether the two samples came from the same individual. Additionally, a "size marker" or "allelic ladder" is often run concurrently with the sample in another lane of the gel. By comparing the alleles amplified in the DNA sample to the allelic

6

ladder one can determine precisely which alleles appear in the DNA sample.

Defendants manufacture, offer for sale and sell AmpFlSTR Amplification Kits. These kits provide components for carrying out simultaneous amplification of multiple short tandem repeat loci from one or more DNA samples. The kits are used for chimerism in the context of bone marrow transplant monitoring, cell line authentication, genotyping hydatidiform moles, cancer analysis, determinations of fetal sex and anthropological research, among other things.

Chimerism occurs following bone marrow transplantation when the recipient produces her own blood cells as well as donor blood cells. The kits are used to compare the amount of amplified STR alleles from the donor and host and then to determine the proportion of blood cells contributed by each source. Repetitive testing over time indicates whether the proportion of blood cells from the donor and host is changing, which has treatment and prognostic value.

In genotyping hydatidiform moles, kits are used to classify moles in a woman's uterus during pregnancy to assess whether the woman is at risk for particular diseases. In cell line authentication, kits are used to determine whether new cell lines are unique. In cancer analysis, the kits are used to analyze genetic instability in cancers by detecting allelic imbalance.

OPINION

A. Claim Construction

The parties' arguments on questions of infringement and invalidity rely in part on their understanding of the phrase "a set of . . . loci," which appears in all of the asserted claims in the '235, '298, '660, and '771 patents. In particular, each claim includes the phrase "a set of . . . loci" followed by a list of particular loci. For example, claim 16 of the '660 patent discloses:

> A method of simultaneously determining the alleles present in three short tandem repeat loci from one or more DNA samples, comprising:
>
> (a) obtaining at least one DNA sample to be analyzed,
>
> (b) selecting a set of three short tandem repeat loci of the DNA sample to be analyzed which can be amplified together, wherein the set of three loci is selected from the group of sets of loci consisting of:
>
> D3S1539, D19S253, D13S317;
> D10S1239, D9S930, D20S481;
> D10S1239, D4S2368, D20S481;
> D10S1239, D9S930, D4S2368;
> D16S539, D7S820, D13S317; and
> D10S1239, D9S930, D13S317.
>
> (c) co-amplifying the three loci in the set in a multiplex amplification reaction, wherein the product of the reaction is a mixture of amplified alleles from each of the co-amplified loci in the set; and
>
> (d) evaluating the amplified alleles in the mixture to determine the alleles present at each of the loci analyzed in the set within the DNA sample.

8

The question of claim construction presented by the parties is whether the set may include loci in addition to those that are listed in the claim, that is, whether the set is open or closed. Plaintiff says all of the asserted claims are open-ended; defendants say they are all closed.

The parties raised this issue in their claim construction briefs, but I declined to resolve it because both sides supported their arguments with text of particular claims without accounting for the textual differences among the claims. Accordingly, I directed the parties to reassert their arguments at summary judgment if they believed a construction was needed to resolve a dispute of infringement or invalidity. "In the meantime, the parties should consider how they wish to frame their arguments. If they believe that 'a set of . . . loci' has an identical meaning everywhere it appears in every asserted claim in every asserted patent, then they should be prepared to explain why textual differences in the claims may be disregarded. They should not use the language of a particular claim to support a construction they wish to be applied across the board." Dkt. #190, at 4.

Defendants largely disregarded these instructions in their summary judgment materials. They advance arguments from the prosecution history with the assumption that a statement from the history of one patent applies equally to another and they cherry pick language from particular claims while ignoring other claims that have different texts.

I will consider defendants' arguments about the prosecution history first and I will assume that any statement in the prosecution history applies to all of the asserted patents.

9

A9

Defendants argue that the applicants disclaimed the inclusion of any loci in the reaction not expressly listed in the claims. In support, defendants cite various statements from the applicants that the prior art did not include "these combinations" of loci and a statement from the examiner of the '598 patent that the prior art "does not teach the specific combinations provided in the claims." Dfts.' Br., dkt. #245, at 12-13. (Defendants did not include proposed findings of fact about these aspects of the prosecution history, but I will consider them because doing so will not make any difference to the outcome of the motion.)

If the applicants had been distinguishing prior art that included one of the listed sets of loci *and* one or more additional loci, defendants would have a stronger argument of disclaimer. Defendants' argument fails because the applicants were distinguishing prior art that was *missing* some of the loci in the listed combinations. For example, the applicants noted that Oldroyd included two of the loci listed in claim 1 of '660 patent, but none of the other loci. Dkt. #240-12. Thus, a statement that "these combinations" were not in the prior art does not disclaim an invention that includes those combinations and additional loci.

The cases defendants cite provide no support for their argument. In <u>Seachange International, Inc. v. C-COR, Inc.</u>, 413 F.3d 1361, 1369 (Fed. Cir. 2005), the question was whether the applicants had defined the term "network for data communications" to mean "point-to-point networks" during the prosecution history. In concluding that they had, the

10

A10

court of appeals relied on statements in which the applicants overcame an examiner's objection by explaining that the prior art did not include a point-to-point network. In Elkay Manufacturing Co. v. Ebco Manufacturing Co., 192 F.3d 973, 977 (Fed. Cir. 1999), the question was whether the term "an upstanding feed tube" meant one tube or could mean more than one. The court limited the term to one tube because, during the prosecution history, the applicants had distinguished prior art on the ground that it used multiple tubes.

Neither of these cases raised the question whether the claimed invention is limited to recited items. Both involved applicants who needed to narrowly define their invention during prosecution in order to overcome an anticipation defense. Because the applicants in this case did not define their invention to exclude additional loci, SeaChange and Elkay are not on point.

Defendants' other "universal" argument is similar. They rely on Smith v. Snow, 294 U.S. 1, 14 (1935), Phillips v. AWH Corp., 415 F.3d 1303, 1321 (Fed. Cir. 2005), Acumed, LLC v. Stryker Corp., 483 F.3d 800, 815 (Fed. Cir. 2007), and In re Gray, 53 F.2d 520, 522 (CCPA 1931), for the proposition that claims should not be construed to cover more than what was actually invented. Because the applicants did not invent any combinations of loci other than those listed in the claims, defendants say it would violate this principle to allow the claims to cover additional loci.

Again, none of the cited cases raise the question whether a claim must be limited to

11

A11

recited elements. It is well-established that claims are not so limited; that is the whole point of using terms such as "comprising" or "including." Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc., 246 F.3d 1336, 1348 (Fed Cir. 2001) ("[T]he transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements."); AFG Industries, Inc. v. Cardinal IG Co., Inc., 239 F.3d 1239, 1244 (Fed. Cir. 2001) ("When a claim uses an 'open' transition phrase, its scope may cover devices that employ additional, unrecited elements."); Stiftung v. Renishaw PLC , 945 F.2d 1173, 1178 (Fed. Cir. 1991) (a claim that "uses the term 'comprising,' is an 'open' claim which will read on devices which add additional elements"). If I were to accept defendants' argument, it would mean that a defendant could avoid infringement simply by adding more elements to a device or method. That is not the law, even when the additional elements are an improvement to the claimed invention. Free Motion Fitness, Inc. v. Cybex International, Inc., 423 F.3d 1343, 1347 (Fed. Cir. 2005) ("The addition of unclaimed elements does not typically defeat infringement when a patent uses an open transitional phrase such as 'comprising.'"); Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1365 (Fed. Cir. 2004) ("Making improvements on a patented invention by adding features to a claimed device beyond those recited in the patent does not avoid infringement."); A.B. Dick Co. v. Burroughs Corp., 713 F.2d 700, 703 (Fed. Cir. 1983) ("It is fundamental that one cannot

12

A12

avoid infringement merely by adding elements if each element recited in the claims is found in the accused device."). See also Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1374 (Fed. Cir. 2005) (claim disclosing razor with three blades could read on razor with four blades); Genentech, Inc. v. Chiron Corp., 112 F.3d 495, 499 (Fed. Cir. 1997) ("[T]he district court improperly limited the transitional phrase 'comprising,' which allows additional elements to be present as long as the named elements are present, to exclude additional DNA between the alpha-factor processing sequences and the human IGF-I sequence.").

Turning to the language of the asserted claims, I will begin with the '660 patent because I construed some of those claims in a previous case. Promega Corporation v. Applera Corporation, No. 01-C-244-C (W.D. Wis. June 10, 2002), dkt. #64. The question in case no. 01-C-244-C was the same as in this case, whether "a set of . . . loci" in the asserted claims was opened or closed. In this case, plaintiff is asserting claims 2-5, 16-17, 19-21, 23-25 and 27-31; in case no. 01-C-244-C, plaintiff was asserting claims 1-5 and 16. Although claim 1 is not asserted in this case, it is relevant because claims 2-5 depend from it. Claim 1 discloses:

> A method of simultaneously determining the alleles present in at least four short tandem repeat loci from one or more DNA samples, comprising:
>
> (a) obtaining at least one DNA sample to be analyzed,
>
> (b) selecting a set of at least four short tandem repeat loci of the DNA sample to be analyzed which can be amplified together, wherein the at least four loci

13

A13

in the set are selected from the group of loci consisting of:

D3S1539, D4S2368, D5S818, D7S820, D9S930, D10S1239, D13S317, D14S118, D14S548, D14S562, D16S490, D16S539, D16S753, D17S1298, D17S1299, D19S253, D20S481, D22S683, HUMCSF1PO, HUMTPOX, HUMTH01, HUMF13A01, HUMBFXIII, HUMLIPOL, HUMvWFA31;

(c) co-amplifying the loci in the set in a multiplex amplification reaction, wherein the product of the reaction is a mixture of amplified alleles from each of the co-amplified loci in the set; and

(d) evaluating the amplified alleles in the mixture to determine the alleles present at each of the loci analyzed in the set within the DNA sample.

A review of the 2002 opinion reveals that there were *two* disputes about the scope of the claims, both of which seem to be relevant to this case. The first was the one focused on by the parties in this case, that is, whether the list of loci in step (b) is exclusive or may include other unnamed loci. The second was whether step (c) may include loci not listed in step (b), regardless whether the list in step (b) is closed. Both sides raise arguments about both issues, though neither acknowledges that the issues are distinct. In any event, the parties seem to agree that the accused products infringe the claims of the '660 patent if plaintiff prevails on either issue.

In case no. 01-C-244-C, I agreed initially with the defendants that lists of loci identified in claims 1-5 and 16 were closed and that the loci in step (c) were limited to the list in step (b). Promega Corporation v. Applera Corporation, No. 01-C-244-C (W.D. Wis. Jan. 3, 2002), dkt. #40. However, upon reconsideration, I adopted the following

14

A14

construction: "Claims 1 through 5 and 16 of the '660 Patent require the presence of at least one of the sets identified in the Markush groups stated in limitation (b) of those claims but do not exclude the presence of other STR loci in the multiplex reaction required by limitation (c) of those claims." Dkt. #64, at 10. In reaching that conclusion, I discussed several factors.

First, I concluded that it was important not to conflate the loci in "the set" in step (b) with the loci in the "reaction" in step (c). That is, even if "the set" in step (b) was limited to the recited loci, it did not follow that the loci in the "multiplex amplification reaction" in step (c) was limited to those listed in step (b). I concluded that the language of step (c) did not exclude the presence of other loci. (Plaintiff buttresses that conclusion in this case by pointing out that step (c) discloses a "mixture," which generally permits ingredients not listed in the claim. Mars, Inc. v. H.J. Heinz Co., 377 F.3d 1369 (Fed. Cir. 2004).)

Second, I cited the rule that "[o]ne who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim." Wahpeton Canvas Co., Inc. v. Frontier, Inc., 870 F.2d 1546, 1552 (Fed. Cir. 1989). Under the defendants' view, this rule would be broken because it would be possible for an accused product to infringe a dependent claim without infringing the independent claim. For example, claim 3 contains the following set of loci: "D16S539, D7S820, D13S317, D5S818, HUMFI3A01, HUMFESFPS." Although the first five of these loci are listed in claim 1,

15

A15

HUMFESFPS is not. Thus, if the set of loci in claim 1 is closed, a product that included the six loci in claim 3 could infringe claim 3, but not claim 1.

Third, I rejected the defendants' argument that the patentees disclaimed an open set when they amended the phrase "at least four of the loci in the set" to "the at least four loci in the set." Although I acknowledged the possibility that inclusion of "the" could be read "to require that all the loci in a set, whether four or more, be selected from the Markush group in step (b)," I also found credible plaintiff's argument that "the amendment was not substantive, but was made instead to conform the claim to standard patent claim drafting procedure, which requires that an element of a claim be preceded by a definite article, such as 'the,' each time it is referred to after its initial appearance in a claim." Dkt. #64, at 8-9. Because neither the patentees nor the examiner made a clear statement regarding the amendment's significance, I declined to narrow the scope of the claim.

Finally, I cited a statement by the patentees when they deleted the HUMFESFPS loci from the list in claim 1: "the amendments to claim 1 do not change the fact that the claimed method encompasses the coamplification and evaluation of sets of short tandem repeat loci which include the deleted locus, provided at least four of the loci in the set . . . are selected from the remaining group of loci listed in claim 1." Because there was no clear evidence that the patentees ever disavowed this broad interpretation or that the examiner disagreed with it, the statement supported plaintiff's view that the set was open.

16

As I noted in the claim construction order in this case, the law suggests that I am not bound by the conclusion in the 2002 opinion because the case settled before judgment. Talmage v. Harris, 486 F.3d 968, 974 (7th Cir. 2007) ("Normally, when a case is resolved by settlement or stipulation, courts will find that the 'valid final judgment' requirement of issue preclusion has not been satisfied."). However, defendants do not directly address the 2002 opinion or criticize its reasoning. Although they raise arguments that would conflict with the earlier case, those arguments are undeveloped and unpersuasive. Accordingly, I decline to depart from my previous conclusion.

This resolves the claim construction dispute with respect to claims 2-5 and 16 of the '660 patent. Because asserted claims 17, 19-21 and 23-24 all depend from claim 16 and do not include any additional "set of . . . loci" limitations, I need not consider those claims separately.

Claims 1-2, 4-5 and 7-9 of the '598 patent have a structure similar to that of claims 2-5 and 16 of the '660 patent. Because defendants do not point to any more restrictive language in claims 1-2, 4-5 and 7-9 of the '598 patent, I conclude that those claims may include unrecited loci as well.

Asserted claim 25 in the '660 patent is another matter. That claim discloses:

A kit for simultaneously analyzing short tandem repeat sequences in at least three loci, comprising a container which has oligonucleotide primers for co-amplifying a set of at least three short tandem repeat loci, wherein the set

17

of loci are selected from the sets of loci consisting of:

D3S1539, D19S253, D13S317;
D10S1239, D9S930, D20S481;
D10S1239, D4S2368, D20S481;
D10S1239, D9S930, D4S2368;
D16S539, D7S820, D13S317;
D10S1239, D9S930, D13S317;
D3S1539, D7S820, D13S317, D5S818;
D17S1298, D7S820, D13S317, D5S818;
D20S481, D7S820, D13S317, D5S818;
D9S930, D7S820, D13S317, D5S818;
D10S1239, D7S820, D13S317, D5S818;
D14S118, D7S820, D13S317, D5S818;
D14S562, D7S820, D13S317, D5S818;
D14S548, D7S820, D13S317, D5S818;
D16S490, D7S820, D13S317, D5S818;
D17S1299, D7S820, D13S317, D5S818;
D16S539, D7S820, D13S317, D5S818;
D22S683, D7S820, D13S317, D5S818;
D16S753, D7S820, D13S317, D5S818;
D3S1539, D19S253, D13S317, D20S481;
D3S1539, D19S253, D4S2368, D20S481;
D10S1239, D9S930, D4S2368, D20S481;
D16S539, D7S820, D13S317, HUMvWFA31;
D16S539, D7S820, D13S317, D5S818, HUMCSF1PO, HUMTPOX;
D16S539, D7S820, D13S317, D5S818, HUMF13A01, HUMFESFPS;
D16S539, D7S820, D13S317, D5S818, HUMCSF1PO, HUMTPOX, HUMTH01;
D16S539, D7S820, D13S317, D5S818, HUMF13A01, HUMFESFPS, HUMBFXIII;
D16S539, D7S820, D13S317, D5S818, HUMCSF1PO, HUMTPOX, HUMTH01, HUMvWFA31; and
D16S539, D7S820, D13S317, D5S818, HUMF13A01, HUMFESFPS, HUMBFXIII, HUMLIPOL.

Both sides recognize that the phrase "consisting of" signals a closed list. "In simple

18

A18

terms, a drafter uses the phrase 'consisting of' to mean 'I claim what follows and nothing else.'" <u>Vehicular Technologies Corp. v. Titan Wheel Intern., Inc.</u>, 212 F.3d 1377, 1383 (Fed. Cir. 2000). Extending that logic to this claim would mean that the set must include loci from the list and no other loci. Unlike claims 2-5 and 16, claim 25 does not include a counterpart to step (c) that would allow unrecited loci to be included in a mixture. In addition, no claims depend from claim 25 that recite loci not included in claim 25.

Plaintiff asks the court not to construe claim 25 as closed because the claim includes the term "comprising," which it says supports a construction that additional, unrecited loci may be included. Although plaintiff is correct that the term "comprising" is open-ended, as defendants point out, the term " '[c]omprising' is not a weasel word with which to abrogate claim limitations." <u>Spectrum International Inc. v. Sterilite Corp.</u>, 164 F.3d 1372, 1380 (Fed. Cir. 1998). The context of the term is important. In claim 25, "'[c]omprising' appears at the beginning of the claim . . . The presumption raised by the term 'comprising' does not reach into each of the [elements] to render every word and phrase therein open-ended." <u>Dippin' Dots, Inc. v. Mosey</u>. 476 F.3d 1337, 1343 (Fed. Cir. 2007). In other words, the term "comprising" in claim 25 suggests that the kit may include elements other than "a container which has oligonucleotide primers for co-amplifying a set of at least three short tandem repeat loci," but it does not suggest that the set may include loci outside the list.

The importance of context is shown by comparison to asserted claim 10 of the '598

19

patent:

> A kit for simultaneously analyzing short tandem repeat sequences in at least three loci, comprising:
>
> a single container containing oligonucleotide primers for each locus in a set of at least three short tandem repeat loci, wherein the at least three short tandem repeat loci in the set comprises at least three loci selected from the group consisting of: [a listing of 20 sets of three loci].

In this claim, the applicants wrote that the set "comprises at least three loci selected from the" recited group, making it clear that the set may include other loci outside the group. Claim 25 of the '660 patent is missing similar language.

Alternatively, plaintiff relies on the phrase "at least three loci" in claim 25: "the fact that the sets themselves (from which to choose) are bigger than three loci makes it expressly clear additional loci can be selected." Plt.'s Br., dkt. #228, at 11. This argument makes no sense. If the listed sets were limited to two or three loci, then the phrase "at least three loci" might support an argument that additional loci must be present as well. However, because some of the listed sets have three loci and some have more than three, there is no reason to interpret "at least three loci" as anything other than an acknowledgment that some of the listed sets have more than three loci in them.

Accordingly, I conclude that claim 25 of the '660 patent is limited to the listed loci. Because asserted claims 27-31 depend from claim 25, this conclusion extends to those claims

20

as well.

The language of the remaining asserted independent claims makes it clear that they are not limited to the recited loci because they all use the word "comprising" when listing the loci. '598 pat., claim 12 ("selecting a set of short tandem repeat loci of the DNA sample to be analyzed which can be co-amplified, comprising . . ."); id. at claim 23 ("a set of short tandem repeat loci which can be co-amplified, comprising . . ."); id. at claim 28 ("a set of short tandem repeat loci of the DNA sample to be analyzed which can be co-amplified, comprising . . . "); id. at claim 33 ("a set of short tandem repeat loci which can be co-amplified, comprising . . . "); '235 pat., claim 1 ("selecting a set of loci of the DNA sample, comprising . . ."); id. at claim 13 ("selecting a set of loci of the DNA sample, comprising . . ."); id. at claim 18 ("the loci comprise . . ."); '771 pat., claim 5 ("a set of loci from one or more DNA samples, comprising . . ."). The remaining asserted claims of these four patents are dependent claims that do not include more limiting language that is relevant to this issue. Accordingly, I conclude that all of the asserted claims allow for unrecited loci, with the exception of claims 25 and 27-31 of the '660 patent.

B. Infringement

Plaintiff contends that summary judgment is appropriate for direct infringement with respect to those asserted claims that disclose a kit and inducement of infringement with

21

respect to the method claims. Defendants do not deny in their briefs that the accused products include all of the elements of the '984 patent. With respect to the '660, '598, '235 and '771 patents, the only element defendants say is missing is "a set of . . . loci" on the ground that the accused products include loci not recited in the claims. In the previous section, I agreed with this argument with respect to claims 25 and 27-31 of the '660 patent, but I disagreed with respect to every other asserted claim. Accordingly, I will grant defendants' motion for summary judgment with respect claims 25 and 27-31 of the '660 patent, but I cannot grant defendants' motion on this ground with respect to the other asserted claims.

Defendants raise two more grounds for granting summary judgment with respect to direct infringement of the other asserted claims. First, defendants argue that any allegedly infringing acts under the '235, '598, '660 and '771 patents fall within the scope of a 1996 licensing agreement. Second, defendants argue that plaintiff does not have the right to sue under the '984 patent.

Finally, with respect to inducement, the question is whether plaintiff has proven inducement by defendants as a matter of law. Defendants have not moved for summary judgment on the question of inducement.

1. Direct infringement of the '235, '598, '660 and '771 patents: scope of 2006 cross license

22

A22

The parties dispute whether several kinds of applications performed by the accused products sold by defendants fall within the scope of the license agreement: chimerism in the context of bone marrow transplant monitoring, cell line authentication, classifying molar specimens and determinations of fetal sex. The license extends to "any analysis, based on the measurement of the length of polynucleotide sequence containing a tandem repeat, of human genetic material for (a) use in, or preparation for, legal proceedings, or (b) analysis of biological specimens for the identification of individuals." Defendants argue that their kits fall within the scope of the license because they perform an "analysis of biological specimens for the identification of individuals."

Neither side cites much case law in favor of its position or even conducts a choice of law analysis. However, it is unnecessary to ask for supplemental briefing because it is clear from the plain language of the license and the undisputed facts that the kits in dispute do not perform an analysis "for the identification of individuals."

It is undisputed that the identity of the individual is either already known or irrelevant to the applications at issue. Plt.'s PFOF ¶ 135, dkt. #246; Dfts.' Resp. to Plt.'s PFOF ¶ 135, dkt. #257; Plt.'s PFOF ¶ 147, dkt. #246; Dfts.' Resp. to Plt.'s PFOF ¶ 147, dkt. #257; Plt.'s PFOF ¶ 150, dkt. #246; Dfts.' Resp. to Plt.'s PFOF ¶ 150, dkt. #257; Plt.'s PFOF ¶ 152, dkt. #246; Dfts.' Resp. to Plt.'s PFOF ¶ 152, dkt. #257. (Defendants dispute these proposed findings of fact on the ground that the applications involve a "human

23

identity application," but they do not dispute the fact that the identity of the individual is already known or irrelevant in each of them.)  In particular, chimerism involves determining the relative *amount* present of two different types of DNA, Plt.'s PFOF ¶ 135; classifying molar specimens involves determining whether a mole is present and what type it is; Plt.'s PFOF ¶ 147; cell line authentication involves a determination whether two cell lines are unique, Plt.'s PFOF ¶ 149.  Determination of fetal sex is self-explanatory.

Defendants do not dispute plaintiff's description of these applications, but they rely on the opinion of their expert for the proposition that the applications "determine the identity, or DNA fingerprint or genetic profile of a known individual."  Booker Rpt., dkt. #291-1 at ¶ 17.  That is not helpful.  The expert's opinion suggests that the applications may be used for the identification of particular genetic characteristics, but it does not suggest that they are used "for the identification of *individuals*." Defendants do not provide any reason to give the word "individuals" anything other than its ordinary meaning.

To the extent the parties' subjective intent is relevant, the available evidence does not support defendants' view.  For example, defendants' corporate representative, Daniel Hall, testified that defendants did not have a license from plaintiff for bone marrow transplant applications, which is evidence that defendants themselves do not believe that the license covers applications in which the identity of the donor is already known.  Hall Dep., dkt. #233-48, at 53-54.  Defendants do not even attempt to reconcile the representative's

24

position with their position in their summary judgment briefs that bone marrow transplant applications fall within the scope of the license. Accordingly, I am granting plaintiff's motion for summary judgment with respect to direct infringement of the asserted apparatus claims in the '235, '598, '660 and '771 patents, with the exception of claim 25 in the '660 patent and the claims that depend from claim 25.

2. Direct infringement of the '984 patent: scope of 1996 license

Defendants' argument on the '984 patent seems to be that plaintiff lacks standing to sue for infringement, though defendants do not say this explicitly. Rather, they say that plaintiff's rights under the '984 patent derive from a 1996 license that does not include the "research market" and that all of defendants' sales fall within that exception.

It is undisputed that plaintiff's rights under the '984 patent come from the 1996 license. Under that agreement, plaintiff has "an exclusive, worldwide license . . . for the HUMAN GENETIC IDENTITY and the HUMAN CLINICAL MARKET" except for "HUMAN LINKAGE ANALYSIS in the RESEARCH GENETICS FIELD OF USE." Dkt. #1-6. Defendants are simply wrong when they say that the agreement excludes the "research market" generally and they identify no reason to believe that any of their sales fall outside the human genetic identity market or the human clinical market.

Alternatively, defendants say that summary judgment is "premature" because the

25

parties are "in the midst of arbitration proceedings" that "could result in [plaintiff] losing all rights to the ['984] patent." Dfts.' Br., dkt. #253, at 31. Defendants provide no details and they cite no authority to support this view. I decline to stay a ruling on summary judgment because of an arbitration proceeding that may or may not affect plaintiff's rights in this case at some point in the future.

Although plaintiff asserted in its opening brief that the accused products meet all of the elements of the asserted claims in the '984 patent, defendants did not challenge this assertion in their opposition brief regarding noninfringement of this patent. Accordingly, I conclude that plaintiff is entitled to summary judgment with respect to infringement of the '984 patent.

## 3. Inducement of the method claims

Plaintiff said little about its claim that defendants may be held liable for inducing infringement under 35 U.S.C. § 271(b). It simply summarizes the standard and then lists a number of alleged actions by defendants. It did not develop any argument in support of a view that any of these actions constitute inducement or specify which actions induce infringement of which claims. Accordingly, plaintiff has not met its burden to show that it is entitled to judgment as a matter of law on its claims under § 271(b). Because defendants did not move for summary judgment on this issue, it will proceed to trial.

26

C. Enablement as to the '235, '598, '660 and '771 patents

Defendants' lack of enablement argument is the flip side of its noninfringement argument, that is, if the asserted claims are not limited to the recited loci, defendants say, they are invalid because the specification does not explain how to practice any methods or kits that use loci other those recited in the claims and undue experimentation would be required to determine what other loci could be added.

Defendants' argument is not persuasive. They cite the standard that "[t]o meet the enablement requirement, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." Martek Biosciences Corp. v. Nutrinova, Inc., 579 F.3d 1363, 1378 (Fed. Cir. 2009), but they misread it to mean that the "claimed invention" includes unrecited elements. Employing open-ended language does not change the invention; it is simply a way to insure that others cannot avoid infringement by adding to the invention.

If defendants were correct, nearly every open-ended claim would be invalidated. The whole point of such claims is to prevent others from avoiding infringement by adding new elements that the inventors did not anticipate at the time of the invention. If, as the court of appeals has held, patentees are entitled to draft their claims to cover unrecited elements, then it would make no sense to require patentees to explain in the specification how to practice later improvements or additions. Cf. A.B. Dick Co., 713 F.2d at 703 ("[A] pencil

27

structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine that limits or controls what the pencil can write. *Neither would infringement be negated simply because the patentee failed to contemplate use of the pencil in that environment*.") (Emphasis added).

Defendants cite two cases to support their argument, but neither of them addresses the question whether a patentee must enable unrecited elements. Rather, both of them involved an applicant that used a broad term in the claim and then failed to explain how to practice the invention with respect to particular aspects of that term. In re Vaeck, 947 F.2d 488, 495 (Fed. Cir. 1991) (affirming patent office's conclusion that claim was not enabled because applicant included "cyanobacteria" element without explaining in specification which cyanobacteria could be used); Sitrick v. Dreamworks, LLC, 516 F.3d 993, 1000 (Fed. Cir. 2008) (claim that disclosed invention related to both movies and video games not enabled because specification did not teach how to practice invention with movies). In the absence of case law requiring the patentee to enable his invention with respect to unrecited elements, I decline to impose such a requirement.

### D. Obviousness as to the '235, '598, '660 and '771 patents

The parties agree that all elements of the claims were known in the prior art, with the exception of the particular combinations of loci to be co-amplified. Under 35 U.S.C. §

28

103(a), a claim is invalid "if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 655 F.3d 1364, 1374 (Fed. Cir. 2011) (internal quotations and alterations omitted). Defendants have the burden to show by clear and convincing evidence that the asserted claims are obvious. Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1375 (Fed. Cir.1986).

Defendants advance two theories of obviousness. The first is the only theory included in defendants' expert report. It is contingent on defendants' argument that the claims are not enabled unless the specification shows how to practice the inventions using loci not recited in the claims:

> In the event that the Promega patents are actually deemed [to] teach and enable skilled artisans to multiplex sets of loci other than those listed in the claims, i.e., arbitrary sets of loci, then the claims would have been obvious in light of the prior art because the prior art would have already taught and enabled the same. Sun Decl., Ex. 8 (Struhl Invalidity Report) ¶ 45. In other words, if trial and error as disclosed in the Promega patents constitutes an enabling disclosure for multiplexing arbitrary sets of loci, then the prior art, which already taught trial and error, would also already have taught multiplexing of arbitrary sets of loci.

Dfts.' Br., dkt. #245, at 44. Because I have rejected defendants' enablement theory, this argument is moot.

Defendants' second theory is that the new loci combinations are not a "significant"

29

difference from the prior art because "the selection of the number of loci and the specific loci for use in a multiplex is merely an arbitrary choice." Id. at 45-56. This argument suffers from multiple problems. To begin with, it seems to be an afterthought because defendants' expert does not discuss it and defendants have submitted no proposed findings of fact about it. As I noted in the introduction, the court will not consider facts if they are included in a brief but not in the party's proposed findings of fact. Defendants cite United States v. Murphy Oil USA, Inc., 143 F. Supp. 2d 1054, 1064 (W.D. Wis. 2001), for the proposition that parties should not include legal conclusions in their proposed findings of fact. That is obviously correct, but unhelpful. Expert opinions and descriptions of the prior art are not legal conclusions. In any event, even if I considered the allegations in defendants' brief, defendants cite no evidence showing that it would be obvious to a person of ordinary skill in the art that combinations of loci in the claims can be successfully co-amplified. Because defendants bear the burden of persuasion with respect to invalidity, plaintiff's motion for summary judgment must be granted on the issue of obviousness.


E. Willful Infringement

Finally, plaintiff has moved for summary judgment on the question of willfulness, which it bears the burden to prove by clear and convincing evidence. nCube Corp. v. Seachange Intern., Inc., 436 F.3d 1317, 1319 (Fed. Cir. 2006). Plaintiff has not shown that

30

it is entitled to judgment as a matter of law on this issue. "'[W]illful' action is quintessentially a question of fact, for it depends on findings of culpable intent and deliberate or negligent wrongdoing." Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1356 (Fed. Cir. 2001). In fact, plaintiff cites no cases in which a court concluded that the plaintiff was entitled to summary judgment on willfulness. Perhaps more important, plaintiff's argument on willfulness is undeveloped, making up a page of their opening brief and consisting of little more than a few quotations from documents prepared by one employee of defendants. This is insufficient to show as a matter of law that plaintiff is entitled to a finding of willfulness.

## ORDER

IT IS ORDERED that

1. The motion for partial summary judgment filed by defendants Life Technologies Corporation, Invitrogen IP Holdings, Inc. and Applied Biosystems, LLC, dkt. #234, is GRANTED with respect to plaintiff Promega Corporation's claim of infringement of claims 25 and 27-31 of U.S. Patent No. 5,843,660 and defendants' counterclaims for noninfringement of the same claims. Plaintiff's complaint is DISMISSED as to those claims. Defendants' motion is DENIED in all other respects.

2. Plaintiff's motion for summary judgment, dkt. #227, is GRANTED with respect

31

A31

to the following claims of infringement:

- AmpFlSTR COfiler PCR Ampliflication Kit infringes claims 23 and 27 of U.S. Patent No.6,221,598 and claim 42 of U.S. Patent No. Re 37,984;

- AmpFlSTR Profiler PCR Amplification Kit infringes claims 10, 23-24, 27 and 33 of the '598 patent and claim 42 of the '984 patent;

- AmpFlSTR Identifiler PCR Amplification Kit infringes claims 10, 23-24 and 27 of the '598 patent, claims 18-19 and 21-23 of U.S. Patent No. 6,479,235, claim 5 of U.S. Patent No. 7,008,771 and claim 42 of the '984 patent;

- AmpFlSTR Profiler Plus PCR Amplification Kit infringes claim 42 of the '984 patent; and

- AmpFlSTR Yfiler PCR Amplification Kit infringes claim 42 of the '984 patent.

The motion is DENIED as to all other claims of infringement and inducing infringement.

2. Plaintiff's motion for summary judgment, dkt. #227, is GRANTED with respect to defendants' affirmative defenses and counterclaims that the '235, '598, '660 and '771 patents are invalid because they are anticipated, obvious or not enabled. Plaintiff's motion is DENIED with respect to its claim of willfulness.

3. Plaintiff's motion to disregard facts not included in the proposed findings of fact, dkt. #262, is GRANTED. Plaintiff's motion for leave to file a reply brief in support of that

32

A32

motion, dkt. #293, is DENIED as unnecessary.

Entered this 29th day of November, 2011.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

33

A33

CASE PARTICIPANTS ONLY

# TAB 2

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PROMEGA CORPORATION,

                             Plaintiff,

                and

MAX-PLANCK-GESELLSCHAFT zur
FORDERUNG der WISSENSCHAFTEN E.V.,

                       Involuntary Plaintiff,

       v.

LIFE TECHNOLOGIES CORPORATION,
INVITROGEN IP HOLDINGS, INC. and
APPLIED BIOSYSTEMS, LLC,

                    Defendants.

OPINION and ORDER

10-cv-281-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     Plaintiff Promega Corporation is suing defendants Life Technologies Corporation,

Applied Biosystems, LLC and Invitrogen IP Holdings, Inc. for infringement of U.S. Patents

Nos. 5,843,660, 6,221,598, 6,479,235, 7,008,771 and Re 37,984.  Trial is scheduled for

February 6, 2012 and the parties' motions in limine are now before the court.

1

A34

A. <u>Plaintiff's Motions in Limine</u>

1. <u>Motion to preclude references to equitable defenses, dkt. #375</u>

In their answer, defendants raised affirmative defenses and counterclaims for unclean hands, laches and estoppel, but neither side discussed these issues in its summary judgment materials. Plaintiff says that defendants have now waived these counterclaims and defenses because they did not raise them in response to plaintiff's motion for summary judgment. Defendants say they had no obligation to raise those defenses at the time.

The parties debate whether <u>Diversey Lever, Inc. v. Ecolab, Inc.</u>, 191 F.3d 1350 (Fed. Cir. 1999), and <u>Pandrol USA, LP v. Airboss Ry. Products, Inc.</u>, 320 F.3d 1354 (Fed. Cir. 2003), resolve the matter. In <u>Diversey</u>, 191 F.3d at 1352, the court held that the defendant waived an equitable estoppel defense by failing to raise it in response to the plaintiff's motion for summary judgment on "liability." In <u>Pandrol USA</u>, 320 F.3d at 1364, the court held that the defendant did *not* waive an invalidity defense by failing to raise it in response to the plaintiff's motion for summary judgment on "infringement." The key issue in these cases seems to be whether the defendant had notice that the plaintiff's motion for summary judgment required it to come forward with all of its liability defenses or just those related to infringement.

In this case, plaintiff did not limit its motion to "infringement," but it did not say that it was seeking judgment on "liability" either. Rather, it said that it "hereby moves for

2

A35

summary judgment that certain claims of the Promega Patents and Tautz patent are a) not anticipated, b) not obvious, c) enabled, and d) infringed." Dkt. #228, at 2. The order on summary judgment was limited to those issues; I did not enter judgment in favor of plaintiff on liability generally. Although the question is a close one, I think that plaintiff left enough ambiguity in its motion to preclude a finding of waiver by defendants.

However, that does not resolve plaintiff's motion entirely. The parties agree that equitable defenses are decided by the court, not the jury, so there is no reason that either side should be referring to these defenses in front of the jury. Agfa Corp. v. Creo Products Inc., 451 F.3d 1366, 1375 (Fed Cir. 2006) ("[A]n equitable defense [is] adjudicated by the trial court without a jury."). Defendants object on the ground that plaintiff has not identified any specific evidence to exclude. However, it is not necessary to identify particular testimony or documents at this point. Obviously, if defendants wish to offer evidence that is relevant to one of the issues to be decided by the jury, they may do so even if that evidence happens to be relevant to one of the equitable defenses as well.

Defendants' argument raises another question: what pieces of evidence do defendants intend to offer in support of these defenses? There is no point in holding a court trial on the defenses if defendants have no evidence to support them. Accordingly, I will give defendants an opportunity to identify the grounds for these defenses. If defendants can show that they have support for the defenses, I will hold a court trial after the conclusion of the jury trial.

3

A36

2. Motion to "preclude references to defendants' arguments on scope of employment and respondeat superior," dkt. #376

This motion relates to Lisa Ortuno, an employee of defendants. Plaintiff argues that defendants should be precluded from arguing at trial that Ortuno was acting outside the scope of her employment with respect to various actions she took that plaintiff says are relevant to its claims for inducement. Defendants say that they do "not intend to assert a scope of employment, or respondeat superior, argument and, therefore, d[o]not intend to introduce evidence or argument regarding that issue," dkt. #442, so this motion will be granted as unopposed.

3. Motion to exclude certain testimony relating to kit sales to universities by damages expert Jonathan Tomlin, dkt. #378

Plaintiff says that Tomlin has improperly excluded from his damages calculation certain sales of defendants' accused kits to universities. First, plaintiff says that Tomlin is wrong to conclude that sales to U.S. universities are covered by a license agreement that extends to "any analysis, based on the measurement of the length of polynucleotide sequence containing a tandem repeat, of human genetic material for (a) use in, or preparation for, legal proceedings, or (b) analysis of biological specimens for the identification of individuals." However, plaintiff simply says that the universities used the kits for "training." It fails to

4

provide any specific facts about the content of the training or otherwise develop any argument that the training falls outside the scope of the license. Accordingly, I am denying this portion of plaintiff's motion.

Second, with respect to the foreign universities, plaintiff argues that Tomlin did not have enough data to determine the purpose for which those universities were using the kits. Again, this argument is conclusory. If plaintiff believes that Tomlin's data set is too small to make a generalization, it is free to attempt to establish that through cross-examination.

4. Motion to exclude certain testimony relating to "alternative" and "upper bound" damages, dkt. #380

In his report, plaintiff's damages expert John Beyer set forth three damages estimates that he called "lower bound," "alternative" and "upper bound." Plaintiff wishes to preclude defendants' damages expert Jonathan Tomlin from critiquing Beyer's estimate relating to "alternative" and "upper bound" damages on the ground that Tomlin did not include an analysis of these estimates.

In their response, defendants admit that "Dr. Tomlin does not 'correct' or 'adjust' Dr. Beyer's 'alternative' and 'upper bound' calculations," dkt. #443, at 5, so I will grant plaintiff's motion to the extent that plaintiff's are seeking to preclude Tomlin from offering an adjusted figure. However, Tomlin is free to explain why he believes the jury should reject

Beyer's "alternative" and "upper bound" calculations as a general matter because Tomlin does include that discussion in his report. Dkt. #414, at 6.

5. Motion to "preclude evidence or argument concerning certain terms of the 2006 agreement," dkt. #381

At summary judgment, one of defendants' defenses to infringement was that a 2006 licensing agreement gave them the right to sell accused kits for various purposes: chimerism in the context of bone marrow transplant monitoring, cell line authentication, classifying molar specimens and determinations of fetal sex. I rejected this argument and granted plaintiff's motion for summary judgment for direct infringement of the patents at issue. In its motion, plaintiff asks the court to preclude defendants from relitigating this issue.

In their response, defendants say that they "will not be re-litigating issues already determined by the Court's November 29, 2011 Opinion and Order," but that "there are multiple issues related to the 2006 Cross-License that remain in the case." In particular, defendants say that their understanding of the scope of the license is relevant to inducement and willfulness, that the court has not yet determined whether "forensic training" falls within the scope of the license and that the court has not considered "the specific identity and number of sales that [defendants] sold in unlicensed fields." Dkt. #457. With respect to the third issue, defendants say that they should be able to argue that particular sales of those

6

kits fall within the license agreement if defendants did not have knowledge of how a customer was going to use a kit.

The first two issues are outside the scope of plaintiff's motion, so I need not consider them. Defendants have waived the third issue. Plaintiff moved for summary judgment on direct infringement with respect to sales of these kits. If defendants believed that the license agreement protected them in instances in which they were unaware of the customer's use of the kit, that is an issue they should have raised in response to plaintiff's motion. <u>Pandrol USA</u>, 320 F.3d at 1366-67; <u>Diversey</u>, 191 F.3d at 1352. Accordingly, I am granting this motion.

6. <u>Motion to preclude defendants from relying on attorney advice as a defense to willfulness, dkt. #382</u>

This motion will be granted as unopposed. Dkt. #444 (Defendants do "not intend to rely on or introduce at trial evidence of attorney advice in defense of willfulness, or any other claim.").

7. <u>Motion to "preclude defendants from introducing evidence or argument on matters decided by claims construction and summary judgment and request for statement to the jury on previous findings," dkt. #383</u>

7

The only specific issue plaintiff identifies in this motion is a request for an instruction to the jury regarding the issues that have been resolved by the court. Because defendants agree that such an instruction is appropriate, I will grant this portion of the motion. However, plaintiff provides no context for the remainder of the motion, so I cannot decide it at this time.

8. Motion to "preclude testimony on certain fields of use matters prior to 2006 to avoid jury confusion," dkt. #384

I am denying this motion because plaintiff never identifies with any precision what it wants to exclude with this motion or why. Plaintiff refers to the subject matter variously as "evidence prior to 2006 about Promega's inquiries and work in examining clinical diagnostics and other non-permitted fields," "[e]vidence of Promega's actions to commercialize and sell products into particular fields of use prior to 2006" and "matters related to Promega's examination of commercial opportunities." However, plaintiff never explains what it means by this or why such evidence would confuse the jury. Obviously, if defendants wish to use evidence of any events leading up to the 2006 license agreement, they will have to show that the evidence is relevant to the remaining issues for the jury and not an attempt to contradict the summary judgment opinion.

8

A41

9.  <u>Motion to exclude any references to the arbitration proceedings, dkt. #386</u>

This court granted defendants' motion to compel arbitration of a number of claims arising out of a 1996 agreement.  Dkt. #140.  Because defendants "agre[e] that evidence or testimony relating to the substantive claims that have been referred to arbitration . . . would be irrelevant," dkt. #447, at 2, I am granting this motion as unopposed.

Defendants raise another issue in their response regarding the timing of this lawsuit.  In particular, defendants say that "the fact that Promega brought the instant action within one month after service of the Demand for Arbitration under the 1996 License Agreement . . . may be evidence that Promega did not believe that Life was infringing during this period, and accordingly may be evidence relevant to non-willfulness."  <u>Id.</u>  It is not clear how *plaintiff's* beliefs could be relevant to show *defendants'* intent.  In any event, because that issue is beyond the scope of plaintiff's motion, I need not resolve it now.

10.  <u>Motion to strike defendants' "newly disclosed" witnesses, dkt. ## 368 and 387</u>

Discovery in this case closed on December 15, 2011.  On January 13, 2012, defendants supplemented their Fed. R. Civ. P. 26(a)(1) disclosures with 18 new witnesses.  Plaintiff asks the court to strike each of these witnesses as untimely under Fed. R. Civ. P. 37.  (Plaintiff says it is seeking to strike 19 witnesses, but defendants point out that plaintiff's list has 18 names on it.)  Under Rule 37(c)(1), if a party fails to disclose its evidence as

9

required under Rule 26, the evidence must be excluded unless the failure was substantially justified or harmless.

Defendants offer two reasons for allowing 13 of the witnesses to testify. (They are not contesting plaintiff's motion with respect to the other five. Dkt. #423, at 6 n.3) First, defendants say that two of the proposed witnesses, Arthur Eisenburg and Guido Sandulli, are not really new because they were identified previously in other discovery. Second, defendants say that the remaining witnesses are necessary to rebut the "wrong assumptions" made by plaintiff's expert John Beyer in a report he filed on December 15.

I am granting this motion because defendants have failed to show that the late supplements were justified or harmless. Simply because a witness's name appears in a discovery document does not mean that the other side has notice that the witness is testifying on a particular topic. To the extent defendants believed that they were unfairly surprised by opinions in Beyer's report, the proper response would have been to file a motion to strike those opinions or seek leave to file a supplemental report from their own expert. With respect to prejudice, because plaintiff had no notice of these witnesses until just before trial, there is no time left for plaintiff to take their depositions or otherwise explore their potential testimony before trial.

As a "sanction," plaintiff asks the court to prohibit any witness from testifying about particular topics. Because plaintiff fails to develop that argument, I am denying this request.

10

A43

11. <u>Motion to dismiss counts 17, 18 and 19 of the amended complaint without prejudice,</u>

<u>dkt #372</u>

  This motion is GRANTED as unopposed.

12. <u>Motion to "expand summary judgment ruling to new products," dkt. #373</u>

  Plaintiff wants the court to "expand the summary judgment ruling" to include products that were not included in its motion for summary judgment because these products are indistinguishable from those that the court found to be infringing. In response, defendants concede that the following additional products fall within the scope of the summary judgment ruling:

  a. AB Minifiler PCR Amplification Kit (Claim 42 of the '984 Patent);

  b. AB SGM Plus PCR Amplification Kit (Claim 42 of the '984 Patent);

  c. AB SEfiler Kit (Claim 42 of the '984 Patent);

  d. AB SEfiler Plus Kit (Claim 42 of the '984 Patent);

  e. NGM PCR Amplification Kit (1000 and 200) (Claim 42 of the '984 Patent);

  f. NGM SElect Kit (Claim 42 of the '984 Patent);

  g. Identifiler Plus Kit (Claim 42 of the '984 Patent, Claim 5 of the '771 Patent, Claims 18, 19, 21, 22 and 23 of the '235 Patent, Claims 10, 23, 24,

<p style="text-align:center">11</p>

27, and 33 of the '598 Patent);

h. Identifiler Direct Kit (Claim 42 of the '984 Patent, Claim 5 of the '771 Patent, Claims 18, 19, 21, 22 and 23 of the '235 Patent, Claims 10, 23, 24, 27, and 33 of the '598 Patent);

i. AB Green I PCR Amplification Kit (Claim 42 of the '984 Patent and claims 23 and 27 of the '598 patent1);

j. Blue PCR Amplification Kit (Claim 42 of the '984 Patent); and

k. COfiler + Profiler Plus Kit (Claim 42 of the '984 and claims 23 and 27 of the '598 Patent).

Accordingly, I will amend the summary judgment order to include these additional products with respect to these claims.

### B.  Defendants' Motions in Limine

1. Motion to exclude testimony of Randall Dimond regarding STR kit use by institution type, dkt. #404

As discussed in the January 31, 2012 order, I am reserving a ruling on this motion to allow the parties to submit supplemental briefs.

2.  Motion to exclude "certain testimony" of John Beyer, dkt. #408

Defendants seek to exclude testimony by plaintiff's expert John Beyer on various subjects: (1) the "quantum" of infringing sales by defendant Applied Biosystems; (2) the "interchangeability" of the products of plaintiff and defendants; (3) noninfringing substitutes; (4) plaintiff's manufacturing capacity for STR kits; and (5) demand for plaintiff's products.   I will consider each subject in turn.

a.  Quantum of infringing sales

This issue overlaps with the motion to exclude certain testimony of Randall Dimond. Again, the question is whether one of plaintiff's experts may provide an opinion about the percentage of defendants' sales that fall outside the scope of the license agreement in the absence of direct evidence on that issue.   I will a reserve a ruling on this issue until the parties file their supplemental briefs.

b.  "Interchangeability" and non-infringing substitutes

Defendants argue that Beyer is not qualified to testify about the similarity of plaintiff's and defendants' products or the availability of noninfringing substitute products. In its response, plaintiff does not say that Beyer is qualified to give these opinions.  Rather, plaintiff says that Beyer was simply parroting the opinions of Dimond on these issues when it was necessary as part of his damages report.  Plaintiff points out that defendants do not

13

A46

challenge that aspect of Dimond's opinions. Accordingly, I will grant this motion, but only to the extent that Beyer's opinion is different from Dimond's.

### c. Manufacturing capacity

Again, plaintiff does not argue that Beyer is qualified to give an opinion on plaintiff's manufacturing capacity. Therefore, I am granting this motion to the extent Beyer intends to rely on his own expertise in testifying about this matter.

### d. Demand for plaintiff's products

I am denying this motion because defendants fail to develop their argument. They do not deny that Beyer is qualified to testify about product demand, but they say that his opinion relies on "various assumptions" and he "does not consider all the factors" that he should. Dkt. #410, at 43. However, they do not explain what these assumptions are or why his failure to consider individual factors is grounds for excluding his opinion rather than for cross examination.

## ORDER

IT IS ORDERED that

1. Plaintiff Promega Corporation's motion to preclude references to equitable

14

defenses, dkt. #375, is GRANTED IN PART. Defendants Life Technologies Corporation, Applied Biosystems, LLC and Invitrogen IP Holdings, Inc. may not refer to these defenses during the jury trial. Defendants may have until February 6, 2012, to explain in writing the grounds for their equitable defenses and the evidence they have to support those defenses.

2. Plaintiff's motion to "preclude references to defendants' arguments on scope of employment and respondeat superior", dkt. #376, is GRANTED as unopposed.

3. Plaintiff's motion to exclude certain testimony by damages expert Jonathan Tomlin, dkt. #378, is DENIED.

4. Plaintiff's motion to exclude certain testimony relating to "alternative" and "upper bound" damages, dkt. #380, is GRANTED IN PART. Defendants' expert may not provide an adjustment to plaintiff's experts' calculations, but he may challenge the reliability of the calculations.

5. Plaintiff's motion to "preclude evidence or argument concerning certain terms of the 2006 agreement," dkt. #381, is GRANTED.

6. Plaintiff's motion to preclude defendants from relying on attorney advice as a defense to willfulness, dkt. #382, is GRANTED as unopposed.

7. Plaintiff's motion to "preclude defendants from introducing evidence or argument on matters decided by claims construction and summary judgment and request for statement to the jury on previous findings," dkt. #383, is GRANTED IN PART. The court will provide

15

A48

an instruction to the jury regarding the matters that have been resolved before trial.

8.  Plaintiff's motion to "preclude testimony on certain fields of use matters prior to 2006 to avoid jury confusion," dkt. #384, is DENIED.

9.  Plaintiff's motion to exclude any references to the arbitration proceedings, dkt. #386, is GRANTED as unopposed.

10.  Plaintiff's motion to strike defendants' "newly disclosed" witnesses, dkt. ## 368 and 387, is GRANTED.  Defendants are precluded from calling the following witnesses at trial, except for impeachment:  Phillip Habermeier; Rebecca Clifton; Carla Abdo; Orion Ng; Roberto Castlenovo; Naseem Malik; Beate Balitzki; Katja Anslinger; Franz Neuhuber; Arthur Eisenberg; Solomon F. Ofori-Acquah; Jason Linvelle; Robert Allen; Mary Brophy; Ken Dyu; Steven Wittbrodt; Robert Harris and Graham Consterdine.

11.  Plaintiff's motion to dismiss counts 17, 18 and 19 of the second amended complaint without prejudice, dkt #372, is GRANTED as unopposed.  The second amended complaint is DISMISSED WITHOUT PREJUDICE as to those three counts.

12.  Plaintiff's motion to "expand summary judgment ruling to new products," dkt. #373, is GRANTED as unopposed.  The order dated November 29, 2011, dkt. #345, is AMENDED to grant summary judgment to plaintiff with respect to the following claims of infringement:

a. AB Minifiler PCR Amplification Kit infringes claim 42 of the '984 Patent;

16

b. AB SGM Plus PCR Amplification Kit infringes claim 42 of the '984 Patent;

c. AB SEfiler Kit infringes claim 42 of the '984 Patent;

d. AB SEfiler Plus Kit infringes claim 42 of the '984 Patent;

e. NGM PCR Amplification Kit (1000 and 200) infringes claim 42 of the '984 Patent;

f. NGM SElect Kit infringes claim 42 of the '984 Patent;

g. Identifiler Plus Kit infringes claim 42 of the '984 Patent, claim 5 of the '771 Patent, claims 18, 19, 21, 22 and 23 of the '235 Patent, claims 10, 23, 24, 27 and 33 of the '598 Patent;

h. Identifiler Direct Kit infringes claim 42 of the '984 Patent, claim 5 of the '771 Patent, claims 18, 19, 21, 22 and 23 of the '235 Patent, claims 10, 23, 24, 27 and 33 of the '598 Patent;

i. AB Green I PCR Amplification Kit infringes claim 42 of the '984 Patent and claims 23 and 27 of the '598 patent;

j. Blue PCR Amplification Kit infringes claim 42 of the '984 Patent; and

k. COfiler + Profiler Plus Kit infringes claim 42 of the '984 and claims 23 and 27 of the '598 Patent.

13.  Defendants' motion to exclude the testimony of John Beyer is GRANTED IN PART, dkt. #410.  Beyer may not offer expert testimony about the similarity of plaintiff's

17

and defendants' products, the availability of noninfringing substitutes or plaintiff's manufacturing capacity, except to rely on Randall Dimond's opinion. Defendants' motion is DENIED with respect to demand for plaintiff's products.

Entered this 1st day of February, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

18

A51

CASE PARTICIPANTS ONLY

# TAB 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PROMEGA CORPORATION,

Plaintiff,

and

MAX-PLANCK-GESELLSCHAFT zur
FORDERUNG der WISSENSCHAFTEN E.V.,

Involuntary Plaintiff,

v.

LIFE TECHNOLOGIES CORPORATION,
INVITROGEN IP HOLDINGS, INC. and
APPLIED BIOSYSTEMS, LLC,

Defendants.

AMENDED
JUDGMENT IN A CIVIL CASE

Case No. 10-cv-281-bbc

This action came for consideration before the court with District Judge Barbara B. Crabb presiding. The issues have been considered and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that judgment is entered:

(1) granting defendants' motion for partial summary judgment with respect to plaintiff's claim of infringement of claims 25 and 27-31 of U.S. Patent No. 5,843,660 and defendants' counterclaims for non-infringement of the same claims;

(2) granting plaintiff's motion for summary judgment with respect to defendants' counterclaims that U.S. Patent Nos. 6,479,235, 6,221,598, 5,843,660 and 7,008,771 are invalid because they are anticipated, obvious or not enabled;

(3) dismissing the counterclaims filed by defendants for their failure to prove these counterclaims; and

A70

      (4) granting defendants' motion for judgment as a matter of law regarding 35 U.S.C.

§ 271(a) and (f)(1).

Approved as to form this _14th_ day of September, 2012.


_Barbara B. Crabb_
Barbara B. Crabb, District Judge


_Peter Oppeneer_                                          _9/18/12_
Peter Oppeneer, Clerk of Court                                    Date

CASE PARTICIPANTS ONLY

# TAB 4

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PROMEGA CORPORATION,

                Plaintiff,

       and

MAX-PLANCK-GESELLSCHAFT zur
FORDERUNG der WISSENSCHAFTEN E.V.,

                Involuntary Plaintiff,

    v.

LIFE TECHNOLOGIES CORPORATION,
INVITROGEN IP HOLDINGS, INC. and
APPLIED BIOSYSTEMS, LLC,

                Defendants.

ORDER

10-cv-281-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The parties have agreed that, under the summary judgment opinion, dkt. #345, the

Profiler Plus ID infringes claim 42 of U.S. Patent No. Re 37,984. Accordingly, IT IS

ORDERED that the order dated November 29, 2011, dkt. #345, is AMENDED to grant

summary judgment to plaintiff Promega Corporation with respect to infringement of that

1

product and claim.

Entered this 6th day of February, 2012.

<div style="margin-left:40%">

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

</div>

2

CASE PARTICIPANTS ONLY

# TAB 5

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PROMEGA CORPORATION,

                            Plaintiff,

           and

MAX-PLANCK-GESELLSCHAFT zur
FORDERUNG der WISSENSCHAFTEN E.V.,

                    Involuntary Plaintiff,

       v.

LIFE TECHNOLOGIES CORPORATION,
INVITROGEN IP HOLDINGS, INC. and
APPLIED BIOSYSTEMS, LLC,

                 Defendants.

OPINION and ORDER

10-cv-281-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Promega Corporation sued defendants Life Technologies Corporation,

Applied Biosystems, LLC and Invitrogen IP Holdings, Inc. for infringing and inducing

infringement of five patents related to the copying of sequences of a DNA strand. The

action grew out of a licensing agreement between the parties under which defendants Life

Technologies and Applied Biosystems could sell plaintiff's patented products within certain

permitted fields; plaintiff alleged that defendants were making, using and selling products

into fields such as clinical diagnostics, clinical research and research markets, which were not

covered by the licensing agreement. A jury found in plaintiff's favor and awarded more than

1

$50 million in damages.  Dkt. #567.

Various motions from both sides are now before the court.  Plaintiff seeks enhanced damages, attorney fees, costs and a permanent injunction.  Dkt. ##593, 594, 599 and 601. Defendants argue that they are entitled to judgment in their favor, both because they proved their equitable defenses of estoppel and laches and because plaintiff failed as a matter of law to prove infringement under either of the theories it asserted at trial.  In the alternative, they ask for various limitations on plaintiff's damages and for a new trial.  Dkt. ##578, 580, 582, 584, 586 and 588.

Although I am persuaded that defendants failed to prove their equitable defenses, I agree with them that they are entitled to judgment as a matter of law under Fed. R. Civ. P. 50 because plaintiff failed to prove infringement under 35 U.S.C. § 271(a) or (f)(1), the only two theories plaintiff is asserting.   The parties agree that plaintiff's evidence at trial relied on the assumption that *all* of the accused products defendants sold during the relevant time frame (between August 29, 2006 and the end of January 2012) were made in the United States, imported into the United States or made with a substantial portion of components from the United States, as required by § 271(a) and (f)(1).  Because plaintiff failed to submit admissible evidence at trial showing that all the sales at issue satisfied one or more of these requirements, I cannot sustain the verdict.   In addition, plaintiff failed to show that defendants engaged in active inducement, which is a separate requirement of § 271(f)(1). Accordingly, I am granting defendants' Rule 50 motion and directing the clerk of court to enter judgment in their favor.

2

A2334

OPINION

I.  EQUITABLE DEFENSES

Defendants seek judgment on their equitable defenses (and counterclaims) of estoppel and laches, which must be decided by the court.  Agfa Corp. v. Creo Products Inc., 451 F.3d 1366, 1375 (Fed Cir. 2006).  Before trial, I questioned defendants' failure to raise these defenses at summary judgment, but I concluded that the defenses were not waived, in accordance with circuit law.  Dkt. #486 at 2-3 (citing Diversey Lever, Inc. v. Ecolab, Inc., 191 F.3d 1350 (Fed. Cir. 1999), and Pandrol USA, LP v. Airboss Railway Products, Inc., 320 F.3d 1354 (Fed. Cir. 2003)).  I did not hold a separate trial on the defenses because defendants represented to the court that all of their evidence related to the defenses would be presented during the jury trial.  Dkt. #520 at 2.  Defendants have not altered that position now, but both sides have submitted briefs on the question whether the evidence at trial proved that plaintiffs' infringement claims should be dismissed under one or both defenses.

A.  Equitable Estoppel

To prevail on their estoppel defense, defendants must prove three elements:  (1) plaintiff engaged in "misleading conduct" that led defendants to believe reasonably that plaintiff did not intend to enforce the patents against defendants; (2) defendants relied on that conduct; and (3) defendants would be materially prejudiced if the plaintiff were permitted to proceed with its charge of infringement.  Aspex Eyewear Inc. v. Clariti Eyewear,

3

A2335

Inc., 605 F.3d 1305, 1310 (Fed. Cir. 2010). Because I conclude that defendants have failed to prove the first element, I need not consider the other two.

Defendants do not argue that plaintiff made any misleading statements to them. Rather, defendants say that plaintiff misled them by failing to object to their allegedly illegal sales even though it knew that defendants were infringing by making sales that were not authorized under the terms of the parties' 2006 license.

A patentee's inaction may constitute misleading conduct, but it "must be combined with other facts respecting the relationship or contacts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned. . . . In the most common situation, the patentee specifically objects to the activities currently asserted as infringement in the suit and then does not follow up for years. " A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 1042 (Fed. Cir. 1992). See also Aspex Eyewear, 605 F.3d at 1310 (finding estoppel when plaintiff failed to take action against defendant after accusing it of infringement); ABB Robotics, Inc. v. GMFanuc Robotics Corp., 52 F.3d 1062, 1064 (Fed. Cir. 1995) (objection of infringement by parent company followed by silence); Hottel Corp. v. Seaman Corp., 833 F.2d 1570, 1574 (Fed. Cir. 1987) ("In the cases that have applied intentionally misleading silence in the patent infringement context, a patentee threatened immediate and vigorous enforcement of its patent right but then did nothing for an unreasonably long time."). In this case, defendants cite no evidence that plaintiff's inaction was preceded by a threat to sue or an accusation of infringement.

Defendants rely on a nonpatent case in which the court found that a contractor was

A2336

equitably estopped from suing the Secretary of the Navy for failing to submit orders by mail rather than electronically, even though the contract at issue required mail delivery. Mabus v. General Dynamics C4 Systems, Inc., 633 F.3d 1356, 1361-63 (Fed. Cir. 2011). In that case, the court concluded that the contractor had misled the Navy by accepting 13 electronically delivered orders before refusing later orders submitted in the same way. Defendants argue that the situation in this case is similar because plaintiff continued accepting royalty payments under the licensing agreement even though plaintiff sold kits that its customers used for purposes not permitted by the licensing agreement.

Even if I assume that accepting royalty payments for unlicensed sales could be a ground for estoppel, defendants' reliance on Mabus is misplaced because they have failed to meet their burden to show that plaintiff *knew* it was accepting payments for unlicensed sales. Randall Dimond, plaintiff's vice president, testified that he was not aware that defendants were selling outside the licensed fields until the fall of 2009, only a few months before plaintiff filed this lawsuit. Tr. Trans., dkt. #544, at 18. Defendants cite no statements from plaintiff showing that it was aware that defendants were failing to limit the use of its kits to licensed purposes. Rather, they ask the court to infer plaintiff's knowledge from various pieces of evidence, such as testimony that plaintiff and defendant Life Technologies both had representatives on a committee that discussed Life's use of kits for cell line authentication (a non-licensed use), testimony from one of defendants' employees that "customers" told "us" that plaintiff told the customers that defendants' Identifiler kit was "overkill," Ortuno Dep., dkt. #348, at 144, and testimony from one of defendants' experts

5

in this case that he had used defendants' unlicensed kits. Even if I assume that this evidence is admissible, it is simply too speculative to prove that plaintiff misled defendants into reasonably believing that it would not enforce its rights under the patent. Accordingly, I conclude that defendants have failed to prove their equitable estoppel defense and counterclaim.

## B. <u>Laches</u>

To prevail on their laches defense and counterclaim, defendants must prove that plaintiff "delayed filing suit for an unreasonable and inexcusable length of time from the time it knew or reasonably should have known of its claim" and the delay prejudiced defendants. <u>Hearing Components, Inc. v. Shure Inc.</u>, 600 F.3d 1357, 1375 (Fed. Cir. 2010). Again, this defense fails because defendants have not shown that, before filing this lawsuit, plaintiff knew or should have known for an unreasonable amount of time that defendants were infringing its patent. Defendants cite no case in which a court concluded that a party was entitled to a laches defense under similar circumstances. Accordingly, I am dismissing this defense as well.

## II. MOTION FOR JUDGMENT AS A MATTER OF LAW

At summary judgment, I concluded that various kits defendants sold infringed one or more claims of the five patents at issue in this case. Dkt. #345. The issue at trial was whether defendants had engaged in particular behavior that violated any provisions of the

A2338

patent statute. That issue was less straightforward than in some patent infringement cases because defendants claimed that many of their kits were assembled and sold outside the United States. Generally, foreign sales are outside the scope of the patent statute.

Plaintiff relied on two theories of infringement at trial. First, it argued that defendants sold accused products that included components supplied from the United States, in violation of 35 U.S.C. § 271(f)(1). Second, it argued that the accused products were manufactured in or imported into the United States, in violation of 35 U.S.C. § 271(a). The jury found that all of the accused products defendants sold during the relevant time frame satisfied the requirements for one or both of these provisions.

In their renewed motion under Fed. R. Civ. P. 50(b), defendants argue that the evidence plaintiff presented was not legally sufficient to sustain the jury's verdict under either theory. When reviewing a motion filed under Rule 50, the court must consider "the record as a whole to determine whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." Clarett v. Roberts, 657 F.3d 664, 674 (7th Cir. 2011). See also Koito Manufacturing Co. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1148 (Fed. Cir. 2004) (regional circuit law applies to standard under Rule 50 motions). Because this standard was not met for either of plaintiff's theories of infringement, I am granting defendants' motion.

A.  35 U.S.C. § 271(f)(1)

7

A2339

Under § 271(f)(1),

[w]hoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

Defendants argue that plaintiff failed to prove that a "substantial portion of the components" of the accused products was supplied from the United States, that defendants "actively induce[d]" the combination of components or that they did so "in a manner that would infringe the patent if such combination occurred within the United States." I will consider each of these contentions in turn.

1. Substantial portion of components

Neither side attempts to provide a comprehensive interpretation of the meaning of the word "substantial." However, defendants argue that, even when the evidence is considered in the light most favorable to plaintiff, it showed at most that *one* component of all the accused products, a polymerase, was supplied from the United States and that a single component is not a "substantial portion" as a matter of law. Although defendants do not deny that plaintiff adduced evidence that *some* of the accused products include two components from the United States, defendants say that does not help plaintiff because plaintiff did not attempt to quantify the sales of those accused products that included at least two components from the United States. Rather, plaintiff adduced evidence only as to defendants' *total* worldwide sales, so defendants are entitled to judgment as a matter of

8

law unless all of those sales fall under § 271(a) or (f)(1).

Plaintiff does not dispute defendants' last point, so I consider that to be conceded. However, plaintiff says that defendants' interpretation of § 271(f)(1) is wrong (because a single component may be "substantial") and their view of the facts is wrong as well (because a reasonable jury could find that at least two components of all of the accused products came from the United States). In addition, defendants say that plaintiff waived any argument that one component is not substantial by failing to raise it in a motion under Fed. R. Civ. P. 50(a).

a. Waiver

I disagree that defendants waived an argument regarding the proper interpretation of § 271(f)(1). In their Rule 50(a) motion, defendants argued that

> the statute requires that [plaintiff] prove a substantial portion of the components of the patented invention. I would submit, Your Honor, that for the Identifiler Kit that [plaintiff] went through the bill of materials on, there is evidence that could go to the jury for that kit. But [plaintiff] base[s] [its] entire 271(f)(1) analysis on all the remaining kits on the fact that they contained Taq DNA polymerases and that does not meet the burden of showing all or a substantial portion of the components as to those other kits.

Tr. Trans., dkt. #572, at 74. That was sufficient to put plaintiff on notice of defendants' position that a single component (the polymerase) is not a "substantial portion" of components, which is all that defendants were required to do. Extreme Networks, Inc. v. Enterasys Networks, Inc., 2008 WL 4756498, *1 (W.D. Wis. 2008) (Rule 50(a) motion "must be specific enough to give notice to the plaintiff of the hole in its case so that it can

9

A2341

attempt to put in more evidence while there is still an opportunity to do so"); see also Exxon Shipping Co. v. Baker, 554 U.S. 471, 486 n.5 (2008) ("motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury").

Plaintiff points out that defendants did not cite case law when making their Rule 50(a) motion, but I have never interpreted the rule to impose such an exacting burden on a party and plaintiff cites no authority to support that view. If plaintiff had additional evidence that the accused products included multiple domestic components, defendants' Rule 50(a) motion was fair warning that plaintiff should come forward with that evidence before submitting its case to the jury. Failing to cite case law does not rob the other side of an opportunity to fill the hole in its case. Case law citations might have persuaded plaintiff of the *necessity* of presenting additional evidence, but it was not defendants' burden to convince plaintiff to try harder, only to give it a chance to do so. Further, courts are not obligated to ignore controlling law simply because the parties fail to cite it, Elder v. Holloway, 510 U.S. 510 (1994); In re Aqua Dots Products Liability Litigation, 654 F.3d 748, 752 (7th Cir. 2011), so it would make little sense to prohibit parties from supporting their positions with additional authority in a Rule 50(b) motion.

b. Is a single component sufficient?

With respect to the merits, plaintiff acknowledges that § 271(f)(1) consistently uses the plural term "components." However, it argues that each use of "components" in the

provision is referring to the components of the invention as a whole rather than the components from the United States.  For example, plaintiff says that it makes more sense to read the phrase "where such components are uncombined in whole or in part" as a reference to the components of all of the invention rather than just the part or parts that come from the United States because, otherwise, "[o]ne could avoid infringement under 271(f)(1) by simply combining those components of the patented invention that are to be supplied from the United States prior to shipment."  Plt.'s Br., dkt. #616, at 17.

Plaintiff's reading is plausible if one reads § 271(f)(1) in isolation, but it becomes less so when viewed in conjunction with the similarly worded § 271(f)(2):

> Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

35 U.S.C. § 271(f)(2).

Like § 271(f)(1), § 271(f)(2) targets products that may be manufactured and sold overseas, but include parts from the United States.  For the purpose of this case, the primary difference is that § 271(f)(2) extends to "any component" of the invention rather than "all or a substantial portion of the components."  (Plaintiff did not argue at trial that defendants' sales violated § 271(f)(2), presumably because it did not believe it could prove that any component was "especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use," which

11

is an additional element in § 271(f)(2).)

Similarly to § 271(f)(1), § 271(f)(2) uses the phrase "where such component is uncombined in whole or in part." In that instance, the reference to the singular "component" must be to a component that is "supplied in or from the United States" rather than to the invention as a whole because § 271(f) does not apply to single component inventions. Further, because § 271(f)(1) employs the same phrasing as § 271(f)(2) ("where such components are uncombined in whole or in part"), it follows that the term "such components" in § 271(f)(1) refers to the components from the United States as well. Nken v. Holder, 556 U.S. 418, 426 (2009) ("[S]tatutory interpretation turns on 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole'") (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)).

As defendants point out, this conclusion is supported by the case law. In Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 454 n.16 (2007), the Supreme Court discussed § 271(f)(1) and (2), concluding that "the two paragraphs differ, among other things, on the quantity of components that must be 'supplie[d] . . . from the United States' for liability to attach." Because § (f)(2) applies to a single component, the Court's statement that § (f)(1) and § (f)(2) "differ . . . on the quantity" of components, suggests that § (f)(1) requires that more than one component must come from the United States. More generally, the Court concluded that it was improper to use policy concerns about "loopholes" to justify broad interpretations of the patent statute, both because any "loophole" in the statute "is properly left for Congress to consider, and to close if it finds such action warranted," id. at 457, and

12

A2344

because of the presumption that "our patent law operates only domestically and does not extend to foreign activities," so that any provision extending the patent law's reach into foreign territory must be construed narrowly. Id. at 455 (internal quotations omitted and alterations). Thus, even if plaintiff is correct that it would be easier for competitors to avoid infringement under a narrow interpretation, that is not a ground for expanding the reach of the statute.

Defendants cite two other federal cases in which a court concluded that § 271(f)(1) did not extend to inventions that include only one component from the United States: Ormco Corp. v. Align Technology, Inc., 609 F. Supp. 2d 1057, 1073 (C.D. Cal. 2009); Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., No. 95 CIV 8833, 2001 WL 1263299, at *4 (S.D.N.Y. Oct. 19, 2001). Plaintiff cites no authority to the contrary. Accordingly, I conclude that a single component is not sufficient to satisfy § 271(f)(1).

Even if § 271(f)(1) did not require multiple components to come from the United States in all cases, it seems unlikely that one component could constitute a "substantial" portion in this case when plaintiff does not dispute defendants' position that the accused products are made up of no fewer than five components. Dkt. #581 at 8. Although plaintiff points to testimony that the polymerase is a "major" component of the accused products, dkt. #558, at 45-46, it does not quantify "major" or otherwise explain what it means.

c. Is there sufficient evidence of multiple components?

Alternatively, plaintiff argues that a reasonable jury could find that all of the accused

products include two or more components from the United States. (Because defendants do, I will assume that two components are a substantial portion.) First, plaintiff cites Dimond's answer of "no" to the question, "Has anyone at Life Technologies ever contradicted the comment that Dr. Moehle made to you that these products are made or their components are made in the United States?" Tr. Trans., dkt. #555, at 61. However, because the question assumes various facts, Dimond's one-word answer establishes nothing. As defendants point out, counsel's question is referring to earlier testimony by Dimond that, "[a]t the time of that agreement [the 2006 cross license], I was informed by Dr. Moehle [an employee of defendants] that all of their products were made in the United States." Tr. Trans., dkt. #545, at 27. Even if I assume that Moehle has personal knowledge of where defendants' products were made, Dimond's testimony is unhelpful, both because it is so vague, referring generally to "products" rather than particular components, and because it is irrelevant where defendants made their components when the parties entered their agreement in 2006. Particularly because Sandulli testified that multiple components of the accused products have been manufactured in the United Kingdom in recent years, Tr. Trans., dkt. #558, at 38-46, Dimond's vague testimony cannot carry the day for plaintiff.

Second, plaintiff relies on the designated deposition testimony of Michelle Shepherd, another employee of defendants, who said that "[c]omponents of the kits are manufactured in" the United States. Dkt. #551-1, at 129. When asked to specify which components, she said, "[t]he allelic ladders." Id. However, it is not reasonable to infer from this testimony that all of the accused products defendants sold worldwide since 2006 included allelic

14

ladders. Again, Shepherd's testimony is vague; she does not provide any time frame. This is a problem in light of Sandulli's more specific testimony that defendants manufactured allelic ladders in the United States in the past, but no longer do so. Tr. Trans., dkt. #558, at 46. In addition, Shepherd did not testify that all of the accused kits included allelic ladders. Rather, when asked about the origins of a kit ordered in Germany, she said that she was "only able to speak to the U.S. shipping and manufacturing," dkt. #551-1 at 130, so it is impossible to infer from her testimony anything about the origin of components in kits shipped outside the United States. I conclude that plaintiff failed as a matter of law to prove that all of the accused products from 2006 to 2012 included a "substantial portion" of components from the United States.

2. Actively induce

Defendants argue that plaintiff failed to meet the element of active inducement for two reasons: (1) plaintiff did not adduce evidence regarding inducement of a third party; and (2) plaintiff did not adduce evidence that defendants "shipped components for assembly abroad with the intention of subverting the U.S. patent laws or otherwise culpably encouraged acts that would be acts of infringement if they occurred in the United States." Dfts.'s Br., dkt. #581. The second argument was not included in defendants' Rule 50(a) motion and it is not developed in the Rule 50(b) motion, so the argument is waived.

Plaintiff does not argue that defendants waived the first argument except to say that defendants cite new cases in their Rule 50(b) motion. (Although plaintiff does argue that

15

defendants failed to ask for an instruction regarding active inducement, that argument is relevant only to defendants' motion for a new trial under Fed. R. Civ. P. 59.)  As I explained above, I do not read Rule 50 as prohibiting parties from buttressing their arguments with supplemental authority in their renewed motions for judgment as a matter of law.  In their Rule 50(a) motion, defendants stated that

> [t]here's no specific acts or circumstances from which the jury could infer that defendants actively induced a third party to assemble or use the kits in a manner that would have infringed if done in the United States.  The statute requires that they be—one element is that in such a manner as to actively induce the combination of such components outside the United States in a manner that would infringe the patent if such combination occurred within the United States and so you can't induce yourself to do that.

Tr. Trans., dkt. #572, at 74.  That was sufficient to preserve the issue.

The parties agree that plaintiff did not present any evidence at trial that defendants induced another party to combine any components outside the United States in an infringing manner.  Rather, defendants did all the combining themselves.  Thus, the question is whether the term "actively induce" requires the involvement of a third party or whether defendants may "induce" themselves under the statute.

Because the ordinary meaning of the word "induce" is to influence or persuade, http://www.merriam-webster.com/dictionary/induce, it makes little sense in common parlance to say that someone "induced himself" to perform a particular action.  The more natural reading of the word is that it involves an action taken with respect to a third party, encouraging another to do something.  As defendants point out, this is consistent with the way the Court of Appeals for the Federal Circuit has used the term in the context of 35

16

A2348

U.S.C. § 271(b).  DSU Medical Corp. v. JMS Co., Ltd., 471 F.3d 1293, 1305 (Fed. Cir. 2006) ("[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement."); Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 553 (Fed Cir. 1990) ("It must be established that the defendant possessed specific intent to encourage another's infringement."); Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660, 668 (Fed. Cir. 1988) ("[A] person infringes [under § 271(b)] by actively and knowingly aiding and abetting another's direct infringement.").

Plaintiff does not deny that "active inducement" under § 271(b) requires the involvement of a third party.  It simply says in a footnote that the cases defendants cite "are not on point" because they did not involve the interpretation of § 271(f)(1).  Plt.'s Br., dkt. #616, at 8 n.6.  This is true, but not helpful.  Courts generally assume that the same phrase in the same statute means the same thing.  Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").  Although that canon is not without its exceptions, defendants cite both legislative history and controlling case law supporting the view that the phrase "active inducement" means the same thing in both §§ 271(b) and 271(f)(1).  Liquid Dynamics Corp. v. Vaughan Co., Inc., 449 F.3d 1209, 1222 (Fed. Cir. 2006) (applying § 271(b) standard for active inducement in case brought under § 271(f)(1)); Section–by–Section Analysis of H.R. 6286, Patent Law Amendments Act of 1984," Congressional Record, Oct. 1, 1984, H10525–26 ("The term 'actively induce' is drawn from existing subsection 271(b)

17

of the patent law, which provides that whoever actively induces patent infringement is liable as an infringer.").

As it did with respect to its interpretation of "substantial portion," plaintiff argues that it would create an undesirable loophole in the statute to construe "actively induce" as requiring a third party. This is plaintiff's strongest argument. As plaintiff points out, when defendants made their Rule 50(a) motion, I expressed doubt "that Congress intended to leave a loophole for anybody who did its own combinations of components outside the borders of the country." Tr. Trans., dkt. #572, at 75. Although I still believe it makes little sense to prohibit a party from supplying another with components while permitting the party to supply itself, I am persuaded that the loophole is not one that a court is empowered to close.

As I noted above, the Supreme Court has admonished lower courts not to engage in "dynamic judicial interpretation" of § 271(f) in order to avoid perceived loopholes. Microsoft, 550 U.S. at 457. In particular, the Court said that courts should keep in mind the particular problem § 271(f) was intended to address:

> Section 271(f) was a direct response to a gap in our patent law revealed by this Court's Deepsouth [Packing Co. v. Laitram Corp., 406 U.S. 518(1972),] decision. See supra, at 1752, and n. 3. The facts of that case were undeniably at the fore when § 271(f) was in the congressional hopper. In Deepsouth, the items exported were kits containing all the physical, readily assemblable parts of a shrimp deveining machine (not an intangible set of instructions), and those parts themselves (not foreign-made copies of them) *would be combined abroad by foreign buyers*. Having attended to the gap made evident in Deepsouth, Congress did not address other arguable gaps.

Id. at 457-58 (emphasis added). Because the facts of Deepsouth involved inducement of

18

a third party, this counsels against a broader interpretation of § 271(f) that would include other factual scenarios, even if policy considerations suggest that the statute should apply regardless what party is combining the components overseas.

I cannot accept plaintiff's interpretation of § 271(f)(1) in the face of all the reasons not to. These include the facts of <u>Deepsouth,</u> the Supreme Court's instruction to construe § 271(f) narrowly, the Federal Circuit's interpretation of the relevant phrase, the legislative history of § 271(f), the canon to interpret the same words in the same way and the ordinary meaning of the word "induce." It is particularly telling that plaintiff fails to address in its brief any of the reasons undermining its position. It may well be that Congress would have chosen its words differently had it contemplated the loophole it left open, but courts must apply statutes as they are written, not as the court believes they should have been written. Thus, plaintiff's failure to adduce any evidence that it induced the actions of a third party is a second and independent reason for concluding that plaintiff failed as a matter of law to prove its claim under § 271(f)(1).

3.  <u>In a manner that would infringe the patent</u>

Defendants' final argument under § 271(f) is that their combination of components could not render them liable for violating that provision because their assembly of the accused products was permitted under the license agreement. Certain *sales* fell outside the scope of the agreement, but § 271(f)(1) does not address sales, only assembly.

I agree with plaintiff that defendants waived this argument by failing to present it in

19

A2351

their Rule 50(a) motion. Defendants say that they preserved this issue by quoting the relevant language in the statute and arguing that plaintiff failed to satisfy it, but that is not sufficient because it fails to identify the particular problem. Extreme Networks, 2008 WL 4756498 at *1 ("Defendant cannot preserve all possible arguments simply by listing the elements of a claim and arguing generally that the plaintiff did not meet them."). However, because I have concluded that plaintiff failed to meet the elements that a "substantial portion" of the components came from the United States and that defendants "actively induced" the combination of those components, defendants' waiver of another element does not change the result.

## B. 35 U.S.C. § 271(a)

Alternatively, plaintiff argues that all of defendants' sales violated § 271(a), which provides: "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." In particular, plaintiff says that the jury could have found that all of the accused products are made in or imported into the United States.

With respect to § 271(a), plaintiff relies entirely on Shepherd's testimony. However, she admitted she did not know where all the kits were made. Tr. Trans., dkt. #551-1, at 129 ("I'm not certain there—all of these varieties of AmpFLSTR kits are assembled in Foster City [California]. They may be assembled in Warrington [the United Kingdom]."). And, as

20

A2352

noted above, she admitted she did not know whether foreign orders came through the United States. Id. ("I'm only able to speak to the U.S. shipping and manufacturing."). Accordingly, even if the jury were to ignore all the evidence that many of the accused products are not made in or imported into the United States, it could not find reasonably from Shepherd's testimony that all of defendants' sales infringed under § 271(a).

Plaintiff has failed to point to evidence that would sustain a finding that all of the accused products defendants sold between August 2006 and January 2012 would meet the requirements of § 271(a) or (f)(1). Because plaintiff did not adduce evidence regarding defendants' sales of any subset of products that would meet those requirements, defendants are entitled to judgment as a matter of law. In addition, because plaintiff did not seek a new trial on damages in the event the court reached this conclusion, that issue is waived.

## ORDER

IT IS ORDERED that

1. The equitable defenses and counterclaims filed by defendants Life Technologies Corporation, Applied Biosystems, LLC and Invitrogen IP Holdings, Inc. are DISMISSED for defendants' failure to prove these defenses and counterclaims.

2. Defendants' motion for judgment as matter of law regarding 35 U.S.C. § 271(a) and (f)(1), dkt. #580, is GRANTED.

3. The following motions are DENIED as moot: (a) defendants' motion for judgment as a matter of law on lost profits calculations, dkt. #578; (b) defendants' motions

A2353

for a new trial, dkt. ##580, 582, 584 and 586; (c) defendants' motion for judgment as a matter of law on nonwillfulness, dkt. #588; (d) plaintiff Promega Corporation's motion for an "exceptional case" finding under 36 U.S.C. § 285, dkt. #594; (e) plaintiff's motion for enhanced damages, dkt. #599; (f) plaintiff's motion for a permanent injunction, dkt. #601; and (f) plaintiff's bill of costs.  Dkt. #593.

4.  The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 12th day of September, 2012.

> BY THE COURT:
> /s/
> BARBARA B. CRABB
> District Judge

A2354

CASE PARTICIPANTS ONLY

# TAB 6

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PROMEGA CORPORATION,

                Plaintiff,

          and

MAX-PLANCK-GESELLSCHAFT zur
FORDERUNG der WISSENSCHAFTEN E.V.,

                Involuntary Plaintiff,

        v.

LIFE TECHNOLOGIES CORPORATION,
INVITROGEN IP HOLDINGS, INC. and
APPLIED BIOSYSTEMS, LLC,

                Defendants.

OPINION and ORDER

10-cv-281-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      This is a case brought under the Patent Act, 35 U.S.C. § 271, involving four patents related to a type of DNA testing called "multiplex amplification of short tandem repeat loci." Plaintiff Promega Corporation contends that defendants Life Technologies Corporation, Invitrogen IP Holdings, Inc. and Applied Biosystems, LLC sell testing kits that meet the limitations for one or more claims in patents that plaintiff owns. In an order dated November 29, 2011, dkt. #345, I agreed with plaintiff that defendants were practicing some of the claims of U.S. Patents Nos. 5,843,660, 6,221,598, 6,479,235, 7,008,771 and Re 37,984. One of the questions that remained for trial was the extent to which defendants

1

were engaging in acts prohibited by the Patent Act because many of the accused products were manufactured and sold in foreign countries and the reach of the Act is more limited in the context of foreign sales.

At trial plaintiff based its theories of infringement on 35 U.S.C. § 271(f)(1) and 35 U.S.C. § 271(a). Section 271(f) prohibits the sale of infringing products if "a substantial portion" of the components of the accused products are supplied from the United States; the relevant portion of § 271(a) prohibits manufacturing infringing products in the United States or importing infringing products into the United States. Plaintiff asked the jury to find that *all* of defendants' sales met the requirements of one or both of these statutes. The jury agreed with plaintiff and awarded more than $50 million in damages.

Defendants filed a motion for judgment as a matter of law under Fed. R. Civ. P. 50 in which they argued that plaintiff had failed to prove its case under either § 271(f)(1) or § 271(a). Although defendants did not deny that plaintiff had adduced evidence that some of the accused products included a substantial portion of components supplied from the United States, were made in the United States or were imported into the United States, defendants argued that "some" was not enough because plaintiff adduced evidence only as to defendants' total worldwide sales, so defendants were entitled to judgment as a matter of law unless all of those sales fell under § 271(a) or (f)(1). In responding to defendants' motion, plaintiff did not deny that it took an "all or nothing" approach at trial, so I concluded that any argument to the contrary was forfeited. Instead, plaintiff argued that the evidence was sufficient to allow the jury to find that all of defendants' sales violated § 271(a)

2

or (f)(1). Ultimately, I agreed with defendants that they were entitled to judgment as a matter of law. As a result I denied as moot defendants' motion for judgment as a matter of law on lost profits calculations, defendants' motions for a new trial, defendants' motion for judgment as a matter of law on nonwillfulness, plaintiff's motion for a finding of an "exceptional case" under 36 U.S.C. § 285, plaintiff's motion for enhanced damages, plaintiff's motion for a permanent injunction and plaintiff's bill of costs. Dkt. #684.

In response to that order, plaintiff has filed three motions: (1) a "motion for amendment of, or relief from, judgment regarding damages, or, in the alternative, for a new trial"; dkt. #693; (2) a "motion for amendment of, or relief from, the judgment with respect to infringement, permanent injunction, and exceptional case finding, or, in the alternative, a new trial," dkt. #690; and (3) a "motion for relief from the amended judgment based on newly discovered evidence and for a new trial." Dkt. #727. In addition, plaintiff has requested oral argument on its motions. Dkt. #697. Finally, defendants have filed a motion to "strike" portions of plaintiff's reply briefs in support of the first two motions. Dkt. #741.

I am denying plaintiff's motion for oral argument because I do not believe oral argument is necessary to resolve any of the motions before the court. I am denying plaintiff's remaining motions as well because plaintiff has failed to show that it is entitled to relief from the amended judgment. Finally, I am denying as unnecessary defendants' motion to "strike" portions of plaintiff's reply briefs because any new arguments in those briefs would make no difference to the outcome of plaintiff's motions.

3

A2360

OPINION

I will address the arguments in plaintiff's various motions in the following order: (A) the court erred in concluding that plaintiff had failed as a matter of law to prove that all of defendants' sales of the accused products since 2006 violated 35 U.S.C. § 271(a) or 35 U.S.C. § 271(f)(1); (B) if the court adheres to its conclusion, the court should grant a new trial on these issues; (C) the court should not have denied as moot plaintiff's motion for a permanent injunction and motion for attorney fees; and (D) the court should vacate the judgment and hold a new trial because of newly discovered evidence.

A. <u>Motion for Reconsideration as to Damages</u>

1. <u>Section 271(a)</u>

Under § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." In defending the verdict under this provision, plaintiff argued that the jury could have relied on the deposition testimony of Michelle Shepherd, one of defendants' designated witnesses under Fed. R. Civ. P. 30(b)(6), to find that all of the accused products are made in the United States or imported here. I rejected this argument because Shepherd admitted she did not know whether either of these things was true. Tr. Trans., dkt. #551-1, at 129 ("I'm not certain there—all of these varieties of AmpFLSTR kits are assembled in Foster City [California]. They may be assembled in Warrington [the United Kingdom]."); <u>id.</u> at 129-30 (when asked

4

about origin of kit ordered in Germany, she said that she was "only able to speak to the U.S. shipping and manufacturing").

Although plaintiff argues in its new motion that the evidence was sufficient under § 271(a), it points to no new or different evidence supporting that conclusion. Instead, it argues that Shepherd's testimony alone is sufficient if it is viewed in the light most favorable to plaintiff. In particular, plaintiff points to the following question and answer:

> Q. Okay, So some complete kits may be shipped out of England to a customer?
>
> A. They would be shipped to a warehouse in the States, and from there be shipped to a customer.

Dkt. #551-1 at 129. Plaintiff says that Shepherd did not expressly limit her testimony about the kits that are shipped to "the States," so the jury could infer that she was referring to *all* of defendants' accused products.

This argument has two problems. First, the question was about "some" kits, so Shepherd's answer that "[t]hey" are shipped to the United States does not permit the drawing of any inference about all of the kits shipped since 2006. Second, although courts must draw all reasonable inferences in favor of the nonmoving party, this rule does not permit courts to view pieces of evidence in isolation. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) ("[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record."). Because Shepherd's later testimony made it clear that she did not know where a kit ordered from Germany would come from, the jury could not draw a reasonable inference from her previous

5

A2362

ambiguous statement that she knew that all of defendants' accused products were imported into the United States. Accordingly, I adhere to my conclusion that plaintiff failed as a matter of law to prove that all of defendants' sales of the accused products were made in the United States or imported here.

2. Section 271(f)(1)

Under § 271(f)(1),

[w]hoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

In granting defendants' Rule 50 motion, I concluded that plaintiff had failed as a matter of law to prove that all of the accused products satisfied two elements of this statute, first, that a "substantial portion of the components" was supplied from the United States and, second, that defendants "actively induce[d]" the combination of components. Dkt. #684 at 8-18. With respect to a "substantial portion" of components, I concluded that the statute requires that at least two components be supplied from the United States and that plaintiff had failed to show that all of the accused products from the relevant time period were made with two or more components supplied from the United States. With respect to active inducement, I relied on several factors to conclude that the statute required the involvement of a third party and that plaintiff did not deny defendants' contention that defendants had done all the combining themselves.

6

A2363

In its new motion, plaintiff challenges the court's conclusion on both elements. With respect to a "substantial portion," it argues in its opening brief that the evidence was sufficient to show that all of the accused products included Taq polymerase and allelic ladders supplied from the United States, but it admits in its reply brief that the "documents show that not every STR kit throughout the damages period had allelic ladders that were supplied from the United States," dkt. #726 at 26, so this argument is moot. Although plaintiff says that it is challenging the court's conclusion that § 271(f)(1) requires that two components be supplied from the United States, it does not develop an argument on this point, so it has forfeited the point for the purpose of this motion.

With respect to active inducement, plaintiff relies primarily on a case decided by the Court of Appeals for the Federal Circuit after this court granted defendants' Rule 50 motion, Akamai Technologies, Inc. v. Limelight Networks, Inc., 692 F.3d 1301 (Fed. Cir. 2012). However, nothing in Akamai suggests that a party may "induce" itself under § 271(f), so it is not instructive.

Plaintiff raises an alternative argument that defendants did not "induce" themselves, but their "foreign divisions, subsidiaries or employees." Plt.'s Br., dkt. #726, at 23. This is a new argument. Plaintiff points to a sentence in its brief in opposition to defendants' Rule 50 motion in which it stated that § 271(f)(1) "includes the situation where an offshore division of a company is supplied components," but this was in the context of a larger argument that "there is nothing in the statute that limits it to situations where only a third party creates the combination." Dkt. #616 at 8. Plaintiff never developed an argument

7

until now that the entity or entities combining the components overseas could be considered

distinct from defendants. Accordingly, that argument is forfeited as well.

### B. Motion for a New Trial on Damages

In the event that the court denies its motion for reconsideration on these issues,

plaintiff asks for a new trial to prove a lesser amount of damages. I conclude that this is

another forfeited argument. In their postverdict motions defendants did not seek a new trial

under Fed. R. Civ. P. 59 on the ground that the particular amount of damages found by the

jury could not be sustained. Rather, defendants sought judgment as a matter of law under

Fed. R. Civ. P. 50 on the ground that plaintiff had failed to prove *any* damages. See

generally Dfts.' Br., dkt. #581. In particular, defendants argued that plaintiff's evidence at

trial related solely to defendants' total worldwide sales and that plaintiff had made no

attempt to quantify the sales of any subset of products. Because the evidence did not

support a finding that all of defendants' sales violated § 271(a) or § 271(f)(1), defendants

argued, this left plaintiff with no evidence of damages.

In response to defendants' motion, plaintiff argued that the motion should be denied

because the evidence was sufficient to support the jury's finding that *all* of defendants' sales

of the accused products violated § 271(f)(1) or § 271(a). Plaintiff did *not* argue in the

alternative that defendants' Rule 50 motion should be denied because the trial record was

sufficient to support a lesser damages award and it did not respond in any way to

defendants' contention that plaintiff's evidence at trial was limited to defendants' total

8

worldwide sales. As a result, I concluded that plaintiff had conceded this issue. Dkt. #684 at 8-9.

Although my finding that plaintiff had failed to address this issue was explicit in the September 13 order, plaintiff does not challenge the finding in its new motion. Accordingly, I need not consider this issue further. "A party may not introduce evidence or make arguments in a Rule 59 motion that could or should have been presented to the court prior to judgment." United States v. 47 West 644 Route 38, Maple Park, Illinois, 190 F.3d 781, 783 (7th Cir. 1999). If plaintiff believed that the evidence at trial could support a lesser damages award, it could have and should have raised that issue in response to defendants' Rule 50 motion.

### C.  Injunctive Relief and Attorney Fees

When I granted defendants' Rule 50 motion, I denied as moot plaintiff's motion for a permanent injunction and its request for attorney fees under 35 U.S.C. § 285. In its new motion, plaintiff argues that doing so was a mistake, even if the court was correct in concluding that plaintiff was not entitled to any damages.

With respect to the motion for a permanent injunction, plaintiff argues that it is still entitled to one because it has proven that some of defendants' sales of the accused products violated § 271(a) and § 271(f)(1). However, even if I agreed with plaintiff that some unspecified amount of defendants' sales fall within § 271(a) or § 271(f)(1), plaintiff points to no findings by this court or the jury that would allow the court to determine what the

9

proper scope of any injunction should be. Although plaintiff performs a detailed exegesis of the court's summary judgment opinion and its own summary judgment briefs in an attempt to show that the court resolved the issue of infringement at summary judgment, plaintiff never asked in its summary judgment motion that the court find that any particular act by defendants violated § 271(a) or § 271(f)(1) with respect to a particular accused product. Plaintiff says that defendants waived the issue by failing to raise it in their summary judgment opposition materials, but proving violations of these provisions was plaintiff's burden, not defendants', so it is not clear why defendants would have the obligation to raise an issue that was not included in plaintiff's summary judgment motion.

The same is true of the jury verdict. Plaintiff did not ask for a jury question on the extent to which defendants violated § 271(a) or § 271(f)(1) with respect to particular accused products. Plaintiff fails to explain in any of its briefs under what authority the court could issue an injunction in the absence of those findings. (Plaintiff does not develop an argument that the court could enjoin defendants' activities regarding a particular product without a corresponding finding that defendants violated § 271(a), § 271(f)(1) or some other provision of the patent statute with respect to that product, so I do not consider that question.) Although plaintiff asks for a new trial to fill in any gaps, plaintiff is not entitled to a do-over when it was plaintiff's own failure to request more specific findings in the verdict form that caused the problem.

With respect to plaintiff's request for attorney fees under 35 U.S.C. § 285, I see no reason to reconsider the denial of that request. Because plaintiff has not shown that it is

10

A2367

entitled to damages or an injunction, I cannot find plaintiff has shown that this is an "exceptional" case that would justify an award of attorney fees.

### D.  Newly Discovered Evidence

Plaintiff says that defendants provided information in the context of arbitration proceedings that they should have provided in the context of this case and that, if plaintiff had obtained that information before the trial, the result of this case would have been different.  In particular, plaintiff says that defendants' "bills of materials" and "business objects data" spreadsheets would help prove the extent of defendants' United States sales.

Plaintiff brings this motion under Fed. R. Civ. P. 60(b)(2), which applies when the party has "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)."  However, it is undisputed that plaintiff obtained the evidence at issue in August 2012 and plaintiff's time for filing a Rule 59 motion expired 28 days after the court entered an amended judgment in September 2012, but plaintiff did not file its Rule 60 motion until December 2012.  In its opening brief, plaintiff fails to explain why it could not have raised this issue earlier.  It says only that the "meaning [of the evidence] was not fully explained until [November 2012] at the Rule 30(b)(6) depositions of Defendants' witnesses."  Dkt. #728 at 13.  See also id. at 26.  This conclusory statement does not satisfy plaintiff's "extraordinary" burden under Rule 60(b)(2) to show that it could not have discovered the evidence it needed by October 2012.  Musch v. Domtar Industries, Inc., 587 F.3d 857, 861 (7th Cir. 2009).  Although plaintiff attempts

11

to provide more explanation in its reply brief, that effort comes too late. <u>Casna v. City of Loves Park</u>, 574 F.3d 420, 427 (7th Cir. 2009). In any event, plaintiff never argues that the new evidence shows that all of defendants' sales after 2006 fall within § 271(a) or § 271(f)(1), which was the question addressed in defendants' Rule 50 motion.

To the extent plaintiff means to argue that it would have used the evidence at trial to show that the jury could award a lesser amount of damages, I have concluded that plaintiff has forfeited that argument. Further, plaintiff does not persuasively rebut defendants' arguments that the discovery it obtained after trial would not have made any difference because plaintiff did not make use at trial of the geographical information it already had, that plaintiff knew during the trial about the existence of the documents it later obtained but failed to ask for them and that plaintiff has failed to point to any discovery request in this case that would have required defendants to produce the documents at issue. Accordingly, I am denying plaintiff's motion under Rule 60(b)(2).

ORDER

IT IS ORDERED that

1. Plaintiff Promega Corporation's "motion for amendment of, or relief from, judgment regarding damages, or, in the alternative, for a new trial," dkt. #693, is DENIED.

2. Plaintiff's "motion for amendment of, or relief from, the judgment with respect to infringement, permanent injunction, and exceptional case finding, or, in the alternative, a new trial," dkt. #690, is DENIED.

12

3. Plaintiff's "motion for relief from the amended judgment based on newly discovered evidence and for a new trial," dkt. #727, is DENIED.

4. Plaintiff's motion for oral argument, dkt. #697, is DENIED.

5. The motion filed by defendants Life Technologies Corporation, Invitrogen IP Holdings, Inc. and Applied Biosystems, LLC to "strike" portions of plaintiff's reply briefs in support of the first two motions, dkt. #741, is DENIED as unnecessary.

Entered this 22d day of April, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

13

A2370

# TAB 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PROMEGA CORPORATION,

        Plaintiff,

and

MAX-PLANCK-GESELLSCHAFT zur
FORDERUNG der WISSENSCHAFTEN E.V.,

        Involuntary Plaintiff,

        v.

LIFE TECHNOLOGIES CORPORATION,
INVITROGEN IP HOLDINGS, INC. and
APPLIED BIOSYSTEMS, LLC,

        Defendants.

JUDGMENT IN A CIVIL CASE

Case No. 10-cv-281-bbc

This action came before the court and a jury with District Judge Barbara B. Crabb presiding.
The issues have been tried and the jury has rendered its verdict.

IT IS ORDERED AND ADJUDGED that judgment is entered:

1.    granting defendants' motion for partial summary judgment with respect to plaintiff Promega

    Corporation's claim of infringement of claims 25 and 27-31 of U.S. Patent No. 5,843,660 and

    defendants' counterclaims for noninfringement of the same claims;

2.    granting plaintiff's motion for summary judgment with respect to the following claims of

    infringement:

    a.    AmpFISTR COfiler PCR Amplification Kit infringes claims 23 and 27 of U.S. Patent No.
        6,221,598 and claim 42 of U.S. Patent No. RE 37,984;

    b.    AmpFISTR Profiler PCR Amplification Kit infringes claims 10, 23-24, 27 and 33 of the
        '598 patent and claim 42 of the '984 patent;

    c.    AmpFISTR Identifiler PCR Amplification Kit infringes claims 10-23-24 and 27 of the '598
        patent, claims 18-19 and 21-23 of U.S. Patent No. 6,479,235, claim 5 of U.S. Patent No.
        7,008,771 and claim 42 of the '984 patent;

    d.    AmpFISTR Profiler Plus PCR Amplification Kit infringes claim 42 of the '984 patent;

    e.    AmpFISTR Yfiler PCR Amplification Kit infringes claim 42 of the '984 patent;

    f.    AB Minifiler PCR Amplification Kit infringes claim 42 of the '984 patent;

    g.    AB SGM Plus PCR Amplification Kit infringes claim 42 of the '984 patent;

h.   AB Sefiler Kit infringes claim 42 of the '984 patent;

i.   AB Sefiler Plus Kit infringes claim 42 of the '984 patent;

j.   NGM PCR Amplification Kit (1000 and 200) infringes claim 42 of the '984 patent;

k.   NGM SElect Kit infringes claim 42 of the '984 patent;

l.   Identifiler Plus Kit infringes claim 42 of the '984 patent, claim 5 of the '771 patent, claims 18, 19, 21, 22 and 23 of the '235 patent, claims 10, 23, 24, 27 and 33 of the '598 patent;

m.   Identifiler Direct Kit infringes claim 42 of the '984 patent, claim 5 of the '771 patent, claims 18, 19, 21, 22 and 23 of the '235 patent, claims 10, 23, 24, 27 and 33 of the '598 patent;

n.   AB Green I PCR Amplification Kit infringes claim 42 of the '984 patent and claims 23 and 27 of the '598 patent;

o.   Blue PCR Amplification Kit infringes claim 42 of the '984 patent;

p.   COfiler + Profiler Plus Kit infringes claim 42 of the '984 patent and claims 23 and 27 of the '598 patent; and

q.   the Profiler Plus ID infringes claim 42 of U.S. Patent No. Re 37,984;

3.   granting plaintiff's motion for summary judgment with respect to defendants' affirmative defenses and counterclaims that the '235, '598, '660 and '771 patents are invalid because they are anticipated, obvious or not enabled; and

4.   awarding damages in favor of plaintiff Promega Corporation against defendants Life Technologies Corporation, Invitrogen IP Holdings, Inc. and Applied Biosystems, LLC in the amount of $52,009,941.

Approved as to form this **21st** day of February, 2012.

*Barbara B. Crabb*

BARBARA B. CRABB,  District Judge

*Peter Oppeneer*

Peter Oppeneer, Clerk of Court

2/23/12

Date

## CERTIFICATE OF SERVICE

I certify that I filed this Brief with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served a copy on counsel of record, this 26 day of August, 2013, by the CM/ECF system and electronic mail.


Seth P. Waxman                    /s/ Seth P. Waxman

Name of Counsel                   Signature of Counsel


Law Firm:          WILMER CUTLER PICKERING HALE AND DORR LLP

Address:           1875 Pennsylvania Avenue, NW

City, State, ZIP:  Washington, DC 20006

Telephone Number:  (202) 663-6000

E-mail Address:    seth.waxman@wilmerhale.com

## CERTIFICATE OF COMPLIANCE

Counsel for Plaintiff-Cross Appellant hereby certifies that:

1.     The brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i) because exclusive of the exempted portions it contains 16,483 words as counted by the word processing program used to prepare the brief; and

2.     The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word in a proportionally spaced typeface: Times New Roman, font size 14.

Dated:  August 26, 2013                     */s/ Seth P. Waxman*
                                             Seth P. Waxman