# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

No. 2013-1011, -1029, -1376

PROMEGA CORPORATION,

*Plaintiff-Cross Appellant,*

and

MAX-PLANCK-GESELLSCHAFT ZUR FORDERUNG DER
WISSENSCHAFTEN E.V.,

*Plaintiff,*

v.

LIFE TECHNOLOGIES CORPORATION,
INVITROGEN IP HOLDINGS, INC.,
and APPLIED BIOSYSTEMS, LLC,

*Defendants-Appellants.*

On Appeal from the United States district court for the Western District of
Wisconsin, Case No. 3:10-cv-00281-bbc, Hon. Barbara B. Crabb

## DEFENDANTS-APPELLANTS'
## REPLY BRIEF AND CROSS APPEAL RESPONSE

Edward Reines
Derek C. Walter
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3022

Bradford Paul Schmidt
Life Technologies
Corporation
5781 Van Allen Way
Carlsbad, CA 92008
(760) 268-8315

Carter G. Phillips
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC
20005
(202) 736-8270

*Counsel for Defendants-Appellants*

October 10, 2013

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellants Life Technologies Corporation, Applied Biosystems, LLC, and Invitrogen IP Holdings, Inc. certifies as follows:

1. The full name of every party or amicus represented by us is:

   Life Technologies Corporation
   Applied Biosystems, LLC
   Invitrogen IP Holdings, Inc.

2. The name of the real parties in interest represented by us are:

   Life Technologies Corporation
   Applied Biosystems, LLC
   Invitrogen IP Holdings, Inc.

3. All parent corporations and any public companies that own 10 percent or more of the stock of the party represented by us are:

   Life Technologies Corporation does not have a parent corporation, nor does any public company own more than 10 percent of its stock. Applied Biosystems, LLC and Invitrogen IP Holdings, Inc., are wholly owned subsidiaries of Life Technologies Corporation.

4. The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or are expected to appear in this court are:

   Francis M. Wikstrom                    Michael J. Modl
   Kristine E. Johnson                    Andrew Clarkowski
   Michael R. McCarthy                    Steven Streck
   **Parsons Behle & Latimer**           **Axley Brynelson, LLP**

   Edward R. Reines                       Carter G. Phillips
   Timothy C. Saulsbury                  **Sidley Austin LLP**
   Derek C. Walter
   **Weil, Gotshal & Manges LLP**        Bradford Paul Schmidt
                                          **Life Technologies Corporation**

# TABLE OF CONTENTS

PAGE

STATEMENT OF THE ISSUES ........................................................1

SUMMARY OF THE ARGUMENT ...................................................1

REPLY ARGUMENT ON LIFE'S APPEAL .......................................6

I.    THE PROMEGA PATENTS ARE INVALID ...............................6

    A.    THE INVALIDITY OF THE PROMEGA PATENTS PRECLUDES REINSTATEMENT OF THE VERDICT .......................6

    B.    THE PROMEGA PATENTS ARE NOT ENABLED ........................9

    C.    THE PROMEGA PATENTS ARE OBVIOUS ...............................16

II.    FORENSIC EDUCATION IS LICENSED ...................................18

ARGUMENT ON PROMEGA'S CROSS APPEAL ............................20

I.    THE DISTRICT COURT CORRECTLY GRANTED JMOL ....................20

    A.    §271(f)(1) REQUIRES EXPORTING MORE THAN ONE COMPONENT.......20

    B.    §271(f)(1) REQUIRES A THIRD PARTY TO BE ACTIVELY INDUCED......26

    C.    THE DISTRICT COURT CORRECTLY GRANTED JMOL ..........................30

    D.    THE JURY VERDICT ADDITIONALLY CANNOT BE REINSTATED BECAUSE LIFE WAS IMPROPERLY REQUIRED TO BEAR THE BURDEN TO PROVE LICENSED SALES ...................................31

II.    THE DISTRICT COURT DID NOT CLEARLY ABUSE ITS DISCRETION IN DENYING PROMEGA'S MOTION FOR A NEW TRIAL ON INFRINGEMENT AND DAMAGES ...............................................34

    A.    PROMEGA'S "ALL OR NOTHING" TRIAL STRATEGY............................39

    B.    PROMEGA CANNOT CLAIM THAT IT WAS SURPRISED BY HAVING TO PRESENT EVIDENCE TO SUPPORT ITS "ALL OR NOTHING" TRIAL THEORY ...................................42

      C.     PROMEGA IS NOT ENTITLED TO A NEW TRIAL ON INFRINGEMENT ....................................................................................43

      D.     PROMEGA IS NOT ENTITLED TO A NEW TRIAL ON DAMAGES .............44

III.   THE DISTRICT COURT PROPERLY DENIED PROMEGA'S MOTIONS FOR INJUNCTION, EXCEPTIONAL CASE, AND ENHANCED DAMAGES ......................56

CONCLUSION ..........................................................................................................58

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  692 F.3d 1301 (Fed. Cir. 2012) .......................................................................... 30

*Anderson v. Flexel, Inc.*,
  47 F.3d 243 (7th Cir. 1995) ................................................................................ 45

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  377 U.S. 476 (1964) ........................................................................................... 28

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
  672 F.3d 1335 (Fed. Cir. 2012) .......................................................................... 58

*Benson v. Allphin*,
  786 F.2d 268 (7th Cir. 1986) .............................................................................. 54

*BIC Leisure Prods. v. Windsurfing Int'l*,
  1 F.3d 1214 (Fed. Cir. 1993) .............................................................................. 32

*Bloomberg v. Kronenberg*,
  106-CV-0733, 2007 WL 218733 (N.D. Ohio Jan. 25, 2007) .............................. 45

*Bourne v. Walt Disney Co.*,
  68 F.3d 621 (2d Cir. 1995) ................................................................................. 33

*Bristol-Myers Squibb Co. v. Rhone- Poulenc Rorer, Inc.*,
  2001 WL 1263299, Slip op. at *5 (Oct. 19, 2001) ............................................. 22

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
  576 F.3d 1348 (Fed. Cir. 2009) (en banc) .......................................................... 23

*CFMT, Inc. v. Yieldup International Corp.*,
  349 F.3d 1333 (Fed. Cir. 2003) .................................................................... 12, 13

*Commissioner of IRS v. Driscoll*,
  669 F.3d 1309 (11th Cir 2012) ........................................................................... 26

*DeGeorge v. Bernier*,
  768 F.2d 1318 (Fed. Cir. 1985) .......................................................................... 12

*Doe v. Princess Cruise Lines, Ltd.*,
657 F.3d 1204 (11th Cir.2011)............................................................50

*DSU Medical Corporation v. JMS Company*,
471 F.3d 1293 (Fed. Cir. 2006) .........................................................27

*Fedoryk v. Dudley*,
995 F.2d 1062 (4th Cir. 1993)............................................................45

*Firestone Tire & Rubber Co. v. Pearson*,
769 F.2d 1471 (10th Cir. 1985) .........................................................51

*Galli v. New Jersey Meadowlands Comm'n*,
490 F.3d 265 (3d Cir. 2007) ..............................................................23

*Geldermann, Inc. v. Fin. Mgmt. Consultants, Inc.*,
27 F.3d 307 (7th Cir. 1994)...............................................................54

*Genentech, Inc. v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997) ...........................................................12

*Global-Tech Appliances, Inc. v. SEB SA*,
131 S.Ct. 2060 (2011) ............................................................... 27, 33

*Hetzel v. Prince William County*,
523 U.S. 208 (1998) ...........................................................................52

*In re Innovative Constr. Sys., Inc.*,
793 F.2d 875 (7th Cir. 1986)..............................................................52

*Int'l Travelers Cheque Co. v. BankAmerica Corp.*,
660 F.2d 215 (7th Cir. 1981)..............................................................50

*Janus Capital Group v. First Derivative Traders*,
131 S.Ct. 2296 (2011) ........................................................................28

*Kansas Jack, Inc. v. Kuhn*,
719 F.2d 1144 (Fed. Cir. 1983) .........................................................33

*KSR Intern. Co. v. Teleflex Inc.*,
127 S. Ct. 1727 (2007) .......................................................................17

*LB Credit Corp. v. Resolution Trust Corp.*,
   49 F.3d 1263 (7th Cir. 1995) ...............................................................45

*Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*,
   895 F. 2d 1403 (Fed. Cir. 1990) ...........................................................53

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
   449 F.3d 1209 (Fed. Cir. 2006) ............................................................29

*Lucent Technologies, Inc. v. Gateway, Inc.*,
   580 F.3d 1301(Fed. Cir. 2009) ..................................................... 27, 57

*MagSil Corp. v. Hitachi Global Storage Techs.*,
   687 F.3d 1377 (Fed. Cir. 2012) .................................................. 2, 11, 12

*MCI Telecommunications Corp. v. Ameri-Tel, Inc.*,
   91 C 4277, 1994 WL 405945 (N.D. Ill. July 29, 1994) ......................46

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) ..................................................................... 27, 33

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007) ................................................................. passim

*Minks v. Polaris Industries, Inc.*,
   546 F.3d 1364 (Fed. Cir. 2008) ............................................................52

*National Presto Indus., Inc. v. West Bend Co.*,
   76 F.3d 1185 (Fed. Cir. 1996) .............................................................28

*Neely v. Martin K. Eby Constr. Co.*,
   386 U.S. 317 (1967) ..............................................................................54

*Nemaizer v. Baker*,
   793 F.2d 58 (2d Cir. 1986) ...................................................................45

*Network Publications, Inc. v. Ellis Graphics Corp.*,
   959 F.2d 212 (11th Cir. 1992) ..............................................................50

*Ormco Corp. v. Align Technology, Inc.*,
   609 F.Supp. 2d 1057 (C.D. Cal. 2009)..................................................22

*Penzoil Exploration & Prod. Co, v. Oxy USA*,
    99 F.3d 1134 (5th Cir. 1996) ...............................................................45

*Plummer v. American Institute of Certified Public Accountants*,
    97 F.3d 220 (7th Cir. 1996) ..................................................................57

*Powerex Corp. v. Reliant Energy Services, Inc.*,
    551 U.S. 224 (2007) ..............................................................................29

*Reich v. Cont'l Cas. Co.*,
    33 F.3d 754 (7th Cir. 1994) ..................................................................23

*Riquelme Valdes v. Leisure Res. Grp., Inc.*,
    810 F.2d 1345 (5th Cir. 1987) ..............................................................45

*Russello v. United States*,
    464 U.S. 16 (1983) ................................................................................22

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U. S. 417 (1984) .............................................................................32

*Tasini v. New York Times Co.*,
    206 F.3d 161 (2d Cir. 2000) ..................................................................34

*Transclean Corp. v Bridgewood Servs.*,
    290 F.3d 1364 (Fed. Cir. 2002) ............................................................32

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
    617 F.3d 1296 (Fed. Cir. 2010) ............................................................12

*Tronzo v. Biomet, Inc.*,
    236 F.3d 1342 (Fed. Cir. 2001) ............................................................45

*Tuttle v. Equifax Check*,
    190 F.3d 9 (2d. Cir. 1999) ....................................................................50

*U.S. v. Walton*,
    909 F.2d 915 (6th Cir. 1990) ................................................................45

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ............................................................51

*Vulcan Eng'g Co. v. Fata Aluminum, Inc.*,
  278 F.3d 1366 (Fed. Cir. 2002) ...........................................................55

*Wordtech Systems v. Integrated Networks Solutions*,
  609 F.3d 1308 (Fed. Cir. 2010) ...........................................................28

## STATUTES

35 U.S. C. §271 ................................................................................ passim

35 U.S.C. §271(a) ............................................................................ passim

35 U.S.C. §271(b) ............................................................................ passim

35 U.S.C. §271(c) ...................................................................................25

35 U.S.C. §271(f) ............................................................................. passim

35 U.S.C. §271(f)(1) ........................................................................ passim

35 U.S.C. §271(f)(2) ............................................................ 5, 22, 23, 25

35 U.S.C. §284 .......................................................................................53

Fed. R. Civ. P. 50(a) ..............................................................................36

Fed. R. Civ. P. 50(b) ..............................................................................54

Fed. R. Civ. P. 59(e) ........................................................................ 45, 46

## OTHER AUTHORITIES

H.R. Rep. No. 1984 U.S.C.C.A.N. .......................................................29

## RULES

Wright & Miller, Federal Practice & Procedure §2805 .................... 44, 55

Wright & Miller, Federal Practice and Procedure §4478.6 ....................54

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| A$x$(:$y$) | page $x$ of the Joint Appendix (at line $y$) |
| Life | Life Technologies Corp., Invitrogen IP Holdings, and Applied Biosystems, LLC (collectively) |
| IP Holdings | Invitrogen IP Holdings |
| AB | Applied Biosystems, LLC |
| Promega | Promega Corporation |
| '984 patent/ Tautz patent | U.S. Patent No. RE 37,984 |
| '660 patent | U.S. Patent No. 5,843,660 |
| '598 patent | U.S. Patent No. 6,221,598 |
| '771 patent | U.S. Patent No. 7,008,771 |
| '235 patent | U.S. Patent No. 6,479,235 |
| Promega patents | '660 patent, '598 patent, '771 patent, and '235 patent (collectively) |
| 1996 License | License Agreement dated June 19, 1996 among Promega Corporation, Research Genetics, Inc. and Garching Innovation GmbH |
| 2006 Cross License | Cross License Agreement dated August 29, 2006 between Promega Corporation and Applera Corporation, through its Applied Biosystems Group |
| STR | Short tandem repeat |
| PCR | Polymerase chain reaction |

## STATEMENT OF THE ISSUES

**Promega's Cross-Appeal**

1.      Did the district court correctly grant JMOL in Life's favor because Promega failed to submit substantial evidence to support the jury's verdict?

2.      Did the district court abuse its discretion in denying Promega's requests for a new trial?

3.      Did the district court abuse its discretion in denying Promega's request for an injunction and for this case to be declared exceptional?

## SUMMARY OF THE ARGUMENT

In the face of Life's appeal establishing that four of the five patents asserted at trial are invalid, Promega insists that those patents are irrelevant to its attempt to reinstate the large verdict.  This position is wrong and conflicts with Promega's express reliance on the invalid Promega patents on appeal to attempt to support its infringement position.

It makes sense for the Court to determine whether the Promega patents are invalid before moving to Promega's cross-appeal.  Promega admits the essential facts establishing its enablement violation.  It does not deny that its patents use open claiming at the point of novelty to encircle huge swaths of non-enabled subject matter.  Indeed, there are countless multiplex and primer combinations about which its patents teach nothing that are ensnared by its aggressive over-

claiming. Promega's response is that there is no need to enable open claim elements even if they are at the point of novelty. This position conflicts squarely with this Court's precedent. *See, e.g.*, *MagSil Corp. v. Hitachi Global Storage Techs.*, 687 F.3d 1377, 1383 (Fed. Cir. 2012) ("The open claim language chosen by the inventors does not grant them any forgiveness on the scope of required enablement.").

The Promega patents teach particular primer combinations that enable particular multiplexes. That slim disclosure cannot justify coverage of undisclosed primer combinations for multiplexes Promega did not even contemplate.

The Promega patents are also invalid as obvious. The incremental new multiplexes disclosed in its patents involve merely the exercise of ordinary skill using the "trial and error" methods of multiplex development. Promega does not claim to have added anything to that prior art method of developing multiplexes. As explained in *KSR*, the exercise of ordinary skill without innovation does not deserve a patent. In any event, if creating a new multiplex by substituting one loci in a prior art triplex, as Promega has done, is a non-obvious innovation, surely these patents are not enabled because they cover countless primer combinations and multiplexes about which they teach nothing.

Promega's attempt to resurrect the jury verdict has no more merit than its attempt to defend its patents. The most important thing to understand about

Promega's cross-appeal is that the problems with Promega's case all stem from strategic litigation decisions it made consciously.

The accused products are made in England. Nevertheless, Promega sought to recover for sales worldwide via a risky "all or nothing" trial strategy that did not permit the jury to address domestic sales separately from foreign sales. Over Life's objection, Promega condensed its worldwide infringement theory into one verdict question that conflated §271(a) and §271(f)(1) infringement. Promega's closing argument urged the jury to include all accused sales worldwide in the verdict, even though there was insufficient evidence supporting such a verdict. As the district court explained, Promega "relied on the assumption that **all** of the accused products defendants sold during the relevant time frame . . . were made in the United States, imported into the United States or made with a substantial portion of components from the United States, as required by §271(a) and (f)(1)." A2334 (emphasis in original).

Throughout trial Life warned Promega not to conflate its theory of domestic and foreign infringement and that it lacked evidence to support a worldwide infringement verdict. Life raised these issues at the end of Promega's case, during Life's case, and before the case was submitted to the jury. The district court even indulged Promega an extra opportunity in rebuttal to cure the shortcomings of its

approach by allowing it to submit additional evidence that sales worldwide violated §271 or to focus on domestic sales.

Despite these warnings, Promega, in an effort to obtain maximum recovery, insisted that the jury be presented with no choice but to calculate damages on worldwide sales. It ***prevented*** the dollar value of Life's domestic sales from being revealed to the jury. It declined the district court's invitation to provide the jury with a way to award damages for domestic sales only.

Promega now asks this Court for a new trial, a second chance to do what it could have done in the first trial but specifically chose not to do. It contends it is now entitled to revise its strategy and parse the different infringing acts to try to obtain a less ambitious recovery. There is no legal principle that can—or should— allow a litigant a retrial to pursue a litigation strategy that it consciously eschewed in the original trial even after being warned of the perils of its position.

Promega's claims of surprise ring hollow. Promega contends it did not understand it had to prove §271 infringing acts for all sales, both domestic and foreign. Promega relies heavily on the summary judgment finding that the accused products fell within the scope of the claims. But it was not reasonable for Promega to conclude that this ruling resolved the specific §271(a) and (f)(1) issues required to support a worldwide damages award. And, even if it had misread the summary judgment ruling, by trial it knew it had to prove the infringing acts for all sales

worldwide.  Life repeatedly informed Promega of this need.  Moreover, *Promega* proposed the verdict question that required proof of infringing acts related to both §271(a) and (f)(1).  It must have known it needed to prove statutory violations for all accused sales.

Promega's request for reversal of the JMOL also fails.  The district court correctly rejected Promega's argument that §271(f)(1) can be triggered by the supply of a single commodity component and that the "active inducement" requirement is satisfied if one "actively induces" *oneself* to infringe.  Promega must establish that the district court was wrong on both these grounds in order to disturb its JMOL ruling.

The requirement that more than one component must be supplied from the United States is made plain by the text and structure of §271(f)(1).  Subsection (f)(1) speaks only of plural "components" whereas subsection (f)(2) speaks in the singular.  In case any doubt remains, the Supreme Court has spoken on this subject, concluding that subsection (f)(1) is different from (f)(2) precisely because it requires more than one component to be supplied.  *See Microsoft Corp. v. AT&T Corp.,* 550 U.S. 437, 454 n.16 and n.18 (2007).  The Supreme Court interpreted the statute correctly and Promega's position should be rejected.

The second independent basis for upholding the JMOL is equally compelling.  Courts have long concluded that active inducement requires the

inducement of another entity under §271(b). There is no reason to construe §271(f)(1) more broadly than §271(b) or to tamper with the historical treatment of active inducement as involving a third party. On the contrary, the Supreme Court in *Microsoft* has implored the lower courts to construe §271(f)(1) narrowly because of its extra-territorial impact and its limited role in the statutory scheme.

Finally, Promega challenges the denial of its permanent injunction motion and request for enhanced damages. Because there is no valid infringement judgment that sets forth the scope of what acts could or should be enjoined, there is no basis for an injunction. Because there is no damages award, much less a viable infringement verdict of defined scope, there is nothing to enhance.

## REPLY ARGUMENT ON LIFE'S APPEAL

### I.   THE PROMEGA PATENTS ARE INVALID

#### A.   THE INVALIDITY OF THE PROMEGA PATENTS PRECLUDES REINSTATEMENT OF THE VERDICT

Throughout this case Promega touted its homegrown patents as remarkable scientific advances that warranted a large damage award. Promega argued in its opening statement that the case was about rewarding Promega for its patented technology: "you will hear about the remarkable technology that came out of that company that did indeed change the world. . . . and its development ultimately of patents." A5096:3-17. And, Promega repeatedly emphasized the value of its

patents during trial. *See, e.g.*, A5102:4-5 ("Promega had an extraordinarily valuable item, its patents."); A6416:15-16.

In the face of Life's compelling invalidity arguments, Promega argues that its patents are irrelevant, relying on the unchallenged validity of the Tautz patent.[1] Specifically, Promega contends that "Promega's right to relief does not depend upon the outcome of Life's invalidity appeal," and disparages as a "distraction" whether its patents are invalid. Promega.Br.5. Promega is wrong.

The invalidity of the Promega patents critically impacts this appeal. Indeed, in its appeal brief, Promega specifically *relies* on the Promega patents to try to resuscitate the verdict. For example, Promega relies on claim 21 of the '235 patent to argue that there is substantial evidence of infringement to support the verdict. Promega.Br.49. Because the '235 patent is invalid (as are all the Promega patents), and it cannot rely on any of these patents to support its §271 analysis, Promega cannot so easily dodge Life's appeal.

The invalidity of the Promega patents affects the scope of what possibly could be infringing. Life has broader license rights under the Tautz patent than under the (invalid) Promega patents. Under the parties' 1996 License, Life

---

[1] Promega in-licensed the Tautz patent (as has Life), and did not develop the technology claimed therein.

retained rights in the basic research field (as opposed to forensic and paternity analysis, and clinical diagnosis or treatment of humans). *See* A784, 788-89 ("both Research Genetics and Promega shall be authorized to exercise any such nonexclusively licensed rights."). Life's retained rights for the Tautz Patent include, among others, uses in cell line authentication, which "has become an essential research application." A857; *see also* A700 (cell line authentication "has become an important matter for universities and research institutions").

By contrast, the district court ruled that Life's rights to the Promega patents under the 2006 Cross License do ***not*** include cell line authentication or genetic research. A190. The district court instructed the jury that those uses were "not permitted" fields for Life based on the limits of the license to the Promega patents in the 2006 agreement and without reference to Life's broader licensing rights to the Tautz patent in the 1996 agreement. A190. To prove both damages and willfulness, Promega repeatedly argued that sales to research universities were unlicensed. *See, e.g.*, A6387:19-20 (Promega arguing that Life's conduct was willful because "They know what universities do. They do research. They don't do forensic and paternity work."); A6068:3-10; A6071:9-12; A6079:3-11; A6081:20-6082:7.

The bottom line is this: Because Life is licensed to sell the accused kits under the Tautz patent for cell line authentication and a host of other uses, its

infringement exposure would have been much reduced had the Promega patents been recognized as invalid. The district court's improper summary judgment of no invalidity of the Promega patents deprived Life of the benefit of its Tautz-specific license protections. From infringing acts, to license scope, to damages, to willfulness, the arguments on virtually every issue tried would have been different. Moreover, the invalidity of the Promega patents directly affects Promega's post-trial requests for an injunction and an exceptional case finding.

Invalidity is an inescapable issue before Promega could be granted its request to reinstate the verdict. For the reasons stated above and in Life's opening brief, this Court will also need to address invalidity regardless of its disposition of the other issues in this appeal. *See* Life.Br.2.

## B. THE PROMEGA PATENTS ARE NOT ENABLED

Life established that summary judgment on the invalidity issue should have been entered in ***favor*** of Life, not against it, because the Promega patents are not enabled. All the claims-at-issue cover limitless sets of multiplexes and primers. The patents disclose particular multiplexes enabled by the use of particular primers without any teaching how to use other primers for the specified multiplexes, much less any disclosure that would allow the addition of loci to create new multiplexes.

Promega does not deny the key facts that establish its enablement violation. Critically, it does not deny that its patents fail to enable the use of any primer pairs

that are not disclosed in the patent or any multiplexes for which it has not disclosed primers. It does not purport to have added anything to the art to improve how one would identify working primers for either the disclosed multiplexes or to develop other multiplexes. It also does not deny that its claims cover countless primers and multiplexes that are not enabled. Instead of contesting these facts, Promega makes two legal arguments. First, it argues that the subject matter encompassed by a claim need not be enabled if it is an "unrecited element" otherwise all "open claims" would be doomed. Second, it argues that the non-enabled multiplexes and primers encompassed by the claims are, in fact, unrecited elements that do not need to be enabled. Promega is wrong on both counts.

### 1. THERE IS NO "UNRECITED ELEMENTS" EXCEPTION TO THE RULE THAT THE FULL SCOPE OF A PATENT CLAIM MUST BE ENABLED

To defend the district court's grant of summary judgment, Promega invents an "unrecited elements" exception to the enablement requirement. No such exception exists. Promega's position fails the common sense test. If Promega were correct and "open elements" or "unrecited elements" did not need to be enabled, the enablement obligation would be the exact same for a very narrow "picture" claim and an incredibly broad claim with open elements at the point of novelty. This is illogical. Promega nevertheless argues that the "unrecited elements" exception is supported because "'open' patent claims permit, but do not

require – and therefore ***need not enable*** – additional matter."[2] Promega.Br.55. This is not the law. As explained in Life's opening brief, this Court in *Magsil* resoundingly rejected any notion that open claim ***elements*** do not need to be enabled to their full breadth: "The open claim language chosen by the inventors does not grant them any forgiveness on the scope of required enablement." *MagSil*, 687 F.3d at 1383.

To be clear, neither *Magsil* nor this case relate to standard open claims using "comprising" as a transitional phrase in the preamble that allow additional elements to be added to the claimed invention. Rather, they involve a particular claim ***element*** itself drafted broadly to encompass open-ended subject matter.

Although Promega spills much ink on *Magsil*, it says little. It does not address *Magsil*'s statement that the full breadth of open claim elements must be enabled. Instead, Promega attempts to distinguish *Magsil* because the open-ended "range" on which the enablement holding was based was supposedly "an essential feature" of the invention and "not merely a non-prohibited additional feature." Promega.Br.57. These distinctions and linguistic formulations are not supported by *Magsil* at all. There is nothing in the decision about essentiality or unrecited elements.

---

[2] Emphasis supplied unless otherwise noted.

Stripped down, Promega's position is that open claim elements (which Promega dubs "unrecited elements") are necessarily "added features" that do not need to be enabled. Promega.Br.55-56. In support, it relies on *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495 (Fed. Cir. 1997). But that case involves infringement, and does not even purport to address enablement. The three enablement cases relied upon by Promega are equally unenlightening. In *DeGeorge v. Bernier,* 768 F.2d 1318 (Fed. Cir. 1985), this Court rejected an enablement argument because the allegedly missing disclosure was within the ordinary skill in the art. That is not the issue here. In *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296 (Fed. Cir. 2010), this Court rejected an enablement argument because the allegedly missing disclosure was an optimized version of the invention. *Id.* at 1307 (It is "not required to enable the most optimized configuration, unless this is an explicit part of the claims."). Optimization is not the issue here. In *CFMT, Inc. v. Yieldup International Corp.*, 349 F.3d 1333 (Fed. Cir. 2003), this Court rejected the enablement argument because it sought to impose "commercial standards of cleanliness." The Court explained that "Title 35 does not require that a patent disclosure enable one of ordinary skill in the art to make and use a perfected, commercially viable embodiment absent a claim limitation to that effect." *Id.* at 1338. That is not the issue here.

After all the cases are read, it is undeniable that the full scope of the claim must be enabled, including the subject matter encompassed by "open" claim elements. Features that are superfluous to the claim need not be enabled. As explained in the next section, undisclosed primers that enable the disclosed multiplexes and new multiplexes with additional loci are not in any way superfluous to the claims at issue; they go to the core of the claimed subject matter right at the point of novelty.

### 2.    THE NON-ENABLED PRIMERS AND MULTIPLEXES *ARE* WITHIN THE BROAD SCOPE OF THE CLAIMS

In its opening brief, Life explained that Promega's enablement violations result from its open-claiming at the "point of novelty." Life.Br.27; *see also id.* at 22 ("Promega relied upon the alleged novelty of the specific loci combinations recited in the claims and the primers that were found to work together in that multiplex without conflict."). Promega never denies that the "openness" in its claims resides at the point of alleged novelty. How could it? Identifying particular primers pairs that would allow a multiplex reaction to work is unquestionably at the center of the alleged inventions.

There are two related enablement problems due to the broad scope of the claims. First, the patents only teach the use of very specific primer pairs to make the disclosed multiplexes work. But there are countless primer pairs that could make these same multiplexes work that are within the scope of the claims. The

patents undisputedly teach nothing about these other primers. Second, the patents teach only specific sets of loci that work together, but claim a limitless number of non-enabled multiplexes that use undisclosed loci (so long as the specified loci are included). Contrary to Promega's "unrecited elements" argument, all this non-enabled subject matter is claimed.

The claims broadly cover all possible primers that can be used with any given multiplex in "recited elements." Specifically, the claims require the step of "co-amplifying the loci in the set in a multiplex amplification reaction." Primers are integral to the claimed step of amplifying loci. A939; A1373. They are likewise an essential component of the claimed "amplification reaction" in which the co-amplification happens because primers make amplification work and must not conflict. A939; A1373. These technical facts are uncontested. *Id.*

The dependent claims confirm that primers are an integral part of the co-amplifying step and are part of the claimed amplification reaction in which that step occurs. *See, e.g.*, A289 ['598 patent, Claim 8] ("identifying primers for co-amplifying each locus…"); A290 ['598 patent, Claim 13] ("the multiplex reaction is carried out using oligonucleotide pairs with primer pair sequences comprising….").

The patents themselves specify that primers are an integral part of the "amplification reaction." *See, e.g.*, A318:19-21 ['598 patent] ("One primer of each

primer pair listed on Table 2 was fluorescently labeled prior to being ***used in the multiplex amplification reaction***.").

Promega's brief ignores the failure of the Promega patents to enable anything beyond the few working primer pairs disclosed in the specification. The core concept of primers is almost completely avoided in Promega's brief. Nevertheless, Promega's response would presumably be that, because primers are not identified *in haec verba* in the independent claims, there is no need to enable them. But that is wrong. If the patent did not disclose ***any*** working primers, surely the claims would fail the enablement test; the patent would have failed to disclose how to make the multiplex it claimed. Claiming a step (co-amplifying) and a reaction (the amplification reaction) that necessarily include primers—but avoiding the word "primer"—does not insulate these claims from enablement scrutiny. And because the primers enable the multiplexing, Promega was entitled only to coverage of co-amplification processes that use the primers that they disclosed and knew would work. Promega concedes that selecting other primer combinations that work is unpredictable and subject to the same trial and error work that it claims as its invention. *See* Life.Br.17-19.

Promega contends that the claims do not encompass multiplexes that include unlisted loci because unlisted loci are supposedly "unrecited." The claims at issue all include the co-amplification of a ***set of loci*** in a multiplex amplification reaction

and a consequent mixture. When multiplex reactions incorporate both listed and unlisted loci, the claimed "set of loci," claimed "multiplex reaction," and claimed "mixture," each ***include*** the unlisted loci as part of the recited elements of the claim. And, once again, there is no dispute that the primer pairs to make such an extended multiplex (beyond the specific loci disclosed) are often ***different*** from what works for the set of loci specifically disclosed. *See* Life.Br.19. So to the extent the patent covers sets of loci that include the disclosed loci and ***any number of additional loci***, the patent fails to disclose ***any*** primers at all that will work. That is, the patent completely fails to disclose how to co-amplify those set of loci. These overbroad claims are thus not enabled.

### C. THE PROMEGA PATENTS ARE OBVIOUS

Promega does not deny that its patents are the product of mere trial and error. Promega fails to identify any innovation that it used to develop the claimed inventions. Indeed, Promega does not identify any teaching in its patents that generally improves primer or multiplex development.

Promega responds that there is no longer a "flash of genius" test for invention and that patentability shall not be "negated by the manner in which the invention was made." But these principles do not insulate from scrutiny obvious patent claims within the exercise of ordinary skill.

It is undisputed on appeal that Promega merely used the prior art "trial and error" process to produce multiplexes based on primer combinations that proved not to conflict. It does not deny that the STR loci it disclosed have no "special characteristics other than that they have been found to co-amplify." Life.Br.49. In short, Promega's employees used only *ordinary skill*, following the well-worn, prior-art path of multiplex development.

Promega does not even cite *KSR*, much less dispute that granting "patent protection to advances that would occur in the ordinary course without real innovation retards progress." *KSR Intern. Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1741 (2007); *see also id.* at 1746 ("the results of ordinary innovation are not the subject of exclusive rights under the patent laws"). And Promega does not claim that its inventors employed anything more than the ordinary skill to determine which primers would not conflict to identify multiplexes for specific sets of loci. The use of ordinary skill to follow a prior art trial and error procedure to pursue a known goal renders this patent obvious.

Finally, Promega's obviousness position undermines its enablement position. If Promega's marginally new multiplexes based on a few primer combinations are each inventive, its sweepingly broad claims must not be enabled. Promega cannot have it both ways. On the other hand, the finite, incremental multiplexes disclosed in the Promega patents are obvious, but its overbroad claims

are not enabled because they expansively cover limitless primer combinations and multiplexes.

## II.   FORENSIC EDUCATION IS LICENSED

The jury's verdict cannot be reinstated absent affirmance of the district court's narrow interpretation of the 2006 Cross License.   The license was interpreted too narrowly and, for this additional threshold reason the verdict cannot be reinstated.

Promega's opposition confirms that the parties' core license scope dispute is whether forensic education (for example, coursework in a university forensic education program) is included in the license for Forensic And Human Identity Applications.   Boiled down, Promega's position is that the setting for forensic training determines whether it is for "use in, or in preparation for legal proceedings."   Promega concedes that forensic training in a forensic lab is licensed, even if it is unconnected to an actual legal action.   Promega also acknowledges that "ongoing training of forensic laboratory employees" is licensed. Promega.Br.67-68.   Promega insists the district court's interpretation is broad enough to allow "ample leeway for forensic laboratory personnel to meet the [FBI's] training requirements."   Promega.Br.68.

Yet, according to Promega, when forensic training is undertaken by forensic students in forensic education programs at a university, it is unlicensed.   Promega

points to nothing in the 2006 Cross License to suggest that the setting of the forensic training should determine whether a use is licensed.

The undisputed evidence is that forensic education in a university setting is indeed "for use in, or in preparation for legal proceedings." Life's expert, Arthur Eisenberg, supported this position:

- "Forensic testing (casework) is complex and technical work, and as such would not be possible without the proper education in forensic science. Accordingly, a forensic education is necessary as preparation for performing actual forensic testing for use in legal proceedings." A1595.

- "a forensic science education is practically oriented; it is foundational to and directly in preparation for, a forensic scientist to perform forensic testing (casework) for use in legal proceedings." A1596.

- "Without forensic education, there would be no forensic testing for use in legal proceedings." A1596.

Consistent with Dr. Eisenberg's testimony, the FBI QAS includes as a "Minimum educational requirement" a threshold level of "course work (graduate or undergraduate level)" in a range of subject areas "as it applies to forensic DNA analysis" *See* A1613-14 [Quality Assurance Standards] ¶5.4.1. Likewise, Dr. Eisenberg pointed out how the FBI QAS sets a "minimum experience requirement" of six months of forensic human DNA laboratory experience. *See* A1598 (citing A1614 [Quality Assurance Standards] ¶5.4.2).

Promega's expert, Dr. Jack Ballantyne did not challenge this testimony. At most, Dr. Ballantyne opines that "only a portion of the students go on after

graduation to be employed at a forensic lab." A1663. Nevertheless, forensic education "is necessary as preparation for performing actual forensic testing for use in legal proceedings." A1595. Because forensic education is a critical predicate to direct "use" of Life's STR kits in legal proceedings, Life would be deprived of the benefit of the bargain if use in forensic education is deemed off-limits. *See* Life.Br.54-60.

## ARGUMENT ON PROMEGA'S CROSS APPEAL

## I. THE DISTRICT COURT CORRECTLY GRANTED JMOL

Promega fails in its attempt to challenge the district court's two independent grounds for granting JMOL.[3]

### A. §271(f)(1) REQUIRES EXPORTING MORE THAN ONE COMPONENT

Promega argues that export of a single commodity component can trigger liability under §271(f)(1) for foreign sales. Promega.Br.48. The plain language of the statute and the Supreme Court's decision in *Microsoft v. AT&T*, 550 U.S. 437 show that Promega's argument must be rejected.

---

[3] Promega has abandoned its attempt to resurrect the verdict based solely on §271(a).

### 1.  §271(f)(1)'s LANGUAGE AND STRUCTURE REQUIRES THE EXPORT OF MORE THAN ONE COMMODITY COMPONENT

The plain language of §271(f)(1) expressly requires that multiple "components" be supplied from the United States for liability to attach by using the plural "components" throughout.

As a matter of grammar, the statute plainly contemplates more than one component supplied from the United States.  The word "components" is plural throughout, and the reference to "such components" must refer to what is being supplied from the United States.  Promega argues that "such components" refers to *all* the components of the invention—including any supplied from outside the United States—because the statute contemplates that "such components" will eventually be combined in a manner that would infringe.  Promega.Br.50.  But that is wrong.  "Such components" as are supplied from the United States can be combined abroad with each other *and foreign supplied components* in a manner that would infringe.  More importantly, the phrase "such components" appears *twice* in the statute, and Promega's proposed interpretation makes no sense as applied to the first.  The first use of the phrase "such components" *must* refer to what is supplied from the United States because the statute is, at that point, still describing the state of the components while in the United States— "uncombined in whole or in part."

21

The plural "components" in §271(f)(1) stands in distinct contrast to §271(f)(2), including its consistent use of the singular "component." Had Congress wanted subsection (f)(1) to apply to the export of a single component, as it clearly intended for subsection (f)(2), it could readily have used the same language. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Promega asks this Court to read (f)(1) as if it had been written like (f)(2), urging the Court to interpret the statute to cover export of a single commodity part, so long as a jury thinks it is important enough. Promega.Br. 48. But, unlike §271(f)(2), §271(f)(1) does *not* say that infringement can be assessed against whoever "supplied in or from the United States *any component* of a patented invention…."

Unlike Promega, the Supreme Court has noticed the difference.[4] As it explained in *Microsoft*, "the two paragraphs differ, among other things, on the

_____

[4] Indeed, every published decision on this topic has reached this conclusion. *See Ormco Corp. v. Align Technology, Inc.*, 609 F.Supp. 2d 1057, 1074 (C.D. Cal. 2009) ("§271(f)(1) cannot, as a matter of law, apply when only one component is 'supplied' abroad."); *Bristol-Myers Squibb Co. v. Rhone- Poulenc Rorer, Inc.*, 2001 WL 1263299, Slip op. at *5 (Oct. 19, 2001) ("The plain meaning of §271(f)(1) is that it only applies where multiple components have been supplied or caused to be supplied in or from the United States."); A2345.

quantity of components that must be 'supplie[d]... from the United States' for liability to attach." 550 U.S. at 454 n.16; *see id.* at 458 n.18 (contrasting §271(f)(1)'s coverage, which applies to all or a substantial portion of a patented invention's components with §271(f)(2)'s coverage, which "applies to the export of even a single component" under certain circumstances). Promega dismisses the Supreme Court's observation as *dicta*, but it cannot dispute its clarity. The Supreme Court has said that the two sections of §271(f) differ in scope based on the number of components potentially at issue; only §271(f)(2) potentially applies to a single component. The Supreme Court's observation comes right out of the text of the statute. It merits the respect of this Court.[5]

Respect is especially due in light of the emphasis that the Supreme Court has placed against construing broadly a statute with extraterritorial application. *Microsoft*, 550 U.S. at 452; *see also Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 576 F.3d 1348, 1362 (Fed. Cir. 2009) (en banc) ("The [*Microsoft*] Court sent a clear message that the territorial limits of patents should not be lightly

---

[5] The Supreme Court not once, but twice, pointed out this distinction based on its plain reading of the statute. *Microsoft*, 550 U.S. at 454 n.16, 458 n.18. Supreme Court "*dicta* are highly persuasive" and cannot be "view[ed] lightly." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007); *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994) (disregarding considered dictum of the Supreme Court is "reckless").

breached.").  Promega suggests that the presumption against extraterritoriality "is irrelevant here" because Life's supply of components is domestic.  Promega.Br.46-47.  The Supreme Court rejected this exact argument in *Microsoft*, holding that the presumption is never irrelevant, but always "remains instructive in determining the extent of the statutory exception."  550 U.S. at 455-56.

### 2.   PROMEGA'S POLICY ARGUMENTS FAIL

Promega's policy arguments are misguided.  Promega argues that the "district court's reading [] leads to the absurd result that a component supplier could avoid liability simply by combining U.S.-supplied components into one bigger 'component' before shipment abroad."  Promega.Br.51.  But, according to the logic of the statute itself, components are distinct whether "uncombined in whole or in part" or "combined outside of the United States."  *See* 35 U.S.C. §271(f).  Combining components does not transform them into "one bigger component."  Nor does the district court's rule "unreasonably protect a company that supplies from the United States one component of a two-component invention."  Promega.Br.51.  Liability may attach under paragraph (f)(2), if the single component is designed for infringement.  *See Microsoft*, 550 U.S. at 458 n.18.

Regardless, Promega has addressed its policy arguments to the wrong body.  Courts must not engage in "dynamic judicial interpretation of §271(f)" to close

perceived policy "loopholes." *Microsoft*, 550 U.S. at 457. In fact, the difference in scope between the two paragraphs makes sense. While the second paragraph "applies to the export of even a single component," it imposes the requirement that it be especially designed for infringement. By contrast, §271(f)(1) applies to the export of staple articles that have substantial legitimate uses other than infringement and thus imposes the requirement that multiple components must be exported.

### 3. PROMEGA'S SECONDARY ARGUMENTS MISS THE MARK

Relying on legislative history, Promega argues that the contrast between paragraphs (f)(1) and (f)(2) in the use of the plural "components" is mere happenstance resulting from (f)(2)'s imitation of §271(c). Promega.Br.51. But express language chosen by Congress cannot be so lightly dismissed. In fact, Promega misstates the legislative history, which explains that *only* the phrase "especially made . . . non-infringing use," and *not* the language specifying the quantity of components, "comes from existing §271(c)." *See* 1984 U.S.C.C.A.N at 5828.

Promega also suggests that "the Dictionary Act weakens any inference from the use of the plural." Promega.Br.50(n.13), 52. But the Dictionary Act can never overpower more direct evidence such as the language of the statute and Supreme Court precedent. *See Commissioner of IRS v. Driscoll*, 669 F.3d 1309, 1311 (11th

Cir. 2012) ("[A]s as the United States Supreme Court has explained, the Dictionary Act, by its own terms, does not apply if 'the context indicates otherwise.'").

### B. §271(f)(1) REQUIRES A THIRD PARTY TO BE ACTIVELY INDUCED

Promega also challenges the district court's conclusion that §271(f)(1) requires a **third party** to be actively induced. A2347-51. This is a second, independent basis for the district court's JMOL ruling. As a preliminary matter, the only live issue is whether a party can induce **itself** under §271(f)(1). Although Promega implies that Life could have induced "its subsidiaries, divisions, or employees," the district court found that Promega waived this argument. Promega.Br.41; A2364 (finding the "argument that defendants did not 'induce' themselves, but their 'foreign divisions, subsidiaries or employees'" "forefeited" because "[t]his is a new argument" first made on a motion for reconsideration). In opposing Life's JMOL motion, Promega merely made the conclusory statement that "[w]hile 271(f)(1) includes the situation where a third party creates the combination, it also includes the situation where an offshore division of a company is supplied components." A9251. Promega cited no supporting authority or evidence and did not identify alleged "offshore divisions" of Life. One passing phrase in a brief does not sufficiently develop an argument to preserve it. *See* Promega.Br.44(n.11). In any event, Promega has not identified substantial evidence supporting its theory.

In terms of the argument that Promega did preserve, inducement **requires** a third party. That is fundamental. As the district court stated, "[b]ecause the ordinary meaning of the word 'induce' is to influence or persuade, it makes little sense in common parlance to say that someone 'induced himself' to perform a particular action." A2348 (citation omitted). This is consistent with the Supreme Court's conclusion that the phrase "induces infringement" in §271(b) requires "that the inducer lead another" or "persuade another." *Global-Tech Appliances, Inc. v. SEB SA*, 131 S.Ct. 2060, 2065 (2011). It is also consistent with the Supreme Court's statement in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 935 (2005), that inducement is defined as "entic[ing] or persuad[ing] another" to infringe.

This Court has likewise consistently understood inducement to require a third party in the context of §271(b). In *DSU Medical Corporation v. JMS Company*, 471 F.3d 1293 (Fed. Cir. 2006) (en banc), this Court ruled that "inducement requires evidence of culpable conduct, directed to encouraging **another's** infringement," requires proof that the defendant "actively and knowingly aid[ed] and abet[ed] **another's** direct infringement," and requires proof "that the alleged infringer knowingly induced infringement and possessed specific intent to encourage **another's** infringement." *Id.* at 1305-1306; *see also Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1322 (Fed. Cir. 2009)

("[I]nducement requires evidence of culpable conduct, directed to encouraging *another's* infringement); *Wordtech Systems v. Integrated Networks Solutions*, 609 F.3d 1308, 1315 (Fed. Cir. 2010) (same); A2349 (collecting cases).

To hold otherwise would subvert the statutory scheme and upend settled principles. It cannot be disputed that "induced" infringement imposes secondary, as distinguished from primary, liability. *See Janus Capital Group v. First Derivative Traders*, 131 S.Ct. 2296, 2302 n.6 (2011) (finding that failing to distinguish between primary and secondary liability would undermine the statute); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 500 (1964) ("It is true that a contributory infringer is a species of joint-tortfeasor, who is held liable because he has contributed with *another* to the causing of a single harm to the plaintiff."); *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1194 (Fed. Cir. 1996) ("The statutory liability for inducement of infringement derives from the common law, wherein acts that the actor knows will lead to the commission of a wrong by *another*, place shared liability for the wrong on the actor."). Promega seeks to eliminate that principle. Doing so would conflate §271(b) with §271(a).

Promega argues that the above principles relate to active inducement in §271(b), not §271(f).[6] It is a "standard principle of statutory construction," however, "that identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 232 (2007). That principle has special force here, because "the term 'actively induce'" in §271(f)(1) was expressly "drawn from existing subsection 271(b)[.]" 1984 U.S.C.C.A.N. at 5828; *see also Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1222 (Fed. Cir. 2006) (applying §271(b) standard for active inducement in case brought under §271(f)(1)).

The inducement requirement in §271(f) should be interpreted more narrowly than the inducement requirement in §271(b). This is because the principle against extraterritoriality teaches that this provision should be interpreted narrowly. *See Microsoft*, 550 U.S. at 458. The *Microsoft* Court explained that the facts of *Deepsouth* "were undeniably at the fore" when Congress drafted §271(f) and those involved a third party:

> §271(f) was a direct response to a gap in our patent law revealed by this Court's *Deepsouth* decision. See supra, at 1752, and n. 3. The facts of that case were undeniably at the fore when §271(f) was in the congressional hopper. In *Deepsouth*, the items exported were kits

---

[6] Promega did not deny before the district court that "active inducement" under §271(b) requires the involvement of a third party. A2349.

containing all the physical, readily assemblable parts of a shrimp deveining machine (not an intangible set of instructions), and those parts themselves (not foreign-made copies of them) **would be combined abroad by foreign buyers**. Having attended to the gap made evident in *Deepsouth*, **Congress did not address other arguable gaps.**

*Microsoft*, 550 U.S. at 457-58.

Promega argues that the "reasoning" of *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308 (Fed. Cir. 2012) supports its position. But this Court's analysis of §271(b) in *Akamai* not only fails to undermine the district court's conclusion, it in fact supports it. *Akamai* relates to the concept of "divided infringement" and thus is only relevant to situations where two different entities are involved with infringement. *See Akamai*, 692 F.3d at 1305 ("In the two cases before us, we address the question whether a defendant may be held liable for induced infringement if the defendant has performed some of the steps of a claimed method and has induced **other parties** to commit the remaining steps (as in the *Akamai* case), or if the defendant has induced **other parties** to collectively perform all the steps of the claimed method, but no single party has performed all of the steps itself (as in the *McKesson* case).").

### C.   THE DISTRICT COURT CORRECTLY GRANTED JMOL

Promega concedes that the verdict cannot be revived unless the district court erred in interpreting §271(f)(1) on both the quantity of components and third-party inducement issues. Promega admits that most accused kits do not contain more

than one component supplied from the United States, *see* Promega.Br.49, and does not contend that Life induced infringement by any third party, *see* Promega.Br.41 & A2363; *see also* A2345-47. Accordingly, the district court correctly granted Life's JMOL motion.[7]

### D. THE JURY VERDICT ADDITIONALLY CANNOT BE REINSTATED BECAUSE LIFE WAS IMPROPERLY REQUIRED TO BEAR THE BURDEN TO PROVE LICENSED SALES

There is an additional, independent reason why the jury verdict cannot be reinstated. Three days before trial, the district court incorrectly ruled that Life bore the burden to prove which sales fell within the scope of the 2006 Cross License.[8] *See* A52-56; A2286; A2644-46; A2675-76.

---

[7] If the Court were to reverse the district court's interpretation of §271(f) on both grounds (which it should not), remand would be required to determine if Taq polymerase constitutes a "substantial portion of the components" of the accused kits. *See* A2345 ("it seems unlikely that one component could constitute a 'substantial' portion in this case when plaintiff does not dispute defendants' position that the accused products are made up of no fewer than five components.").

[8] The district court's erroneous decision on this issue had a cascade effect that led to a series of additional legal errors, most notably the exclusion of key testimony. *See generally* A2648-64. Indeed, after ruling that Life bore the burden of proving licensed sales, it then excluded the testimony of the very Life fact witnesses who would have testified regarding the percentage of licensed versus unlicensed customer uses. Of course, this provides yet additional reason why the jury's verdict cannot stand. *See id.*

Both §271 and relevant case law establish that it was Promega that should have born that burden of proving which sales were licensed. Section 271 provides that "[e]xcept as otherwise provided in this title, whoever **without authority** makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. §271(a) (emphasis added). Thus, "without authority" is properly an element of the cause of action. As the claimant, Promega should bear the burden to prove the absence of authority.[9]

A license defense is an "affirmative defense" and thus the accused infringer bears the burden of proving the **existence** of a license. But the burden of providing **which** infringing acts are licensed should fall on the party asserting infringement. Courts have interpreted similar statutes to require the plaintiff to carry the burden of proof on the scope of a license.[10] The landmark case of *Bourne v. Walt Disney*

---

[9] Indeed, "[i]t is settled law that 'the patent owner bears that burden of providing by a preponderance of the evidence the quantum of damages.'" *Transclean Corp. v Bridgewood Servs.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002); *see also BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1217 (Fed. Cir. 1993) ("The finding of the amount of damages for patent infringement is a question of fact on which the patent owner bears the burden of proof.").

[10] Such authority is highly persuasive in view of the Supreme Court's guidance in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U. S. 417 (1984), that there is a "historic kinship" between copyright and patent law, such that copyright law is a valuable interpretive resource when addressing patent law issues and vice-

*Co.*, 68 F.3d 621, 630-31 (2d Cir. 1995) has a similar fact pattern to this case. In *Bourne*, the plaintiff acknowledged that the defendant had a license to a copyrighted work, but argued that it was defendant's burden to prove authorized uses because "a license is an affirmative defense to a claim of copyright infringement."[11] *Id.* at 630; *see also* A52-56; A2622-23. The Second Circuit analyzed the question carefully and rejected plaintiffs' arguments, concluding that once the fact of the license is established, the copyright holder must bear the burden of proving that disputed sales are "unauthorized":

> [I]n most of the cases addressing the defense of license, the issue has been whether a license is held by the accused infringer. Since, in such cases, evidence of a license is readily available to the alleged licensee, it is sensible to place upon that party the burden of coming forward with evidence of a license.

---

versa. *See also Grokster*, 545 U.S. 913 (relying on patent law for copyright law interpretation); *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060 (2011) (same).

[11] In the lower court, Promega made an identical argument, citing a series of cases that the district court ultimately relied upon when erroneously allocating the burden of proof to Life. *See* A53-54. However, of the cases cited by Promega, only *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1148 (Fed. Cir. 1983) involved an express license between the alleged infringer and the patentee. And *Kansas Jack* did not address the burden of proof issue. The remaining cases Promega cited involved an implied license or a license between the patentee and third party, where there is no documentation evidencing the existence, let alone the terms, of the license. It is therefore logical to make the patentee prove the fact of the license. *See* A2671-73. These cases stand for nothing more than this common sense proposition, and do not address the issue at hand.

In this case, however, there is no dispute that Disney received from Bourne various licenses to copyrighted compositions. The only dispute is whether Disney's synchronization of the Compositions with its home videocassettes and its use of the Compositions in its television commercials fall within the scope of the existing licenses. Thus, the only dispute here is the scope of the licenses, not their existence.

We conclude that, in cases where only the scope of the license is at issue, the copyright owner bears the burden of proving that the defendant's copying was unauthorized. Copyright disputes involving only the scope of the alleged infringer's license present the court with a question that essentially is one of contract: whether the parties' license agreement encompasses the defendant's activities. Just as in an ordinary contract action, the party claiming a breach carries the burden of persuasion.

*Bourne,* 68 F.3d at 631 (internal citations and quotations omitted); *see also Tasini v. New York Times Co.*, 206 F.3d 161, 171 (2d Cir. 2000) (where the dispute was only over the scope of the license, "the copyright owner bears the burden of proving that the defendant's copying was unauthorized.").

The regional circuit law on this issue is most enlightening precedent that should be followed. The jury verdict cannot be reinstated, as Promega requests. Moreover, if for any reason there is a remand, this Court should clarify the proper allocation of the burden in its discretion.

## II. THE DISTRICT COURT DID NOT CLEARLY ABUSE ITS DISCRETION IN DENYING PROMEGA'S MOTION FOR A NEW TRIAL ON INFRINGEMENT AND DAMAGES

Promega has failed to prove that the district court clearly abused its discretion in denying its new trial motions.

Promega first argues that it is entitled to a new trial on infringement because the district court originally awarded it a summary judgment of an infringement violation under §271, only to later "whipsaw" it and unfairly withdraw the judgment.[12]  *See* Promega.Br.31-32.  Promega's position is meritless.  Promega never asked for a summary judgment of a statutory violation of §271 and its briefs did not mention §271(a) or its territoriality requirement.  Nor did its briefs include a substantive discussion of whether Life engaged in acts in the United States that would allow the Court to find a statutory violation of §271 for the accused sales.  *See generally* A688-703; A1541-1560.

As an inevitable consequence of this, the district court's summary judgment opinion does not even refer to §271(a) or address statutory violations thereof.  Rather the Court's summary judgment order simply lists five products and identifies the corresponding claims that were determined to read on those products—without ever addressing statutory violations of §271(a).  A31-32.  On these facts, Promega cannot legitimately contend that the district court's summary judgment ruling found a statutory violation of §271.  Rather, the district court's

---

[12] Promega even contends that in view of the district court's summary judgment ruling, "[it] had no reason to do what Defendants contend was necessary to preserve its rights, namely, seek specific jury instructions and questions on the existence of direct infringement under section 271(a)."  A2615.

summary judgment ruling was limited to just two issues: (1) whether the claims "read on" the accused kits, and (2) whether there was a license. *See* A21-26; *see also* A2532-2541 (detailed discussion of the scope of Promega's summary judgment briefing and the district court's order).

In fact, at trial, Promega acknowledged that the question of whether Life engaged in any liability-triggering acts under §271(a) was not resolved on summary judgment, but was properly before the jury. To wit, in response to Life's proposal to include a special verdict questionnaire on §271(a) infringing acts, Promega did not object on grounds that the issue had already been resolved at summary judgment, but ***conceded*** that this was an infringement issue for the jury that was better suited for a jury instruction.[13]    *See* A6310:7-A6311:4.    Just as

---

[13] Curiously, Promega contends that it was Life that "conceded" that the question of direct infringement had been answered at the summary judgment stage. Life made no such concession. Promega points primarily to statements by counsel for Life that the jury would need to decide willfulness and damages. *See* Promega.Br.29. However, as a necessary predicate to the determination of damages, the jury was obligated to assess whether and to what extent there were violations of §271. When Promega failed to present adequate evidence of §271 violations, Life brought a pre-verdict JMOL motion pursuant to Rule 50(a) directed to precisely this issue. *See* A2150:23-2151:12 ("They have to prove which sales or which products were made, used, sold or imported into the United States and there is simply no evidence of that."); *see also* A2151:24-2152:18. Thus, this Court should reject Promega's contention that Life "conceded" at trial that all of the §271 infringement issues had been resolved at summary judgment.

Promega suggested, this issue was in fact ultimately included in the jury instructions. *See* A2288.

Against this backdrop, the district court aptly described the basis for its summary judgment order as follows:

> Although plaintiff performs a detailed exegesis of the court's summary judgment opinion and its own summary judgment briefs in an attempt to show that the court resolved the issue of infringement at summary judgment, plaintiff never asked in its summary judgment motion that the court find that any particular act by defendants violated § 271(a) or § 271(f)(1) with respect to a particular accused product.

A2367.[14]  Simply put, Promega is wrong to contend that it received a summary judgment of a statutory §271 violation.  Its "whipsaw" argument in favor of a new trial on infringement should be rejected.

As to damages, Promega argues that it must be "offered" its choice of either a remittitur or a new trial because it supposedly proved at trial that there was *at least some* infringement by Life.  A9331 ("[I]t is well established that if there is *any* evidence of damages, a court may not reduce a jury's damage aware without offering the prevailing plaintiff a choice between a remittitur and a new trial.") (emphasis in original).  This is should be so, Promega contends, even though it did

---

[14] *See also* A2338-39 (district court explains that the question of statutory violations was reserved for trial, ruling that the "issue *at trial* was whether defendants had engaged in particular behavior that violated any provisions of the patent statute").

not provide sufficient evidence to support the only damages theory it pursued at trial.  Again, Promega misses the mark.

Promega is not entitled to a new trial because, as the district court correctly found, Promega "took an 'all or nothing' approach at trial," "made no attempt to quantify the sales of any subset of products," and "is not entitled to a do-over when it was plaintiff's own failure to request more specific findings in the verdict form that caused the problem."  A2359; A2365-67.  The district court did not unfairly reject Promega's motion because it was untimely under Rule 50(a), but rejected it on the merits because Promega's new post-verdict *damages theory* was untimely. As the court explained, "[a] party may not introduce evidence or make arguments in a Rule 59 motion that could or should have been presented to the court prior to judgment."  A2366.   Promega cannot show that the district court abused its discretion.

At bottom, Promega seeks a new trial on infringement and damages so that it may try a case it specifically chose not to try previously.  In addressing Promega's two new trial requests, it is important to understand Promega's "all or nothing" trial gambit—which necessarily entailed the possibility that Promega might prove *some* infringement but still not be entitled to a judgment—and how Promega was alerted early-on to the risks of this strategy.  Likewise, it is important to understand how, in these circumstances, Promega's claim that it was the "victim of surprise"

cannot be credited. With an understanding of this background, Promega's arguments in support of its two new trial requests are easily rebutted.

### A. PROMEGA'S "ALL OR NOTHING" TRIAL STRATEGY

At the infringement trial, Promega attempted to capture damages for every accused kit sold *worldwide*. But Life assembles the accused kits in England and sells them outside the United States. Consequently, for domestic sales, Promega was required to prove infringement violations under §271(a), based on its allegation that the kits were imported or sold in the United States. And for *non*-US sales, Promega was required to prove violations of §271(f)(1), based on its allegation that Life "induced" itself to assemble infringing kits abroad with components supplied from the United States.

As the district court observed, Promega "took an 'all or nothing' approach at trial." A2359. Rather than attempt to show specific sales of specific kits met the requirements of §271(a) or §271(f)(1), Promega "relied on the assumption that *all* of the accused products defendants sold during the relevant time frame . . . were made in the United States, imported into the United States or made with a substantial portion of components from the United States, as required by §271(a) and (f)(1)." A2334 (emphasis in original). Promega never informed the jury of the dollar value of Life's domestic sales and never suggested to the jury that it could quantify Life's domestic sales. Promega *prevented* the dollar value of Life's

domestic sales from being revealed to the jury. When Life sought to introduce evidence of U.S. sales through its head of product management, Guido Sandulli, Promega successfully objected *on the ground that it was irrelevant*. A6126:23-A6132:17 ("Q. What are the total U.S. sales of STR kits since 2006? A. It's about -. MR. TROUPIS: Objection. Relevance."). Promega successfully took the position at trial that the jury should not be allowed even to consider whether to find infringement and award damages on something less than all of Life's *worldwide* sales. Indeed, Promega asked the jury to take *all* of Life's $707 million in worldwide sales, "subtract out the permitted sales . . . made in accordance with the licensing agreement," and "multiply that by [Promega's] gross [profit] margin percentage" of 73.5%. *See* A5667:22-5669:13; A6424:3-6425:19. The jury apparently did exactly that. A201-03.[15]

Not only did Promega deprive the jury of evidence to consider what it now claims it should be permitted to prove, but Promega's proposed jury instructions and a verdict form gave the jury no choice. Life proposed instructions that distinguished between §271(a) and (f). It also proposed a special verdict question asking the jury to determine the "total dollar amount of sales of STR kits that were

---

[15] The jury deemed all of Life's worldwide sales to be "United States sales" (Question 2), subtracted out 90% for licensed sales (Questions 3-4), and multiplied by 73.5%, the alleged profit margin (Question 5).

made, used or sold in the United States, or imported into the United States."

A2433, A2441.  Promega proposed a verdict question designed to prevent the jury

from "attribut[ing]" sales to violations of §271(a) as distinguished from §271(f).

A201-204.  It referenced "United States sales," which the jury instructions defined

as:

> all kits made, used, offered for sale, sold within the United States or imported into the United States, as well as kits made outside the United States where a substantial portion of the components are supplied from the United States.

A2288.  Life objected to the verdict form precisely because it conflated §271(a)

and (f).  A6342-43.  Promega nevertheless embraced the verdict form.  A2488.

Promega's closing argument presented the jury with an "all or nothing"

decision.  Promega directed the jury to identify all accused sales without providing

any other option:

> [Y]ou'll see that Question No. 2 asks you very straightforwardly about the total amount of defendants' STR kits that were sold in the United States sales, as that term is used in the instructions. So it refers to the instructions to tell you whether they were United States sales, and then in the instructions it will tell you that if it's a substantial component, if it's a substantial component, then the sale is in the United States for purposes of Question No. 2. And so Question No. 2 becomes very straightforward. Now that you know that these critical components come from the United States for all of their kits, then you know the answer to Question No. 2, and that's 707 million dollars. Because Question No. 2 asks you: "What is the total dollar amount of defendants' sales of STR kits that were United States sales, as that term has been defined for you in the instructions." And the answer is 707, because all of them originated here, according to the testimony that you heard.

A6419:4-22.

Promega did not deny in its post-trial briefing that it took an "all or nothing" approach" at trial, and conceded that the verdict rose or fell based on whether the evidence supported that theory of the case. A2359 ("In responding to defendants' motion, plaintiff did not deny that it took an 'all or nothing' approach at trial"); A2340-41 ("Plaintiff does not dispute defendants' last point" that "defendants are entitled to judgment as a matter of law unless all of those sales fall under §271(a) or (f)(1)" so "I consider that to be conceded.").

### B. PROMEGA CANNOT CLAIM THAT IT WAS SURPRISED BY HAVING TO PRESENT EVIDENCE TO SUPPORT ITS "ALL OR NOTHING" TRIAL THEORY

Promega presented its "all or nothing" damages theory with full awareness of its risks. Indeed, at the close of Promega's case, again during Life's case, and a third time before the case was submitted, Life provided "fair warning that plaintiff should come forward with evidence supporting its trial theory before submitting its case to the jury." A2342. In its Rule 50(a) motion, Life explicitly argued "there's no evidence to th[e] effect" that Life "[m]ade, use[d], sold or imported into the United States" all the accused kits. A61886-10; *see also*; A5735:24-A5736:5 (Life's counsel stating that the "first issue I want to raise with the Court is a failure on the part of the plaintiffs to prove which products/sales are eligible for damages under Section 271(a). They have to prove which sales or which products were

made, used, sold or imported into the United States and there is simply no evidence of that.").

Importantly, after Life presented its Rule 50(a) motion at the close of Promega's case, the district court ruled that it was "not correct" for Promega to conclude that it was unnecessary to submit specific evidence regarding United States sales. The district court extended to Promega a full opportunity in its rebuttal case to correct any shortcomings in its proof of infringing acts:

> So the question is now what do we do about that, because I think clearly plaintiff thought that it didn't have to put in any more than it already had, and that's not correct. And I think the thing to do will be just to let you put that all in in your rebuttal case.

A6190:11-16. Promega nevertheless proceeded solely with its "all or nothing" theory, and decided ***not*** to present any damages theory based on United Staes sales alone. As excerpted above, its request for a worldwide damage award was the sole theory that Promega presented in its closing argument to the jury. A6419.

## C.  PROMEGA IS NOT ENTITLED TO A NEW TRIAL ON INFRINGEMENT

Promega contends that it is entitled to a new infringement trial because it was "unfairly made the victim of surprise" by the district court's conclusion that Promega was at fault for failing to "request more specific findings [on infringement] in the verdict form." *See* Promega.Br.32 (citing A2367). As Promega would have it, the district court granted it a summary judgment of a statutory violation of §271(a) as to all the accused kits. Promega contends that it

was thus under no obligation to request more specific findings on infringement at trial. Promega accuses the district court of "whipsawing" it and attempting to "rewrite the history of this case at the JMOL stage." Promega.Br.31-32.

Promega's "surprise" argument should be rejected flat out. As detailed above, Life raised a timely Rule 50(a) motion alerting Promega and the district court to Promega's failure to present evidence sufficient to establish specific statutory violations of §271 worldwide. *See* A2150:23-2151:12. In response, the district court permitted Promega to present in its rebuttal case any evidence it wished regarding specific statutory violations that would have supported the verdict. *See* A6190:11-16. Promega was undeniably put on full notice of its burden, and afforded every opportunity to meet that burden.

Promega's argument for a new trial on infringement fails because the district court did not abuse its discretion in denying the motion.

### D. PROMEGA IS NOT ENTITLED TO A NEW TRIAL ON DAMAGES

Having failed with its "all or nothing" damages theory, Promega now seeks a do-over. However, a new trial should not be granted "on the basis of a theory not urged at the first trial." Wright & Miller, Federal Practice & Procedure §2805. As the Seventh Circuit has "repeatedly held[,] post-judgment motions cannot be used to raise arguments or legal theories that could have been and should have been brought before judgment." This principle "strikes very deep," *U.S. v. Walton*, 909

F.2d 915, 924 (6th Cir. 1990), permeating the Federal Rules of Civil Procedure, *Riquelme Valdes v. Leisure Res. Grp., Inc.*, 810 F.2d 1345, 1357 (5th Cir. 1987), because trials impose high costs on courts, litigants, and the public. Case upon case thus establishes that regret of strategic decisions is not grounds for a new trial.[16] The principle is especially appropriate here because Promega did not

---

[16] *See, e.g., Anderson v. Flexel, Inc.*, 47 F.3d 243, 247 (7th Cir. 1995) (rejecting new theory urged for the first time post-judgment); *LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263, 1267 (7th Cir. 1995) (denying Rule 59(e) motion because "[w]hat is immediately apparent to us from the record is that LB Credit did not articulate its capital investment theory until after the court had already granted summary judgment"); *Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1347 (Fed. Cir. 2001) (affirming refusal to consider new damages theory, because "Dr. Tronzo made strategic decisions in the initial trial concerning what evidence and arguments to advance in support of his theory of damages."); *Penzoil Exploration & Prod. Co, v. Oxy USA*, 99 F.3d 1134 (5th Cir. 1996) ("Pennzoil insists that because Oxy has admitted that the mistakenly credited gas has some value that we must remand for a new trial on damages to determine the amount. However, . . . Pennzoil is not entitled to a new trial simply because its strategy in the first trial did not work."); *Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir. 1986) ("Mere dissatisfaction in hindsight with choices deliberately made by counsel is not grounds for finding the mistake, inadvertence, surprise or excusable neglect"); *Fedoryk v. Dudley*, 995 F.2d 1062 (4th Cir. 1993) ("We find this [forfeiture] rule especially compelling in a case such as this one, where Fedoryk made a decision to forego an argument he could have made at trial in favor of another argument, and, now that his trial strategy failed, he wants a new trial on the abandoned argument."); *Bloomberg v. Kronenberg*, 106-CV-0733, 2007 WL 218733 (N.D. Ohio Jan. 25, 2007) (denying motion for a new trial because "the theory that the Plaintiff advances through her post-trial motions differs substantially from the arguments she made at trial. As with a motion for a new trial, motions to amend are not intended to raise new arguments that should have been made prior to judgment."); *MCI Telecommunications Corp. v. Ameri-Tel, Inc.*, 91 C 4277, 1994

merely fail to urge the jury to award damages based on only U.S. sales. Promega affirmatively *prevented* the jury from receiving such evidence. It should not be heard to claim a *right* after-the-fact to present evidence to a jury that it fought to keep out.

Promega attempts to sidestep these core principles, providing five reasons why it supposedly deserves a new trial. In a nutshell, Promega argues that, although it did not present evidence sufficient to support its "all or nothing" damages request, the great weight of the evidence nonetheless supports *some* damages warranting a new trial. However, where, as here, the district court already found that the verdict winner lacked evidence sufficient to support its damages verdict, it is illogical to contend that the great weight of the evidence so strongly supports the verdict winner such that a new trial is warranted. Promega has failed to identify any authority that a verdict winner can obtain a new trial based on arguments about the weight of the evidence after it has lost a JMOL due to a lack of supporting evidence. The awkward posture of Promega's new trial request portends the weakness of its positions on the merits.

---

WL 405945 (N.D. Ill. July 29, 1994) ("It would be an abuse of this court's discretion to use Rule 59(e) as a safety-valve for ill-fated litigation strategies.").

### 1. EVEN IF PROMEGA PROVED "SOME" DAMAGES, IT IS NOT ENTITLED TO A NEW TRIAL

Promega argues that "a plaintiff who proves *some* damages but not as much as the jury awarded is entitled to a new trial or a remittitur." Promega.Br.36. Promega contends that it submitted "extensive evidence of U.S. sales" that the jury could have painstakingly pieced together like some crazy quilt on its own initiative according to a damages theory that Promega never presented. *See* Promega.Br.37(n.9). The evidence Promega identifies simply could not have been evaluated by a jury to produce a damages figure. The jury was not told by any competent witness how to piece together the documents upon which Promega now relies. Promega never explained how to piece out a United States damages figure from the documents for a simple reason: it strategically forced the jury to award damages based on worldwide sales.

Promega's primary hindsight evidence of United States sales between August 29, 2006 and 2007 consists of a spreadsheet with "over 3000 rows of U.S. sales between the fourth quarter of 2006 and the fourth quarter of 2007" for both accused and non-accused products, and a "Pivot" worksheet for 2005, 2006, and 2007 also for both accused and non-accused products. Promega.Br.14; A7051-7170; A7033-7050. According to Promega, the jury should have gone through each of the 3000+ spreadsheet rows, cross-referencing the list of accused products, A2495-96, to tabulate United States sales for a single year. While the "Pivot"

worksheet shows total United States sales for both accused and non-accused products in 2005, 2006, and 2007, A7033-7050, at best only the 2007 total would be within the damages period, and even then Promega ignores that the Pivot worksheet does not show actual sales figures, but rather figures translated into a 2008 Plan Code rate to enable comparison between "change in sales year on year[.]" A6263:10-22; A6259:9-11.

Promega skips over all damages for 2008. For 2009-2011, Promega primarily relies on three separate 10,000+ line spreadsheets. Promega.Br.15; A7362-7473; A7632-7744; A7906-8002. The exhibits do not identify the accused products by name, but rather use "Material" codes. Apparently, the jury on its own initiative was supposed to have gone through *thousands* of lines of these spreadsheets, surmised that material codes were the same as SKU numbers, cross-referenced SKU numbers buried on page 21 of a different trial exhibit, cross-referenced the accused products in the initial jury instructions, and tabulated United States sales for three additional years. *See generally* Promega.Br.15 (not citing any key for Material codes); A6263:10-18 (noting that the spreadsheets may contain non-accused products); A6266 (noting that PTX1312 "is a very similar type of report."); A7021 (showing SKUs). And even had the jury done that, the result would be meaningless, because the revenue reported in the spreadsheets is not the actual sales price. A6266:12-16.

Promega also cites an assortment of other exhibits and testimony that mix sales of accused and non-accused products, do not list any accused products, contain redundant and overlapping sales with other exhibits, fail to quantify sales, or contain sales outside the damages period, among other issues. Promega.Br.18-19. Absent from Promega's recitation of evidence is any theory or even suggestion to the jury that it should have sifted through this hodgepodge to quantify and award damages based on Life's United States sales. The closest thing to such a suggestion that Promega identifies is a vague comment made **to the judge in a sidebar** that "the jury will then get those and it can determine the sales." A9343 (citing A6254:11-12). At trial Promega relied on this evidence only to prove willful infringement via the mere fact of unlicensed sales. *See* A6419:23-6423:9; A5070:25-5071:14.

Likewise, regardless of whether there was evidence that some kits contained US-sourced primers and Taq polymerase, Promega made no effort at trial to quantify the sales figures for such kits or to otherwise link them to §271(f) violations. No reasonable jury would have isolated the sales figures for these few kits from the amount of total worldwide sales of all 17 kits—the only figure the jury was provided.

In short, if Promega had expected the jury to quantify Life's domestic sales, even as a fallback option, one would expect Promega to at least **mention** that

option to the jury and to produce a witness who could make sense of the documents upon which Promega now relies.

If the failure to provide the jury an opportunity to award a fraction of Promega's damages request according to the evidence was an error, it was ***Promega's*** error undeserving of relief. *See Int'l Travelers Cheque Co. v. BankAmerica Corp.*, 660 F.2d 215, 224 (7th Cir. 1981) ("It is well-settled law that a party cannot complain of errors which it has committed, invited, induced the court to make, or to which it consented."); *Tuttle v. Equifax Check*, 190 F.3d 9, 15 (2d. Cir. 1999) (plaintiff waived the right to allege error based on special verdict form where he: (1) "had earlier asked for a composite instruction similar to the one delivered"; (2) "never asked that the district court prepare separate interrogatories for each prong"; and (3) "never objected to the charge on this ground"); *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1213 (11th Cir.2011) ("someone who invites a court down the primrose path to error should not be heard to complain that the court accepted its invitation and went down that path").

None of Promega's cases address the key issue here: whether the plaintiff forfeited "arguments or legal theories that could have been and should have been brought before judgment." *Anderson*, 47 F.3d at 247. This case does not resemble Promega's primary authority, *Network Publications, Inc. v. Ellis Graphics Corp.*, 959 F.2d 212, 215-16 (11th Cir. 1992). There, the appeals court granted a new

trial where the district court did not "even realize[] that he had the discretionary power, on his own, to grant a new trial." The court did not address forfeiture, and emphasized that "[w]e do **not** hold that a district court that has set aside the verdict for insufficiency must grant a new trial rather than a judgment to the trial loser."

In *Firestone Tire & Rubber Co. v. Pearson*, 769 F.2d 1471, 1479-80 (10th Cir. 1985), the appeals court granted defendant's request for a new trial because plaintiff's expert "did not take into consideration costs the [plaintiff] saved," and "proof of damages was inherently difficult." Here, by contrast, Promega was not prevented from proving Life's domestic sales alleged to be infringing due to "inherent difficultly." *See* Promega.Br.40 ("any supposed defects in Promega's damages evidence can be easily remedied."). Promega **decided** against presenting such proof.

The remaining cases Promega cites are similarly irrelevant. They do not address forfeiture, but instead generally involve grants of defendants' motions for new trials based on arguments that "tainted" the jury's damages calculations. *E.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318-1321 (Fed. Cir. 2011) (granting defendant's request for a new trial due plaintiff's improper use of a $19 billion "check" under the entire market value rule that "tainted" the jury's damages award). The cases also emphasize the "extremely limited" review of the trial

court's denial of a new trial. *E.g.*, *In re Innovative Constr. Sys., Inc.*, 793 F.2d 875, 888 (7th Cir. 1986).

## 2. THE SEVENTH AMENDMENT DOES NOT REQUIRE A NEW TRIAL

Promega next makes a Constitutional argument, contending that "the district court's reduction of damages to zero violates the Seventh Amendment." Promega.Br.38. According to Promega, "[w]here there is evidence of some damages but not enough to support the entire verdict, a court ***must*** offer the prevailing party a new trial at which a new jury can determine damages afresh." *Id.*

Promega's constitutional argument simply ignores its forfeiture. Promega received its right to a jury ***on the legal theories and evidence it chose to present***. It is entitled to no more. That its theories and evidence proved deficient as a matter of law does not mean it is entitled to ***another*** jury based on theories and evidence it chose to forego. Promega's position that the Constitution requires a new trial whenever there is a scintilla of evidence to support a damages theory—even one deliberately avoided at trial—would create intolerable inefficiency and unfairness.

Promega's argument is unsupported by authority. This case is nothing like the primary cases Promega relies upon, *Hetzel v. Prince William County*, 523 U.S. 208, 209 (1998) and *Minks v. Polaris Industries, Inc.*, 546 F.3d 1364, 1370 (Fed. Cir. 2008). In those cases, the district courts impermissibly weighed the evidence

in performing their own damages calculation. Nothing even remotely similar happened here.

### 3. §284 DOES NOT JUSTIFY A NEW TRIAL

Promega contends that it is entitled to a new damages trial because §284 and the *Story Parchment* case require a plaintiff to be compensated for infringement, even when the exact amount of damages cannot be ascertained with certainty. Neither of these authorities applies.

Section 284 will not excuse a failure of proof as to the amount of damages. *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 895 F. 2d 1403, 1407 (Fed. Cir. 1990) ("The statute [35 U.S.C. § 284] requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute."). Here, Promega expressly rejected a reasonable royalty. *See* A6482:3-4 ("Royalties? Don't want them. Wouldn't have taken them. Don't expect them."). Nor is this a case where Promega tried to quantify Life's domestic sales, but failed to do so with "absolute exactness or mathematical precision" because "the tort itself is of such a nature as to preclude" that possibility, as in *Story Parchment*. Promega.Br.39. Indeed, Promega contradicts its own reliance on *Story Parchment* by arguing it could have "easily" quantified Life's domestic sales. Promega.Br.40.

### 4. THE DISTRICT COURT'S INITIAL DENIAL OF LIFE'S JMOL DOES NOT JUSTIFY A NEW TRIAL

Promega accuses the district court of misleading it by tentatively denying Life's JMOL motion on §271(f). A6344:25-6345:2 ("Well, I want to look a little more closely at that at a break perhaps, but at this point I'm going to keep the clause B in."). According to Promega, denying JMOL during trial not only prevents a court from granting it later, but is affirmatively misleading. Nonsense. Denial of a pre-verdict JMOL automatically reserves a later decision on the motion, *and* provides the non-movant with notice of the deficiencies in its case. Fed. R. Civ. P. 50(b); *Neely v. Martin K. Eby Constr. Co.*, 386 U.S. 317, 321 (1967) (later decision automatically reserved); *Benson v. Allphin*, 786 F.2d 268, 273-74 (7th Cir. 1986) (Rule 50(b) "provides the nonmovant with an opportunity to do what he can to remedy the deficiencies in his case" "before the jury retires to deliberate.").[17] More generally, confusion is not a cognizable basis for a new trial where the plaintiff fails to seek a continuance, or where the plaintiff has had an

---

[17] The cases Promega cites regarding erroneous jury instructions, *see* Promega.Br.39-40, have nothing to do with this case. *Promega* promoted the relevant jury instructions. Even if the district court had adopted an incorrect jury instruction at Promega's urging, the incorrect instruction would be not a basis to deny JMOL. *See, e.g.*, *Geldermann, Inc. v. Fin. Mgmt. Consultants, Inc.*, 27 F.3d 307, 313 (7th Cir. 1994) ("But in reviewing a judgment as a matter of law, we must apply the correct law, not the law on which the jury was instructed."); Wright & Miller, Federal Practice and Procedure §4478.6 (same).

opportunity to rectify the deficiencies in its case. Wright & Miller, Federal Practice and Procedure §2805. As Promega admits, it received such an opportunity. Promega.Br.14(n.3) ("U.S. sales had to be quantified" and it had an opportunity to do so.).

### 5. PROMEGA IS NOT ENTITLED TO A NEW TRIAL SOLELY BECAUSE IT MIGHT BE ABLE TO REMEDY ITS EVIDENTIARY DEFICIENCIES

Promega contends that "a new trial is warranted because any supposed defects in Promega's damages evidence can be easily remedied." Promega.Br.40. However, a new trial is never warranted based *solely* on the possibility that the loser may be able to remedy a defect in its case. Instead, a party must show *both* the ability to remedy defects, and more importantly unfairness, a miscarriage of justice, or exceptional circumstances that caused the defect in the first trial. *See Vulcan Eng'g Co. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1380 (Fed. Cir. 2002) ("A party must present its evidence at the trial, absent some extraordinary development or unwarranted surprise, by a party or the court, whereby justice requires redoing the trial.").

In sum, the district court had ample discretion to deny Promega's motion for a new trial, because the jury's legally unsupported verdict was the product of Promega's trial strategy, not surprise or unfairness.

## III. THE DISTRICT COURT PROPERLY DENIED PROMEGA'S MOTIONS FOR INJUNCTION, EXCEPTIONAL CASE, AND ENHANCED DAMAGES

Promega contends that this Court should remand this case "for consideration of Promega's injunction, exceptional case, and enhanced damages motions." Promega.Br.5.

However, Promega's request for a remand is based mainly on the false notion that §271(a) liability was resolved on summary judgment. The district court's order did *not* resolve the ultimate question of §271(a) liability for particular acts, did not give rise to an infringement judgment subject to "restoration," and certainly did not give rise to a ruling that properly supported motions for an injunction, exceptional case, and enhanced damages. *See supra* Part II. As the district court explained in denying Promega's injunction request, Promega never even asked for a summary judgment that "any particular act by defendants violated § 271(a) or § 271(f)(1) with respect to a particular accused product." A2367.

"The same is true of the jury verdict. Promega did not ask for a jury question on the extent to which defendants violated § 271(a) or § 271(f)(1) with respect to particular accused products." *Id.* As such, the district court properly vacated the jury's willfulness and damages verdicts; they are now invalid and without meaning. Whatever "implicit" findings those verdicts may have carried, the district court properly took them off the table, and they cannot now support an injunction, enhanced damages, or exceptional case finding.

Because the Court entered JMOL in Life's favor due to Promega's failure to support the verdict, Promega cannot demonstrate "the fundamental requirement that the plaintiff must have succeeded on the merits of his claim" to obtain permanent injunctive relief. *Plummer v. American Institute of Certified Public Accountants*, 97 F.3d 220, 230 (7th Cir. 1996) (internal quotations and brackets omitted).

Promega relies on *Lucent*, 580 F.3d at 1317, to argue that a finding of infringement can rest on a single instance of infringement. Promega.Br.28. *Lucent* is inapposite, however, because Promega never asked the jury to make any findings based on "single" or limited instances of infringement. Promega could have done so, but instead elected to "shoot for the moon" by pursuing a trial strategy that deliberately insisted on blurring the distinction between damages and infringement liability—under both §271(a) and §271(f)(1)—into a single question. Having chosen to proceed with that all or nothing strategy, there is no infringement judgment on which an injunction or exceptionality finding could rest. *See French*, 2012 U.S. Dist. LEXIS 42695, at *5 ("Relief from judgment is not available" where a party makes a "purely tactical" decision that it later regrets); *Nemaizer*, 793 F.2d at 62 (same).

Moreover, because the district court's summary judgment order contains no findings of "particular adjudicated infringing activit[ies]," crafting the scope of an

injunction would not be practical in any event. *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1344 (Fed. Cir. 2012) ("[C]ourts are frequently admonished not to issue sweeping injunctions against potentially infringing activities in patent cases, but to restrict the scope of the injunction to the particular adjudicated infringing activity").  In this regard, the district court was correct in concluding that there were "no findings . . . that would allow the court to determine what the proper scope of any injunction should be."  A2366-67. Likewise, with no valid damages verdict, it is impractical—indeed, impossible— for the Court to even entertain enhancing damages.

Accordingly, the district court properly found Promega's permanent injunction, enhanced damages, and exceptionality motions moot.

## CONCLUSION

For all the above reasons, the Court should (1) reverse the judgment of validity of the Promega patents; and (2) affirm the judgment of non-infringement under 35 U.S.C. §271(a) and (f)(1).

Dated: October 10, 2013                Respectfully submitted,

/s/ *Edward R. Reines*
Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8270

Bradford Paul Schmidt
LIFE TECHNOLOGIES CORPORATION
5781 Van Allen Way
Carlsbad, CA 92008
(760) 268-8315

*Counsel for Defendants-Appellants Life
Technologies Corp., Invitrogen IP Holdings,
Inc., and Applied Biosystems, LLC*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B). This brief contains 13,853 words as calculated by the "Word Count" feature of Microsoft Word 2010, the word processing program used to create it.

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

Dated: October 10, 2013          */s/  Edward R. Reines*

                                     Edward R. Reines
                                     *Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

This is to certify that on October 10, 2013, copies of the foregoing were served via the Court's CM/ECF on the following counsel for Plaintiff-Cross Appellant Promega Corporation:

> SETH P.WAXMAN
> Seth.Waxman@wilmerhale.com
> THOMAS SAUNDERS
> Thomas.Saunders@wilmerhale.com
> DINA B.MISHRA
> Dina.Mishra@wilmerhale.com
> WILMER CUTLER PICKERING
> HALE AND DORR LLP
> 1875 Pennsylvania Avenue, N.W.
> Washington, DC 20006
> (202) 663-6000
>
> MARK C. FLEMING
> Mark.Fleming@wilmerhale.com
> PROSHANTO MUKHERJI
> Proshanto.Mukherji@wilmerhale.com
> WILMER CUTLER PICKERING
> HALE AND DORR LLP
> 60 State Street
> Boston, MA 02109
> (617) 526-6000
>
> _/s/ Irina Khait_____
> Irina Khait
> Paralegal
> WEIL GOTSHAL & MANGES LLP
> 201 Redwood Shores Parkway
> Redwood Shores, CA 94065
> Telephone: (650) 802-3000